William HOLLAND, Petitioner,

v.

Martin HORN, Commissioner, Pennsylvania Department of Corrections; Philip L. Johnson, Superintendent of the State Correctional Institution, Greene County; and Joseph P. Mazurkiewicz, Superintendent of the State Correctional Institution at Rockview, Respondents

No. CIV.A. 99CV2551.

United States District Court, E.D. Pennsylvania.

April 25, 2001.

---

710

Ellen Berkowitz, David Wycoff, Matthew Lawry, Philadelphia, PA, for petitioner.

Thomas W. Dolgenos, David Curtis Glebe, Assist. Dist. Attorneys, Philadelphia, PA, for respondents.

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

## I. INTRODUCTION

This matter is before us pursuant to a Petition for a Writ of Habeas Corpus, filed by petitioner William Holland ("Petitioner") on January 14, 2000. Petitioner presents twelve claims in pursuit of relief from his state murder conviction and death sen-

tence under the Anti–Terrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254. Petitioner was arrested on August 14, 1984 and charged with burglary, robbery, attempted rape, attempted involuntary deviate sexual intercourse, and first degree murder arising from an incident in the home of Jewel Stevens ("Victim") on August 11, 1984. Alli B. Majeed, Esq. ("trial counsel") was appointed by the court to assist Petitioner in presenting his defense. Petitioner was found guilty by a jury on all charges in the Court of Common Pleas, First Judicial District of Pennsylvania, Trial Division, on June 12, 1985. The same jury fixed the penalty at death later that day in a bifurcated proceeding. Petitioner filed a timely appeal to the Pennsylvania Supreme Court, which was denied on May 20, 1988. *See Commonwealth v. Holland ("Holland I")*, 518 Pa. 405, 543 A.2d 1068 (1988). He was represented on direct appeal by Norris E. Gelman, Esq. ("appellate counsel").

On October 6, 1994, Petitioner filed a *pro se* petition for collateral post-conviction relief under the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 Pa. Cons.Stat. § 9541 *et seq.* On October 7, 1985, the PCRA court entered an order staying Petitioner's execution for ninety days, pending the filing of a counseled PCRA petition. Barnaby C. Wittles, Esq. ("PCRA counsel") was appointed to represent Petitioner in his post-conviction proceedings. Three evidentiary hearings were held in conjunction with Petitioner's claims for state post-conviction relief. The first was held on July 13, 1995, the second on December 14, 1995, and the third on May 22, 1996. Petitioner's post-conviction claims were denied in the Court of Common Pleas of Philadelphia County, Criminal Trial Division, on September 16, 1996.

Petitioner then filed a timely appeal to the Pennsylvania Supreme Court, which was denied on April 1, 1999.[1] *See Commonwealth v. Holland ("Holland II")*, 556 Pa. 175, 727 A.2d 563 (1999).

This case comes before us under § 2254 of the AEDPA, which permits federal courts to grant, under certain circumstances, a writ of habeas corpus to prisoners convicted in state court. Petitioner filed his Petition for a Writ of Habeas Corpus in this Court on January 14, 2000. His Petition was followed by a Memorandum of Law in Support of Petition for a Writ of Habeas Corpus on April 28 of that year. The Commonwealth submitted its Response to Petition for Writ of Habeas Corpus on November 15, 2000, to which Petitioner responded on March 12, 2001 with Petitioner's Reply Brief in Support of His Petition for Writ of Habeas Corpus. All papers were timely filed and have been considered herein. We have placed the burden of proof on Petitioner to establish by a preponderance of the evidence any or all of the twelve claims included in his Petition, and find that he has satisfied this burden with respect to one of his claims. We therefore vacate Petitioner's death sentence and remand his case to the Pennsylvania courts with an order that there be a resentencing.

## II. BACKGROUND

In the early morning hours of August 11, 1984, Petitioner entered the basement apartment of Jewel Stevens at 7829 Langdon Street in Northeast Philadelphia by cutting a screen and climbing through the window. (*See* N.T. 6/5/85, at 1.70–1.71.) Ms. Stevens, who was seventy-one years old, was asleep. After cutting the phone line, Petitioner proceeded to stab Ms. Stevens in her side and abdomen with an

---

1. Petitioner filed briefs in support of both his appeals to the Pennsylvania Supreme Court.

(*See* Br. Appellant 3/6/87 ("Holland I Brief"); Br. Appellant 6/13/97 ("Holland II Brief").)

onion peeler. (*See* N.T. 6/6/85, at 2.67.) She suffered a deep laceration on her right arm in an attempt to defend herself. (*See* N.T. 6/10/85, at 4.35.) Petitioner then forcefully removed Ms. Stevens' pajama bottoms, used them to tie her wrists together, and sexually assaulted her. (*See* N.T. 6/6/85, at 2.67–2.68.) He stuck Ms. Stevens' toes with straight pins, leaving one in her right foot. (*See* N.T. 6/6/85, at 2.4.) He took a few dollars from a table in the apartment and smoked a cigarette. (*See* N.T. 6/6/85, at 2.57, 2.68.)

At approximately 5 a.m., Betty Roman, Ms. Stevens' upstairs neighbor, was awakened by noises in Ms. Stevens' apartment, including the Victim's cries for help. Ms. Roman called the police. (*See* N.T. 6/5/85, at 1.44–1.49.) When he became aware of the police's arrival, Petitioner hid the bloody onion peeler above a neighbor's door and fled the building. (*See* N.T. 6/5/85, at 1.60–1.62.) Officer Randall Straw arrived on the scene first and tended to Ms. Stevens in her apartment. Officer Bridgette McGinnis arrived after Officer Straw, and proceeded to the back of the Ms. Stevens' apartment building, where she observed Petitioner for about twenty seconds before he fled. (*See* N.T. 6/5/85, at 1.101–1.110.) The next evening, Officer Mitsos, a member of the Sex Crimes Unit of the Philadelphia Police Department, received a call from Ms. Susan Dorfman. Ms. Dorfman identified a man named "Bill" who lived in the building behind Ms. Stevens', as the potential perpetrator. At approximately 1:30 a.m., Officer Mitsos went to the building behind Ms. Stevens' in an attempt to ascertain if anyone named Bill lived there. He met Petitioner, who successfully fled Officer Mitsos' pursuit. The building superintendent notified Officer Mitsos that Petitioner lived with there his mother, Ms. Pauline Rogers, and advised the officer that Petitioner may have gone to his grandmother's house. Officer Mitsos was, however, unable to locate Petitioner at his grandmother's house. (*See* N.T. 6/5/85, at 1.140–1.150.)

Two days later, on August 14, 1984, Officer Dennis Graeber, Petitioner's half-brother, informed Detective Joseph Descher that Petitioner was currently at his grandmother's house. Detective Descher proceeded to that location, where he found Petitioner and his grandmother. Detective Descher asked Petitioner to accompany him to the police station for questioning, making clear to Petitioner that he was under no legal obligation to do so. Petitioner agreed. (*See* N.T. 6/6/85, at 2.25–2.33.) When they arrived at the station, Officer Descher and his partner, Officer Schol, began to question Petitioner about the incident at Ms. Stevens' apartment. When Petitioner made it clear that he was in Ms. Stevens' apartment on the night of the attack, the officers read Petitioner his *Miranda* rights and recorded his full confession. (*See* N.T. 6/6/85, at 2.40–2.69.) On August 24, 1984, Jewel Stevens died from wounds sustained during the incident on August 11. (*See* N.T. 6/6/85, at 2.9.) Petitioner was charged with, among other things, the first degree murder of Jewel Stevens. He was convicted by a jury and sentenced to death. He has been denied relief from his conviction and sentence both on direct appeal and in state collateral proceedings under the PCRA. He now petitions this court for federal habeas corpus relief pursuant to § 2254 of the AEDPA.

## III. DISCUSSION

### A. Exhaustion

Before filing a petition for habeas corpus relief under 28 U.S.C. § 2254, a petitioner must exhaust all available state court remedies. 28 U.S.C. § 2254(b)(1)(A). The exhaustion requirement is a rule of

comity, not jurisdiction, *Castille v. Peoples*, 489 U.S. 346, 349, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989), and is designed to allow state courts the opportunity to correct a state's alleged violation of federal constitutional law before federal courts consider the matter. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844–45, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). "An applicant shall not be deemed to have exhausted the remedies available in the courts of the State ... if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c).

■ Exhaustion requires that petitioner fairly present his claims to every level of state court, including offering each claim for discretionary review by a State's highest court, and afford each reviewing court a fair opportunity to act on those claims.[2] *O'Sullivan*, 526 U.S. at 845, 119 S.Ct. 1728; *Picard v. Connor*, 404 U.S. 270, 275–76, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971).[3] The petitioner bears the burden of proving that he has exhausted available state remedies. *See Landano v. Rafferty*, 897 F.2d 661, 668 (3d Cir.1990); *Santana v. Fenton*, 685 F.2d 71, 73 (3d Cir.1982). The petitioner is not, however, required to revisit claims raised on direct appeal in state collateral proceedings, *see O'Sullivan*, 526 U.S. at 844, 119 S.Ct. 1728 (citing

*Brown v. Allen*, 344 U.S. 443, 447, 73 S.Ct. 397, 97 L.Ed. 469 (1953)), or seek alternatives to state habeas such as "a suit for injunction, a writ of prohibition, or mandamus or a declaratory judgment in the state courts." *Id.* (citing *Wilwording v. Swenson*, 404 U.S. 249, 249–50, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971) (per curiam)). If the petitioner is unable to prove that all claims in his petition satisfy the statutory exhaustion requirements, his entire petition must be dismissed without prejudice and returned to the state courts for consideration of the unexhausted claims. *Rose v. Lundy*, 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982); *Lines v. Larkins*, 208 F.3d 153, 159–60 (3d Cir.2000). In the absence of any colorable federal claim, unexhausted claims may be dismissed on their merits. *See Lambert v. Blackwell*, 134 F.3d 506, 515 (3d Cir.1997) (interpreting 28 U.S.C. § 2254(b)(2): "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

■ If, however, state procedural rules bar a petitioner from seeking further relief in state courts, "the exhaustion requirement is satisfied because there is 'an absence of available State corrective process.'" *McCandless v. Vaughn*, 172 F.3d

**2.** This requirement is currently being questioned in Pennsylvania with regard to non-capital cases. *See Mattis v. Vaughn*, 128 F.Supp.2d 249, 259 (E.D.Pa.2001) (upholding an order by the Pennsylvania Supreme Court making discretionary review by that court "unavailable" for purposes of federal habeas review). The Pennsylvania Supreme Court, however, exercises mandatory review of all death sentences, thereby making the order addressed in *Mattis* inapplicable here.

**3.** The Third Circuit has interpreted this standard and established four criteria to determine whether a federal claim is fairly presented when state court pleadings do not refer to

specific, appropriate portions of the Constitution:

(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir.1999) (quoting *Evans v. Court of Common Pleas, Del. County, Pa.*, 959 F.2d 1227, 1232 (3d Cir.1992)).

255, 260 (3d Cir.1999) (citing 28 U.S.C. § 2254(b)); *see also Gray v. Netherland,* 518 U.S. 152, 161–62, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996) ("Because [the exhaustion] 'requirement . . . refers only to remedies still available at the time of the federal petition,' it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law.' " (citations omitted)); *Coleman v. Thompson,* 501 U.S. 722, 732, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) ("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him.").

■ The Commonwealth argues that at least eight of Petitioner's twelve claims are not exhausted and are therefore not reviewable in federal court. It alleges that four of these claims, Claims I, II, IV, and VII, have been amended and are now so altered that they are not substantially equivalent to those presented in state court ("altered claims"). It further alleges that four other claims, Claims V, VI, VIII, and IX, were never presented in state proceedings at all ("omitted claims") and therefore remain unexhausted. (*See* Resp. Pet. Writ Habeas Corpus at 25.) We believe Petitioner's claims are exhausted under 28 U.S.C. § 2254 by virtue of their having been either fairly presented in state court or precluded from further state court review by an absence of available process. Petitioner is currently barred from pursuing state habeas review by state law under 42 Pa.C.S.A. § 9545(b)(1), which requires that all state habeas claims be presented within one year of the date that the judgment against Petitioner becomes final. A conviction is deemed final "at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review." 42 Pa.C.S.A. § 9545(b)(3). Because Petitioner's eligibility for certiorari to the United States Supreme Court expired on or about August 20, 1988, *see* 28 U.S.C. § 2101(d); Sup.Ct. R. 11, we find that Petitioner's omitted claims are precluded from state court review under 42 Pa.C.S.A. § 9545(b) and, therefore, that he has satisfied the exhaustion requirement of 28 U.S.C. §§ 2254(b) & (c) due to an "absence of available state corrective process." *McCandless,* 172 F.3d at 260 (citing 28 U.S.C. § 2254(b)).

## B. Procedural Default

■ A federal court may not, however, proceed to the merits of a claim simply because that claim satisfies the exhaustion requirement of 28 U.S.C. § 2254(b)(1)(A) and § 2254(c) because of a lack of available state process. Rather, "[i]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred." *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546; *see also Lines v. Larkins,* 208 F.3d 153, 160 (3d Cir.2000) (quoting *McCandless,* 172 F.3d at 260).

■ Like exhaustion, the procedural default doctrine is based on principles of comity, and is intended to "reduce[ ] friction between the state and federal court systems by avoiding the 'unseem[liness]' of a federal district court's overturning a state court conviction without the state courts having had an opportunity to correct the constitutional violation in the first instance." *O'Sullivan,* 526 U.S. at 844–45, 119 S.Ct. 1728. A claim is procedurally defaulted if the state court of last resort refuses to consider its merits. *See Ylst v. Nunnemaker,* 501 U.S. 797, 801, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) ("If the last state court to be presented with a particu-

lar federal claim reaches the merits, it removes any bar to federal-court review that might otherwise have been available."); *County Court v. Allen*, 442 U.S. 140, 152–53, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979) (finding that, because the trial court "ruled on the merits" rather than on some state procedural ground, that the court "implicitly decided that there was no procedural default").

We have noted that Petitioner is presenting four omitted claims and four amended claims to this court for review. Respondent argues that all of these challenged claims are procedurally defaulted and therefore precluded from review by this Court. Petitioner, however, presents three arguments in favor of federal review. First, he maintains that these claims were all reviewed on their merits by the Pennsylvania Supreme Court pursuant to 42 Pa. Cons.Stat. § 9711(h)(3)(i). Second, he contends that none of the aforementioned claims can properly be deemed procedurally defaulted because the state procedural rule forbidding court state consideration of them, 42 Pa. Cons.Stat. § 9545(b), is not an adequate and independent state ground barring collateral review. Alternatively, Petitioner argues that he can show cause and prejudice for failing to present the contested issues in state court.[4] We address the first two of these theories below, and find both of them unconvincing. Neither Petitioner's "automatic exhaustion" theory under § 9711(h) nor his claim that § 9545(b) is an inadequate procedural rule forbidding collateral review are consistent with the existing law of this circuit or with the overwhelming majority of federal cases in other circuits.[5]

### 1. *Automatic Exhaustion*

■■■ Petitioner asserts that none of his challenged claims are procedurally defaulted because the Pennsylvania Supreme Court considered all of them on their merits pursuant to 42 Pa. Cons.Stat. § 9711(h)(3)(i). Section 9711(h)(3)(i) requires that the Supreme Court of Pennsylvania review all death sentences to ensure that they were not the "product of passion, prejudice or any other arbitrary factor." This review is mandatory and does not depend on Petitioner's preservation of particular issues for appeal. *See id.* (referring to the Supreme Court's review of death sentences under this section as "automatic"). Many other states have similar mandatory review procedures. *See, e.g., Mu'min v. Pruett*, 125 F.3d 192, 197 (4th Cir.1997) (interpreting Virginia statute requiring review of death sentences for "passion, prejudice or any other arbitrary factor"); *Kornahrens v. Evatt*, 66 F.3d 1350, 1362 (4th Cir.1995) (addressing the scope of South Carolina's *in favorem vitae* review); *Nave v. Delo*, 62 F.3d 1024, 1039 (8th Cir.1995) (involving a Missouri statute requiring review of death sentences for "passion, prejudice or any other arbitrary factor"). According to Petitioner, the Pennsylvania Supreme Court's mandatory review of his death sentence under § 9711(h)(3)(i) "satisfies the exhaustion requirement for *all* record-based claims of constitutional error" as it provides the "state court system an opportunity to cor-

---

4. Petitioner's cause and prejudice arguments are addressed with respect to each individual claim, *infra* Part III.C.

5. Regardless of whether some parts of Petitioner's amended claims are not reviewable by this Court, we nonetheless remain obligated to address those arguments that were not procedurally defaulted. *Cf. Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982) (finding that a petition containing both exhausted and unexhausted, as opposed to procedurally defaulted and non-procedurally defaulted, claims must be dismissed from federal court).

rect its own constitutional errors." (Mem. Law Supp. Pet. Writ Habeas Corpus at 4 (citing *Preiser v. Rodriguez,* 411 U.S. 475, 490, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973)) (emphasis added).) Petitioner cites three cases in support of his "automatic exhaustion" theory, none of which represent binding authority in this circuit and all of which are distinguishable from the case at hand. The Commonwealth, however, cites case law within the Third Circuit as well as numerous analogous decisions from other circuit courts in opposition to Petitioner's argument. We find that Petitioner's challenged claims are not all "automatically exhausted" by virtue of the Pennsylvania Supreme Court's mandatory review of his death sentence under 42 Pa. Cons.Stat. § 9711(h)(3)(i).[6]

■ Petitioner first relies on the Supreme Court's decision in *Ake v. Oklahoma,* 470 U.S. 68, 74–75, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), for the proposition that mandatory state appellate review of trial records for "fundamental error" constitutes at least an implicit ruling on the merits of all potential constitutional issues. (*See* Mem. Law Supp. Pet Writ Habeas Corpus at 5.) Such a ruling on the merits preserves, according to Petitioner, the right to federal collateral review of those issues. *Ake,* however, did not address whether specific federal claims were fairly presented in state court. The Supreme Court in *Ake* focused instead on whether

state appellate review of a record for fundamental (constitutional) error was an independent and adequate state ground for decision, thus precluding United States Supreme Court jurisdiction.[7] *See Ake,* 470 U.S. at 75, 105 S.Ct. 1087. The *Ake* Court was not concerned with whether a state appellate review for fundamental error included every conceivable constitutional issue, and therefore refrained altogether from defining the breadth of such a review. This left open the possibility, particularly relevant in this case, that some potential federal claims were not considered in state court and therefore were not fairly presented for procedural default purposes, despite the statutory requirement that the state supreme court review the record for "fundamental errors."

Petitioner next cites the Ninth Circuit decision in *Beam v. Paskett,* 3 F.3d 1301 (9th Cir.1993), which concerned an Idaho mandatory appellate review statute nearly identical to the Pennsylvania statute applied here. The *Beam* court interpreted the Idaho statute to mean that the Idaho Supreme Court could, *sua sponte,* consider any constitutional errors evident in the trial record and that those issues would be deemed considered on the merits and exhausted for purposes of federal collateral review. *See id.* at 1306. Since we are not in the Ninth Circuit, we are not required to follow this decision. Furthermore, the

6. Our rejection of Petitioner's claim that § 9711(h) operates as a catch-all exhaustion mechanism does not preclude us from reevaluating the role of Pennsylvania's mandatory review provision with respect to individual claims. *See* discussion of Claims v. and VI, *infra* Part III.C.5–6.

7. The Supreme Court may not review state court decisions based on independent and adequate state grounds. *See Ake,* 470 U.S. at 75, 105 S.Ct. 1087; *Herb v. Pitcairn,* 324 U.S. 117, 126, 65 S.Ct. 459, 89 L.Ed. 789 (1945) ("We are not permitted to render an advisory

opinion; and if the same judgment would be rendered by the state court after we corrected its views of Federal laws, our review could amount to nothing more than an advisory opinion."); *Enterprise Irrigation Dist. v. Farmers Mut. Canal Co.,* 243 U.S. 157, 164, 37 S.Ct. 318, 61 L.Ed. 644 (1917) ("But where the non-Federal ground is so interwoven with the other as not to be an independent matter, or is not of sufficient breadth to sustain the judgment without any decision of the other, our jurisdiction is plain.").

Ninth Circuit refrained from basing its ultimate decision on such a theory. It instead decided the case on the grounds that Mr. Beam had explicitly challenged the Idaho death penalty statute on direct review in state court as "unconstitutionally arbitrary." *Id.* at 1305. The *Beam* court found that this language encompassed petitioner's federal habeas challenge to the constitutionality of the "continuing threat" aggravating circumstance, and therefore that Mr. Beam had exhausted his state court remedies by specifically presenting all of his federal claims in state court. *See id.* at 1305–06. Because the exhaustive effects of the Idaho Supreme Court's mandatory appellate review were never relied on to decide the case, the court's finding that the mandatory review statute satisfied petitioner's exhaustion requirement is merely dicta, and can be considered as no more than persuasive authority in this circuit in support of Petitioner's present case.

Finally, Petitioner argues that *Falcone v. Lewis,* 1994 WL 316022 (9th Cir.1994) (unpublished opinion),[8] also supports his automatic exhaustion theory. The court in *Falcone* held that "[w]hen a state court is required to review the record for federal constitutional error, even if the petitioner fails to properly raise that issue in state court, the state court's determination that there was no such error constitutes a decision on the merits of the petitioner's claim." *Id.* at *3. The statute at issue, Ariz.Rev.Stat. § 13–4035,[9] required the Arizona Supreme Court to review the record of every death penalty case for any

fundamental (constitutional) errors. By contrast, § 9711(h)(3)(i) requires only that the Pennsylvania Supreme Court review the "sentence of death" for "passion, prejudice or any other arbitrary factor." This more limited review distinguishes Petitioner's case from *Falcone* by implying that § 9711(h)(3)(i) does not encompass as broad a review of Petitioner's potential constitutional claims as § 13–4035.

Although the Third Circuit itself has never addressed the issue of § 9711(h)(3)'s effect on the exhaustion doctrine, the Commonwealth relies on case law from other district courts within the circuit as well as holdings from the Pennsylvania Supreme Court and an analysis of legislative intent to demonstrate that § 9711 is not a vehicle for blanket exhaustion of post-conviction constitutional claims.

In *Banks v. Horn,* 49 F.Supp.2d 400 (M.D.Pa.1999), the district court clearly set out both of Respondent's arguments regarding the exhaustive effect of § 9711(h). Although the court acknowledged that the Pennsylvania statute contained language identical to the statute at issue in *Beam,* it went on to note that "the Supreme Court of Pennsylvania has never held that, if it affirms a conviction and sentence under this provision [§ 9711(h)(3)(i) ], all constitutional claims should be deemed to have been resolved against the defendant". *Id.* at 406 (citing *Commonwealth v. Paolello,* 542 Pa. 47, 665 A.2d 439, 454 n. 12 (1995) ("[W]e decline counsel's invitation to scour the record for additional errors caused by

---

**8.** The Eighth Circuit has recently raised the question whether the judicial power granted in Article III of the Constitution requires that unpublished circuit court opinions be considered binding precedent within their jurisdictions. *See Anastasoff v. United States,* 223 F.3d 898, *vacated as moot,* 235 F.3d 1054 (8th Cir.2000). The Third Circuit, however, has yet to raise such an issue regarding unpub-

lished decisions. Furthermore, even if *Falcone* were published, it is a Ninth Circuit opinion, and therefore is no more than persuasive authority with respect to our current decision.

**9.** This provision of the Arizona code has since been repealed by Ariz.Rev.Stat. § 13–198 (1995).

counsel and *sua sponte* raise said issues [under § 9711(h) ]; the request is inappropriate and nonsensical in that such advocacy would be beyond the scope of our appellate review.")). Rather, the state supreme court's mandatory review generally seems to be for a sufficiency of the evidence." *Id.* (citing *Commonwealth v. Thomas,* 552 Pa. 621, 717 A.2d 468, 473 (1998) ("We first note that this Court is required to review the sufficiency of the evidence to sustain a conviction for first degree murder in every case in which the death penalty has been imposed.")); *see also Commonwealth v. Clark,* 551 Pa. 258, 710 A.2d 31, 34 (1998) ("In all cases where the sentence of death has been imposed this court will conduct an independent review of the sufficiency of the evidence supporting the verdict . . . ."); *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982) ("While appellant does not contest the sufficiency of the evidence to sustain a conviction of murder in the first degree, this Court will nevertheless review for sufficiency . . . 42 Pa.C.S.A. § 9711(h)."). Petitioner's challenged claims do not address the sufficiency of the evidence or the arbitrariness of his death sentence, and therefore do not fall within the scope of the Pennsylvania Supreme Court's mandatory review under § 9711(h)(3)(i).

Numerous other circuit courts have likewise concluded that mandatory state statutory review of death sentences does not constitute automatic exhaustion of all of a petitioner's constitutional claims. *See, e.g., Smith v. Moore,* 137 F.3d 808, 821 (4th Cir.1998) (citing *Kornahrens v. Evatt,* 66 F.3d 1350, 1362 (4th Cir.1995) ("Even with *in favorem vitae* review, unless the prisoner raises the specific objections before the state court, we cannot determine whether the state court has properly applied federal constitutional principles, or for that matter, whether the state court has even considered these issues at all.")); *Mu'min v.*

*Pruett,* 125 F.3d 192, 197 (4th Cir.1997) (finding that Virginia statute requiring review of death sentences for "passion, prejudice or any other arbitrary factor" did not include all possible constitutional claims for purposes of determining procedural default); *Nave v. Delo,* 62 F.3d 1024, 1039 (8th Cir.1995) (finding that a Missouri statute requiring state supreme court review of death sentences for "passion, prejudice or any other arbitrary factor" does not mandate that the court "review death penalty cases *sua sponte* for constitutional or instructional errors that are not specified in the direct appeal"); *Julius v. Johnson,* 840 F.2d 1533, 1546 (11th Cir.1988) ("[T]he assertion by an Alabama court that it did not find any errors upon its independent review of the record does not constitute a ruling on the merits of claims not raised in that court or in any court below.").

The structure of the PCRA itself also makes it extremely unlikely that the Pennsylvania legislature intended for § 9711(h)(3)(i) to trigger the "automatic exhaustion" result Petitioner desires. Pennsylvania statute 42 Pa. Cons.Stat. § 9543(a)(3) states that "[t]o be eligible for relief under this subchapter, the petitioner must plead and prove . . . [t]hat the allegation of error has not been previously litigated or waived." Section 9544 goes on to explain that "an issue has been previously litigated if . . . the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." Petitioner's automatic exhaustion theory cannot be valid within the current structure of the PCRA, because application of the theory would make § 9544 unnecessary. If the Supreme Court's mandatory review of death sentences for "the product of passion, prejudice or any other arbitrary factor" is said to represent a decision by that court on

the merits of all of Petitioner's potential constitutional claims, then collateral review in death penalty cases would never be available under § 9543(a)(3); all of Petitioner's potential claims would be precluded from such review for being previously litigated. We are forced to conclude that § 9711(h)(3)(i) was not meant to eradicate all state collateral review in capital cases, and cannot therefore accept Petitioner's interpretation of the exhaustive effect of § 9711(h)(3)(i).

In short, Petitioner's reliance on 42 Pa. Cons.Stat. § 9711(h)(3)(i) to prove exhaustion of his challenged federal habeas claims is mislaid. We, as well as other district courts in the Third Circuit and circuit courts interpreting similar statutes around the nation, have concluded that mandatory state supreme court review of death sentences for "passion, prejudice or any other arbitrary factor" does not constitute a review on the merits of all of Petitioner's potential constitutional claims.

## 2. Independent and Adequate Grounds

■ If Petitioner's omitted or altered claims were not fairly presented and exhausted in state court, our review of those claims is barred by the doctrine of procedural default if state court review of those claims is precluded by an independent and adequate state procedural rule. *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). A state procedural rule is considered independent if it does not rely on the merits of a federal claim or "rest[ ] its decision primarily on federal law." *Harris v. Reed*, 489 U.S. 255, 260–61, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *see also Ford v. Stepanik*, 1998 WL 297626, at *3 (E.D.Pa. June 2, 1998). Such a rule is adequate under the procedural default doctrine if it is "firmly established and regularly followed" within the state. *James v. Ken-*

*tucky*, 466 U.S. 341, 348, 104 S.Ct. 1830, 80 L.Ed.2d 346 (1984); *see also Ford v. Georgia*, 498 U.S. 411, 423–24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991) (stating that a state procedural rule may not be adequate if "the defendant ... could not be 'deemed to have been apprised of its existence'"); *Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988) ("[A] state procedural ground is not 'adequate' unless the procedural rule is 'strictly or regularly followed.'" *Barr v. City of Columbia*, 378 U.S. 146, 149, 84 S.Ct. 1734, 12 L.Ed.2d 766 (1964).). *But see Jamison v. Collins*, 100 F.Supp.2d 521, 559 (S.D.Ohio 1998) ("A state procedural rule that was not firmly established *at the time it should have been complied with* by the petitioner, and therefore is applied retroactively, is not an adequate state ground that bars federal habeas review."). The phrase "firmly established and regularly followed" requires that a petitioner have some sort of notice, at the time of his state court procedural default, of a state procedural rule's potential impact on his case before that rule can be considered adequate. *See Ford v. Georgia*, 498 U.S. at 423–24, 111 S.Ct. 850; *N.A.A.C.P. v. Alabama*, 357 U.S. 449, 457, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) ("[A] local procedural rule, although it may now appear in retrospect to form part of a consistent pattern of procedures ... cannot avail the State here, because petitioner could not fairly be deemed to have been apprised of its existence. Novelty in procedural requirements cannot be permitted to thwart review in this Court ...."); *Cabrera v. Barbo*, 175 F.3d 307, 313 (3d Cir.1999) ("The reason for these requirements is that a petitioner should be on notice of how to present his claims in the state courts if his failure to present them is to bar him from advancing them in a federal court."). The Third Circuit found this notice requirement satisfied when a presid-

ing judge in a collateral proceeding specifically asked a petitioner if he had anything else to present. *Cabrera*, 175 F.3d at 313 (finding that petitioner had "ample opportunity" to present his defaulted claims in state court because "the judge at the hearing repeatedly gave Cabrera, who was present at the hearing, an opportunity to say 'anything' ").

 Petitioner contends that none of his claims are procedurally defaulted because the PCRA's one year filing limit, 42 Pa. Cons.Stat. § 9545(b)(1), which precludes him from currently pursuing his challenged claims in state court, is not an independent and adequate state procedural rule sufficient to foreclose federal post-conviction review. (*See* Mem. Law Supp. Pet. Writ Habeas Corpus at 7–12.) Section 9545(b) was enacted on November 17, 1995, and became effective on January 16, 1996. It states that "[a]ny petition under [the PCRA] . . . shall be filed within one year of the date the judgment becomes final."[10] Section 9545 is clearly an independent state ground for reviewing habeas corpus claims, as it does not rely on feder-

al law for its determination of the availability of state post-conviction review. The parties do not dispute this conclusion.

The question before us, then, is whether § 9545 represents an adequate procedural rule, pursuant to which Petitioner should have sought state post-conviction review of his challenged claims before presenting them for the first time in federal court. More specifically, the debate centers around the notice afforded Petitioner regarding the application of § 9545(b)'s one year time limit for filing state habeas claims. Petitioner argues that § 9545(b)'s filing limit is not an adequate state ground barring adjudication of his claims because it effectively foreclosed his ability to present claims to the state court retroactively; the provision's one year filing limit became effective on January 16, 1996 and immediately barred any claim, according to Petitioner, filed after August 15, 1989, or one year after his state court conviction became final. This set of circumstances, argues Petitioner, did not present sufficient notice to satisfy the adequate and independent state ground requirement of the procedural default doctrine.[11]

---

**10.** The statute includes three exceptions to the one year filing limit, 42 Pa. Cons.Stat. § 9545(b)(1)(i-iii), but Petitioner admits that none of them apply here. (*See* Mem. Law Supp. Pet. Writ Habeas Corpus at 8.)

**11.** Petitioner also implicitly relies on the Pennsylvania "relaxed waiver" doctrine to demonstrate his lack of notice regarding the preclusive effects of § 9545(b) on his future collateral claims. Under the "relaxed waiver" doctrine, the Pennsylvania Supreme Court reserved its discretion "to address all issues arising in a death penalty case, irrespective of a finding of waiver." *Commonwealth v. Travaglia*, 541 Pa. 108, 661 A.2d 352, 356 n. 6 (1995). Petitioner suggests that the doctrine's existence led him to believe that his state collateral claims would be preserved despite his violation of § 9545(b), and that he therefore was without proper notice of the statute's potentially preclusive effect. Although Petitioner is correct in citing the exis-

tence of such a doctrine prior to the PCRA amendments of November 17, 1995, the doctrine appears to have been eradicated by the language of those amendments, which state that "[e]xcept as specifically provided otherwise, all provisions of this subchapter shall apply to *capital* and noncapital cases." 42 Pa. Cons.Stat. § 9542 (emphasis added). The Pennsylvania Supreme Court verified this interpretation in *Commonwealth v. Peterkin*, 554 Pa. 547, 722 A.2d 638 (1998), in which it upheld the constitutionality of the 1995 PCRA amendments against challenges that they could not, in conjunction with the relaxed waiver doctrine, provide reliable notice of the availability of state collateral review. The clear language of the 1995 amendments, in conjunction with the Pennsylvania Supreme Court's ruling that the relaxed waiver doctrine could not trump the statute's authority, leads us to conclude that Petitioner could not have justifiably relied on the relaxed waiver

The Commonwealth, however, claims that Petitioner did in fact have adequate notice to file his challenged claims under § 9545(b), as there existed a sixty-day window of opportunity from November 17, 1995, when § 9545(b) was enacted, until it took effect on January 16, 1996, during which Petitioner could have amended his initial state petition to include the challenged claims without running afoul of the statute's one year time limit. Such an amendment would not have been particularly arduous for Petitioner to seek, argues the Commonwealth, because during this sixty-day notice period, Petitioner was already involved in evidentiary hearings in state trial court pursuant to his initial PCRA petition. Amendment at that stage of the proceedings would not have delayed or interrupted the proceedings at all, but rather simply introduced additional issues that could have been made available for hearings themselves. Respondent also argues that such an amendment would have likely been permitted, noting that the presiding judge specifically asked Petitioner if he had "anything further" to raise in conjunction with his petition, and explained that it might well be his "very last opportunity in life" to do so. (N.T. 12/14/95, at 100.)

Two district court cases have addressed the adequacy of § 9545(b) as a grounds for finding procedural default, and have come to seemingly conflicting conclusions. In *Banks v. Horn*, 49 F.Supp.2d 400 (M.D.Pa. 1999), the petitioner made a claim of inadequacy very similar to the one Petitioner makes here. Banks argued that § 9545(b) was not an adequate ground on which to find procedural default because it was applied "retroactively" to prevent state court review of his collateral claims. *See Banks*, 49 F.Supp.2d at 403. The court, however, found that the relevant date for examining

the applicability of § 9545(b) was not the one year filing limit after Banks' conviction became final, but rather the date on which he filed a second PCRA petition. Since this was after the effective date of § 9545(b), it assured that the statute only be applied prospectively. The court determined that § 9545(b) was an adequate state procedural ground for denying state court review because it was not the retroactive application of a new statute that prevented Banks from having his claims heard in state court, but instead his "failure to raise the claims in the approximately 13 years that they were available for raising that prevented him from pursuing them. That period included the 60 day window of opportunity in which it was clear (due to the passage of the amendments to the PCRA) that the time for filing a petition would not be unlimited." *Id.* at 405; *see also Catanch v. Larkins*, 1999 WL 529036, at *7 (E.D.Pa. July 23, 1999) ("As the judgment against [petitioner] became final on November 18, 1990, ... the statute of limitations [§ 9545(b)] would bar a PCRA petition filed after November 18, 1991. There is no indication that the Pennsylvania courts do not apply this rule consistently, and the rule is thus an adequate and independent state ground for denying habeas relief." (citation omitted)).

Other circuit court decisions have come to similar conclusions. *See, e.g., Glover v. Cain*, 128 F.3d 900, 902 (5th Cir.1997) ("A state procedural rule enjoys a presumption of adequacy when the state court expressly relies on it in deciding not to review a claim for collateral relief."); *Hornbuckle v. Groose*, 106 F.3d 253, 255–56 (8th Cir.1997) (finding that a state procedural rule requiring petitioner to file collateral claims concurrently with his direct appeal was

doctrine as grounds for withholding his state

post-conviction claims.

adequate under the procedural default doctrine because petitioner had at least four months within which to file a valid state claim and failed to do so); *O'Dell v. Netherland*, 95 F.3d 1214, 1241 (4th Cir.1996), *aff'd*, 521 U.S. 151, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997); *Duvall v. Purkett*, 15 F.3d 745, 748 (8th Cir.1994) (holding that petitioner's confusion as to the applicability of a 90–day time limit for filing state collateral claims does not excuse his procedural default because "such confusion should have persuaded [petitioner] to file a state habeas petition," rather than do nothing and wait for a possible default); *Barksdale v. Lane*, 957 F.2d 379, 382–83 (7th Cir.1992) (finding that the retroactive application of a shortened statute of limitations was not a freakish or unexpected occurrence under state law, and therefore that petitioner's failure to comply with the statute constituted procedural default). *But see Moore v. Parke*, 148 F.3d 705, 710 (7th Cir.1998) (concluding that, in case where new state procedural rule required collateral claim to be raised on direct appeal after petitioner's direct appeal was already completed, such a procedural rule was an inadequate ground for state post-conviction relief and procedural default will not preclude federal review of such claim).

A more recent decision in another district court, however, arrived at a slightly different result. In *Whitney v. Horn*, No. 99–1993 (E.D. Pa. June 7, 2000), petitioner Raymond Whitney included in his federal habeas petition numerous claims not presented in any state proceedings. He argued that these claims were not procedurally defaulted because the state provision denying him access to state review, § 9545(b), was not an adequate state ground on which to base such a finding of default. The court recognized the applicability of the statute and the opportunity for amendment during the sixty-day window of opportunity between the statute's enactment and its effectiveness. *See id.* at 11–12. The court distinguished *Banks*, however, on the grounds that, unlike Banks, Whitney had a petition for collateral relief pending before the Pennsylvania Supreme Court during the sixty-day window of opportunity, and that filing a second petition while another is pending is forbidden under Pennsylvania law. *See id.* at 14 ("The 60 day window between passage and the effective date of the PCRA amendments was of no help to Whitney because his first petition was pending during that period."); *Commonwealth v. Lark*, 560 Pa. 487, 746 A.2d 585, 588 (2000) ("[W]hen an appellant's PCRA appeal is pending before a court, a subsequent PCRA petition cannot be filed until the resolution of review of the pending PCRA petition by the highest state court in which review is sought ....."). Under the facts in *Whitney*, the petitioner was not afforded an adequate opportunity to pursue state review of his collateral claims because of the difficulties in amending a petition once it has reached the state supreme court: "Not giving [Whitney] a grace period before the revised PCRA took effect runs afoul of the fair notice requirement enunciated by the Supreme Court in *Ford* and by our Court of Appeals in *Cabrera*." *Whitney*, No. 99–1993, at 14.

In the case at hand, any attempt by Petitioner to raise his challenged claims in state court was clearly barred when § 9545(b) took effect on January 16, 1996. Petitioner's conviction became final long before that on August 15, 1988, and the one year filing limit had long since run on August 15, 1989. Nevertheless, Petitioner had a PCRA proceeding underway in state court during the sixty-day window of opportunity between the enactment and effective date of § 9545(b). Unlike *Whitney*, the proceeding was before a state trial

court during that window, thereby making it relatively easy for Petitioner to amend his petition within the statutory restrictions. The Pennsylvania Supreme Court expressly pointed out that, despite its holding that a petitioner could not file a subsequent PCRA petition while one was pending in state court, it "will not preclude a trial court from granting leave to amend a PCRA petition that is currently pending before that court." *Lark*, 746 A.2d at 588 n. 2. Furthermore, we believe and find that in December 1995, during the window of opportunity, the trial court judge brought this issue squarely to Petitioner's attention when he asked Petitioner during his initial PCRA hearings if he had anything else he would like to present and explained to Petitioner that this opportunity may be Petitioner's last to raise further issues in a collateral proceeding. (*See* N.T. 12/14/95, at 100.) This warning was couched in terms which any lay person could not fail to understand.

Petitioner's case is much more closely analogous to *Banks* than to *Whitney*. Banks had notice of § 9545(b) and sufficient opportunity to file any eventually defunct claims before the statute became effective. By contrast, Whitney faced much greater legal and practical obstacles to amending his PCRA petition before the sixty-day notice period expired. We find that our present Petitioner, Mr. Holland, had adequate opportunity to include his claims in his first petition for state collateral relief. Not only was he better able to amend his claims than Whitney, Petitioner was specifically warned by the trial judge at his state PCRA hearings that he may have no future opportunity to be heard. This warning satisfies the fair notice standards set forth by the Supreme Court in *Ford* and by the Third Circuit in *Cabrera*. In short, § 9545(b) was an adequate state procedural ground upon which Petitioner should have sought timely relief in state court.[12]

## C. Petitioner's Substantive Claims

### 1. General Standards of Review

Having rejected both of Petitioner's theories of complete exhaustion of all claims, we will move on to analyze each of his twelve claims individually. In so doing, we will examine any portions of each claim that may have been procedurally defaulted in state court to determine if cause and prejudice exists to excuse the default and permit us to address the issue on its merits.

 Federal review of defaulted claims is prohibited, unless Petitioner is able to "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law."[13] *Cole-*

---

12. Because we reach the conclusion here that § 9545(b) is an independent and adequate state ground precluding federal review of Petitioner's omitted claims, we do not address the otherwise relevant question of whether Petitioner likewise waived his right to have these claims heard under 42 Pa. Cons.Stat. § 9544(b). We also recognize that our ruling comes while the Third Circuit is in the process of reviewing *Whitney*. In recognition of the severity of the death penalty, and because we do not know what position the Third Circuit will take in *Whitney* or how broad that ruling will be, we will review each of Petitioner's claims on the merits.

13. Another exception to the procedural default doctrine is recognized in cases where preclusion of federal review would result in a "fundamental miscarriage of justice." *Murray*, 477 U.S. at 495, 106 S.Ct. 2639. This is a particularly rare exception, applicable only in cases "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.* at 496, 106 S.Ct. 2639. Actual innocence alone, however, is not a cognizable claim for habeas relief; petitioner must instead "*supplement[ ]* his constitutional claim with a colorable showing of factual innocence." *Herrera v. Collins*, 506 U.S. 390, 404, 113 S.Ct. 853, 122 L.Ed.2d 203

*man*, 501 U.S. at 750, 111 S.Ct. 2546. The Supreme Court has since identified three circumstances in which procedural default may be excused for cause: (1) if the "factual or legal basis for a claim was not reasonably available to counsel," (2) if some "interference by officials made compliance [with state procedural rules] impracticable," or (3) "if the procedural default is the result of ineffective assistance of counsel." [14] *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). If cause is established, a petitioner must then also demonstrate actual prejudice as a result of the procedural default. Actual prejudice requires that the petitioner "shoulder the burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S.

152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) (emphasis in original). Petitioner does not contend that either of the first two circumstances demonstrating cause are relevant to his claims, and we agree and so find. He instead relies solely on assertions that his trial and appellate counsel were constitutionally ineffective in not raising his defaulted claims. (*See* Mem. Law Supp. Pet. Writ Habeas Corpus at 12–13.) We will therefore limit our analysis of Petitioner's defaulted claims to the adequacy of his legal representation.[15]

effective assistance of counsel is a violation of the Sixth Amendment, which guarantees every defendant "[i]n all criminal prosecutions .. the Assistance of Counsel for his defense." A showing of ineffective assistance requires satisfaction of two components. First, counsel must have been so deficient that his "representation fell below an objective standard of

---

(1993) (emphasis in original). To establish actual innocence due to errors at trial, "the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). This represents a "stronger showing than that needed to establish prejudice." *Id.* In order to demonstrate actual innocence as a result of errors committed at sentencing, "one must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found petitioner eligible for the death penalty under the applicable state law." *Sawyer v. Whitley*, 505 U.S. 333, 336, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). Petitioner does not claim that any of his defaulted constitutional claims would result in a "colorable claim of factual innocence," and we therefore find that no miscarriage of justice existed with respect to any of those claims. *Id.* at 339, 112 S.Ct. 2514.

14. The AEDPA has, in some circumstances, eliminated the cause and prejudice exception to procedural default in lieu of a more deferential standard of review for all capital habeas claims arising under § 2254. *See* 28 U.S.C. § 2264. This standard only applies,

however, to convictions in states that satisfy the criteria set forth in 28 U.S.C. § 2261. Since Pennsylvania does not satisfy these criteria, we therefore continue to apply the traditional cause and prejudice analysis in Petitioner's case. *See Death Row Prisoners of Pennsylvania v. Ridge*, 106 F.3d 35, 36 (3d Cir.1997).

15. Because we find that Petitioner fairly presented claims of ineffective assistance of trial and appellate counsel in his state collateral proceedings, he may therefore argue that such deficient representation amounts to an appropriate ground for finding cause. *See Edwards v. Carpenter*, 529 U.S. 446, 120 S.Ct. 1587, 1591, 146 L.Ed.2d 518 (2000) (" '[A] claim of ineffective assistance' ... generally must 'be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.' " (quoting *Murray v. Carrier*, 477 U.S. 478, 489, 106 S.Ct. 2639 (1986))); *Holland II*, 727 A.2d 563, 565 (Pa.1999) (acknowledging that Petitioner "asserts that both his appellate counsel and his trial counsel were ineffective"); (Br. Appellant 6/13/97, at 44–45).

reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Second, a petitioner must show that counsel's "deficient performance prejudiced the defense." *Id.* In determining whether counsel acted reasonably, there remains a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. 2052; *Diggs v. Owens*, 833 F.2d 439, 444–45 (3d Cir. 1987). Counsel's actions are evaluated " 'on the facts of the particular case, viewed as of the time of counsel's conduct.' " *Lockhart v. Fretwell*, 506 U.S. 364, 371, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (quoting *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052). A lack of success is not proof of unreasonableness, *see Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, and strategic and tactical decisions are not grounds for an ineffective assistance claim unless counsel displayed "ineptitude, inexperience, lack of preparation or unfamiliarity with basic legal principles." *Commonwealth of the Virgin Islands v. Weatherwax ("Weatherwax I")*, 20 F.3d 572, 579 (3d Cir.1994), *rev'd on other grounds, Commonwealth of the Virgin Islands v. Weatherwax ("Weatherwax II")*, 77 F.3d 1425, 1435 (3d Cir.1996).

Prejudice exists if there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052; *see also United States v. DeRewal*, 10 F.3d 100, 104 (3d Cir.1993) (defining prejudice as deprivation of "a trial whose result is reliable"). A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. Outcome determination is not, however, the sole consideration in establishing prejudice. "[T]he 'benchmark' of an ineffective assistance claim is the fairness of the adversary proceeding." *Nix v. Whiteside*, 475 U.S. 157, 175, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986). In order to establish prejudice as a result of deficient representation, a defendant must demonstrate that "counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Lockhart*, 506 U.S. at 369, 113 S.Ct. 838 (citing *Kimmelman v. Morrison*, 477 U.S. 365, 374, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986)). The prejudice standard applied in the ineffective assistance context is nearly identical to the actual prejudice standard for excusing a procedural default articulated in *Coleman*. As a result, we may rely on any findings of prejudice within our ineffectiveness inquiry to satisfy any claims of actual prejudice to Petitioner. Furthermore, the standard used to determine ineffective assistance as grounds for cause is identical to that applied with respect to substantive claims for relief under the Sixth Amendment. As a result, we rely on our above explanation of the *Strickland* standard in all our ineffective assistance inquiries.

If we do find sufficient cause and prejudice to excuse procedural default, then those federal habeas claims that were not submitted to state adjudication should be reviewed by us *de novo*. *See, e.g., Hameen v. State of Delaware*, 212 F.3d 226, 248 (3d Cir.2000) ("[U]nder the AEDPA the limitation on the granting of an application for a writ of habeas corpus is only 'with respect to any claim that was adjudicated on the merits in state court proceedings.' Hence we exercise pre-AEDPA independent judgment …."); *Smallwood v. Gibson*, 191 F.3d 1257, 1264 (10th Cir.1999) (finding that under AEDPA "we are generally subject to two different frameworks of review, depending upon whether the state courts addressed the

merits of the claim for relief. If the state courts have not heard the claim on its merits, we review the district court's legal conclusions de novo and its factual findings, if any, for clear error"); *Appel v. Horn*, 1999 WL 323805, at *5 (E.D.Pa. May 21, 1999) ("By the statutory terms, however, AEDPA ... appl[ies] only when the issue facing the reviewing court has been 'adjudicated on the merits in State court proceedings.' When the state court fails to reach the merits of an issue presented to a federal habeas court, AEDPA's deferential standards do not apply ... The district court must, therefore, 'exercise plenary review over state court conclusions on mixed questions of law and fact and pure issues of law,' as the court would have done prior to the enactment of AEDPA."). Of course if cause and prejudice are not present, we cannot review the defaulted portions of a claim and may examine only the remaining exhausted portions in accord with the AEDPA.

Under the AEDPA, a petitioner may not be granted federal habeas relief if his claims were adjudicated on the merits in state court, unless the state court decision was

> (1) ... contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
> (2) ... based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Factual issues decided by the state court "shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).[16]

The "threshold question under AEDPA is whether [petitioner] seeks to apply a rule of law that was clearly established at the time his state court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000). An existing federal law is "clearly established" unless it either "breaks new ground or imposes a new obligation on the States," *id.* at 1495, or was not "dictated" by precedent existing when the petitioner's conviction became final. *Id.; see also Teague v. Lane*, 489 U.S. 288, 301, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). The fact that a federal standard "of necessity requires a case-by-case examination of the evidence, obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established' by this Court." *Williams*, 120 S.Ct. at 1512 (citation omitted) (finding the *Strickland* standard for ineffective assistance of counsel to be clearly established).

A state court decision is contrary to federal law "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams*, 120 S.Ct. at 1523. "[I]t is not sufficient for the petitioner to show merely that his interpretation of Supreme Court precedent is more plausible than the state court's; rather,

---

**16.** If no state court record exists with respect to a petitioner's claims, a federal evidentiary hearing may be held on the matter only if the petitioner satisfies two narrow criteria. First, he must show that his claim relies on either a new, retroactive constitutional law that was previously unavailable, or a factual predicate that could not, with the exercise of due diligence, have been previously discovered. Second, the petitioner must establish that the facts supporting his claim are sufficient to establish, by clear and convincing evidence, that but for constitutional error no reasonable fact-finder would have found him guilty of the underlying offense. 28 U.S.C. § 2254(e)(2).

the petitioner must demonstrate that Supreme Court precedent *requires* the contrary outcome." *Matteo v. Superintendent, SCI Albion,* 171 F.3d 877, 888 (3d Cir.1999). It is likewise not necessary for a petitioner to cite factually identical Supreme Court precedent. He may instead rely on a Supreme Court rule that, by virtue of its factual similarity or intention to apply to variant factual situations, "can fairly be said to require a particular result in a particular case." *Id.* at 888–89.

A state court adjudication is an "unreasonable application" of clearly established federal law if the court "identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams,* 120 S.Ct. at 1523. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was *objectively unreasonable.*" *Id.* at 1521 (emphasis added). Although the term "unreasonable" is often difficult to define, the most important distinction is that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 1522 (emphasis in original). A state court decision cannot be found unreasonable unless, "evaluated objectively and on the merits, [it] resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." *Matteo,* 171 F.3d at 890. The Third Circuit is of the view that in evaluating reasonableness, federal habeas courts are not precluded from considering the decisions

of lower courts. *Matteo,* 171 F.3d at 890 (citing *O'Brien v. Dubois,* 145 F.3d 16, 25 (1st Cir.1998)). In fact, such lower court decisions may serve as "helpful amplifications" of Supreme Court precedent. *Id.*[17]

### 2. Claims I and II

Petitioner's Claims I and II raise two main claims: ineffective assistance of counsel; and an assertion that Petitioner was denied his Fifth Amendment right to a court-appointed defense expert to assist in developing mental health defenses at trial. (*See* Pet. Writ Habeas Corpus at 5–31, 63–81.) Petitioner offers seven subclaims in support of his two main claims. Six of these subclaims address the ineffectiveness of counsel. He argues that his trial counsel was ineffective (1) for failing to obtain potentially helpful records; (2) for failing to investigate, develop, and present expert testimony; (3) for failing to properly interview and present testimony from Petitioner's family and other acquaintances; (4) for presenting harmful arguments and evidence on Petitioner's behalf; (5) for improperly investigating and introducing the testimony of two lay witnesses about Petitioner's level of intoxication on the night of Jewel Stevens' murder; and (6) for making inaccurate and prejudicial statements in association with Petitioner's intoxication defense at the penalty phase. The seventh subclaim argues that Petitioner was denied his Fifth Amendment due process right to a court-appointed defense mental health expert for assistance in developing trial defenses. Respondent argues that both of Petitioner's main claims are defaulted at

---

**17.** Other circuits take the view that only Supreme Court opinions constitute clearly established federal law for purposes of § 2254(d)(1). *See, e.g., Hernandez v. Johnson,* 248 F.3d 344, 362–63 (5th Cir.2001) (Dennis, J., dissenting) ("[T]he source of clearly established law is restricted by section 2254(d)(1) to the Supreme Court's jurisprudence.");

*Doan v. Brigano,* 237 F.3d 722, 729 (6th Cir. 2001) ("[W]e may not 'look to lower federal court decisions in deciding whether the state decision is contrary to, or an unreasonable application of, clearly established federal law.'" (quoting *Herbert v. Billy,* 160 F.3d 1131, 1135 (6th Cir.1998))).

least in part because they contain "different facts and legal theories" from those presented in prior state proceedings.[18] We find that Petitioner did raise the first two subclaims in state court. (*See* Holland II Brief at 12–38.) They were in turn decided on their merits under federal and state law and, as a result, are properly before this court for review under § 2254 of the AEDPA. *See Duncan v. Henry*, 513 U.S. 364, 365–66, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995).

Petitioner did not, however, present any of the five remaining subclaims in state court. Both on direct appeal and in his state collateral proceedings, he failed to argue that his trial counsel was ineffective at sentencing due to his failure to properly interview Petitioner's family and friends, his introduction of arguments and evidence harmful to Petitioner's defense, his misuse of two intoxication witnesses, or his and the trial court's inaccurate and prejudicial statements regarding Petitioner's intoxication. He likewise failed to present to the state courts that he was allegedly denied his Fifth Amendment right to a court-appointed defense expert. We find that Petitioner procedurally defaulted these issues by failing to present them in state court. Petitioner nonetheless contends that these five defaulted subclaims are properly before this Court because he can demonstrate cause and actual prejudice to excuse his default.[19] *See Coleman*, 501 U.S. at 750, 111 S.Ct. 2546.

a. Defaulted Ineffectiveness Subclaims

 Petitioner's third subclaim is that his trial counsel was ineffective at the penalty phase of his trial for failing to proper-

ly interview and present testimony from Petitioner's family members and other acquaintances. Although he failed to present this claim in state court, Petitioner argues that it is properly before this Court for review because his appellate counsel was constitutionally ineffective for failing to raise it on appeal, thereby demonstrating cause and prejudice for Petitioner's default. We reject Petitioner's contention that his appellate counsel was constitutionally ineffective on the ground that the underlying claim against his trial counsel is completely meritless. *See Strickland*, 466 U.S. at 691, 104 S.Ct. 2052 (finding that counsel cannot be ineffective for failing to raise a meritless claim). Trial counsel did interview multiple members of Petitioner's family in preparation for the penalty phase. He presented testimony from Petitioner's mother, grandmother, and a neighbor and family friend in an attempt to establish Petitioner's history of mental illness and substance abuse and bolster his case for mitigation in sentencing. Nevertheless, Petitioner claims that counsel asked too few questions of his witnesses, and argues that counsel should have uncovered that Petitioner's mother drank during her pregnancy, that his stepfather was a "cruel, alcoholic gambler," and that Petitioner's basic physical needs were not provided for as a child. (Mem. Law Supp. Pet. Writ Habeas Corpus at 31–33.)

We find that Petitioner's trial counsel took adequate steps to introduce testimony from family members that would serve as evidence of mitigating circumstances in the eyes of the sentencing jury. This ap-

---

18. Respondent neglected to point out precisely which differences it relied on for this position. Due, however, to the importance of this case, we elected to perform our own analysis of Claims I and II for exhaustion and procedural default purposes.

19. We do not mention the miscarriage of justice exception here because Petitioner presents no evidence of actual innocence. *See supra* note 12.

proach was not objectively unreasonable. Although more could have perhaps been done, it remains very much in question whether further actions would have served counsel's ultimate purpose, or would have instead given the appearance of a laundry list of unconvincing arguments, presented to the jury as part of a last-ditch, desperate attempt to establish any and all possible mitigating factors. Counsel's decision to focus on the most reliable and sincere accounts of Petitioner's childhood and background was well within the broad range of conduct granted a presumption of effectiveness under *Strickland*. Because trial counsel's method of eliciting testimony from Petitioner's family was not the product of ineptitude, inexperience, or a lack of knowledge or preparation, we dismiss Petitioner's argument that counsel was ineffective on this ground on its merits. Because we find that trial counsel was not constitutionally ineffective, appellate counsel cannot be ineffective for failing to raise such a claim. No cause is therefore available to excuse Petitioner's procedural default of this issue, and Petitioner's subclaim (3) is thus not entitled to federal review.

Petitioner next contends in subclaim (4) that his trial counsel was constitutionally ineffective for making arguments and introducing evidence at sentencing that proved harmful to Petitioner's defense. Petitioner cites seven separate examples of such conduct, none of which were presented in state court. Petitioner, however, contends that he can demonstrate cause and prejudice for his default through the ineffective assistance of his appellate counsel in failing to challenge his trial counsel's conduct on direct appeal. Because we find that all seven of Petitioner's arguments are entirely without merit, we in turn conclude that they cannot be grounds for finding cause, as counsel cannot be found ineffective for failing to raise meritless claims. *See Strickland,* 466 U.S. at 691, 104 S.Ct. 2052.

Petitioner asserts in his first example that his trial counsel was somehow deficient for referring to the Commonwealth's attorney as "my respected friend," "my respected colleague," and "my learned friend." (Mem. Law Supp. Pet. Writ Habeas Corpus at 39.) Petitioner argues that an attorney is not permitted to vouch for her own integrity, and therefore that vouching for one's opponent is equally prejudicial and represents a constitutionally deficient performance. (*See id.* (citing *United States v. Pelullo,* 964 F.2d 193, 218 (3d Cir.1992) (finding the prosecutors may not vouch for their own integrity)).) In order for such a finding to be made, however, Petitioner must demonstrate that his counsel "fail[ed] to subject the prosecution's case to meaningful adversarial testing." *United States v. Cronic,* 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Our independent review of the record shows that Petitioner's trial counsel did no such thing.[20] He never actually affirmed his opponent's credibility before the jury. In fact, in his closing argument, trial counsel called both the witnesses and counsel for the Commonwealth liars. (N.T. 6/11/85, at 5.33, 5.35, 5.39, 5.42, 5.44–5.45, 5.48–5.53, 5.74, 5.76.) Petitioner's counsel knows full well that trial counsel's references to opposing counsel were simply a common form of trial courtesy. In our view such remarks only serve to increase a lawyer's credibility with a jury and introduce a degree of proper demeanor, calm, and professionalism into a trial.

---

**20.** We are permitted to review the record independently in this instance, as opposed to through the AEDPA's strict standard of review, because subclaim (4) was never presented in state court.

Such an atmosphere helps to prevent a jury from being swept up by emotion, rather than to create prejudice. Petitioner's argument is at best borderline frivolous. We do not find that trial counsel acted unreasonably or that his statement in any way prejudiced his client's position. In turn, no cause exists to excuse Petitioner's procedural default of this issue and we are thereby precluded from reviewing it on its merits.

Petitioner's second example of trial counsel's detrimental representation focuses on counsel's stipulation to statements made by the victim, Jewel Stevens, to police from her hospital bed on the morning of August 11, 1984. (*See* N.T. 6/7/85, at 3.49.) Counsel permitted police officers to read the statements into the record in front of the jury. Petitioner argues that counsel permitted the introduction of otherwise inadmissible hearsay statements that were inflammatory and prejudicial to Petitioner's defense. Petitioner fails to recognize two circumstances, however, that support trial counsel's decision to admit the statement. First, Petitioner's primary defense at the guilt stage of the proceeding was mistaken identity. His trial counsel permitted the victim's statement to be entered into the record because it further demonstrated the Victim's inability to identify her assailant; she was unable to describe the man who attacked her in any detail. (*See id.* at 3.50, 3.56–3.57, 3.59.) By preserving this uncertainty on the record, defense counsel was able to strengthen his client's misidentification defense. Second, counsel permitted the statement into evidence because he did not want to seem as if he were hiding some important information from the jury. Ms. Stevens' statement added little to the medical reports and signed confession already presented as evidence against Petitioner. By refraining from disputing what was an essentially redundant account of information already available, counsel was able to present himself as forthcoming and cooperative, two qualities that any attorney would like to convey to a jury. We find that trial counsel's strategic decisions to permit the victim's statement to be read to the jury were not unreasonable or the product of ineptitude or unfamiliarity with the facts or legal principles relevant to Petitioner's case. We likewise find that Petitioner was not unduly prejudiced by the statement's introduction. As a result, trial counsel was not constitutionally deficient in failing to object to the introduction of such statement, and therefore no cause exists to excuse Petitioner's procedural default of this issue. This question may not be submitted for federal habeas review.

Third, Petitioner cites as an example of his counsel's harmful tactics counsel's reference during the penalty phase to the Victim's age, her family, and to the terrible nature of the crime. Trial counsel acknowledged to the jury that they may be influenced by the age of the victim and that they may also be inclined to grant a harsher sentence out of "sympathy" or "outrage" as a result of the violent nature of the crime. Petitioner argues that counsel's references incited the jury toward an outcome detrimental to Petitioner's defense, and that such conduct, if performed by a prosecutor, would constitute reversible misconduct and ineffective assistance of counsel. (*See* Mem. Law Supp. Pet. Writ Habeas Corpus at 40 (citing *Commonwealth v. Fisher*, 545 Pa. 233, 681 A.2d 130, 145–48 (1996) and *Commonwealth v. McNeil*, 545 Pa. 42, 679 A.2d 1253, 1259–60 (1996)).) Petitioner fails to recognize, however, that after confronting these rather obvious facts trial counsel went on to argue strongly against the jury's succumb-

ing to emotional reactions.[21] Counsel's recognition of the harsh realities of the case and of the jury's potentially severe reaction to those circumstances was an attempt at placating any vindictive or aggressive feelings by the jury toward Petitioner. By acknowledging the emotional aspect of his client's case, counsel was better able to expose any of the jurors' potentially damaging tendencies and to convince them that following such visceral reactions was not the most appropriate way to decide Petitioner's fate. Furthermore, the effects of such statements are obviously completely different when uttered by defense counsel as opposed to a prosecutor. We find that trial counsel was not at all unreasonable in his decision to be honest with the jury about the victim's age and the severity of the crime at issue. This was a strategic decision designed to secure the jury's trust, and Petitioner presents no evidence convincing us that decision was the product of either incompetent or inadequate representation. Trial counsel was therefore not constitutionally ineffective, and no cause exists to excuse Petitioner's default of this argument in state court. We are, as a result, without authority to review this issue.

Petitioner's fourth example argues that trial counsel was ineffective at the guilt phase of the proceeding for permitting evidence that Petitioner was guilty of multiple uncharged offenses. According to Petitioner, counsel's failure to object to two different witnesses' implications that Petitioner was a suspect in a "series of burglaries in the area that were similar to th[e] type of offense" Petitioner had been convicted of in the past added weight to the Commonwealth's position that the (d)(9) aggravating circumstance applies.[22] Petitioner further highlighted the fact that counsel, in his closing argument at the penalty phase, referred to Petitioner's past convictions as "rather light sentences" in an attempt to establish that counsel was ineffective for acting to Petitioner's detriment.

We find that counsel was not constitutionally ineffective for choosing not to object to the aforementioned testimony, as his decision was actually part of his overarching trial strategy. Detectives Descher and Schol testified at trial that Petitioner had recently been in jail for a robbery conviction and that they were aware of numerous recent burglaries in Petitioner's neighborhood. They also testified that they wanted to talk to Petitioner about these burglaries because he previously fled from police and "may have known something about the[m]." (N.T. 6/6/85, at 2.29.) Under cross-examination, however, both detectives admitted to simply wanting to garner information from Petitioner; neither ever referred to him as a suspect in

---

21. In his closing argument, Petitioner's trial counsel made the following plea to the jury: "Out of outrage, I suppose, for the act itself and out of sympathy for the family of the victim, you [members of the jury] may deem it appropriate in your own minds, that [Petitioner] should not get life imprisonment. I urge you to keep in mind that [Petitioner is] a young man. That this is his first conviction for any kind of violent crime. He also has a mother. And while you shed a tear for the mother, these members of the Court, on this side of the court, I ask you to think of [Petitioner's] mother on that side of the court. While you think of the age of this unfortunate

victim, I ask you to think of the age of [Petitioner's] surviving grandmother." (N.T. 6/12/85, at 6.24–6.25.)

22. The (d)(9) aggravating circumstance requires the jury to consider, if established beyond a reasonable doubt, whether the defendant "has a significant history of felony convictions involving the use or threat of violence to the person" when determining whether a defendant should receive the death penalty. 42 Pa. Cons.Stat. § 9711(d)(9).

the robberies or claimed to have questioned him about anything other than why he fled from a prior encounter with police. (*See* N.T. 6/6/85, at 2.75, 2.77, 2.78, 2.83, 2.147.) Trial counsel's acceptance of the detectives' testimony reinforced his misidentification and scapegoat defenses. Counsel intended to demonstrate to the jury that the investigating officers knew of Petitioner's prior record and that their desire to question him despite being unable to connect him directly to the crime was solely a product of their singling Petitioner out as a suspect in the attack on Jewel Stevens without proper foundation. Counsels' failure to object therefore represents a valid strategic decision designed to impugn the investigatory motives of the two detectives and create doubt in the jury's mind as to the true identity of the victim's attacker. Such a tactical choice is not the product of ineptitude, inexperience, or a lack of preparation or adequate legal knowledge, and therefore deserves considerable deference from this court under *Strickland* and *Weatherwax I*, 20 F.3d at 579. Furthermore, due to our conclusion that trial counsel's decision may have assisted Petitioner's defense, we find that counsel's actions were not unduly prejudicial to that defense.

With regard to Petitioner's allegation that his trial counsel was ineffective at sentencing for referring to Petitioner's prior sentences as "rather light," we find that counsel had ample strategic justification for such comments and therefore that he was also not constitutionally ineffective on that ground. Counsel mentioned the leniency of Petitioner's prior sentences for robbery to demonstrate that Petitioner had never been convicted of a crime as serious as the one he was charged with in this case. (*See* N.T. 6/12/85, at 6.26.) This point is consistent with counsel's strategy at the penalty phase, which relied in part on the uncharacteristic nature of Petition-

er's conduct to support his argument for mitigation on the grounds of mental infirmity. We find that counsel's attempt to strengthen his mental health defense by showing that the crime at issue in this case was out of character for Petitioner is a reasonable tactical choice within the Sixth Amendment's broad range of acceptable legal representation. Petitioner's argument that this choice may have supported the Commonwealth's argument in favor of an aggravating circumstance under (d)(9) does not change the fact that counsel acted within his professional discretion in permitting the jury to hear certain evidence. Counsel did not perform deficiently or unduly prejudice Petitioner. As a result, Petitioner's claim that cause and prejudice exist excusing his state court default of this issue is rejected, and his argument is found inappropriate for federal review under 28 U.S.C. § 2254.

Petitioner's fifth example insists that his trial counsel was ineffective for using inflammatory and prejudicial language in describing the crime to the jury. Petitioner rests his argument on the fact that "these statements were made by defense counsel in a case where the evidence was overwhelming that Mr. Holland was the assailant." (Mem. Law Supp. Pet. Writ Habeas Corpus at 41.) What Petitioner fails to acknowledge, however, is that trial counsel made a decision to pursue a defense of misidentification. Although Petitioner argues that overwhelming evidence existed that Petitioner was the assailant, he does not address the presence of even more overwhelming evidence that the crime was brutal and violent. Accounts from police at the scene, as well as numerous medical reports and the statement of the victim herself describe a horrific scene in Jewel Stevens' apartment on the morning of August 11, 1984. (*See, e.g.,* N.T. 6/5/85, at 1.72–1.75; N.T. 6/6/85, at 2.4–2.11; N.T.

6/7/85, at 3.47–3.49, 3.55–3.59.) Any attempt to prove otherwise would have seemingly been an exercise in futility; Petitioner's trial counsel was left with little choice but to argue that his client was not the man at the scene.[23] Recognizing the seemingly obvious fact that the crime committed against Jewel Stevens was brutal and cruel, counsel continuously presented evidence to the jury that Petitioner was not the assailant, arguing that Petitioner's prior criminal record served as evidence that such a brutal, violent crime was completely out of character for him.[24] (*See, e.g.*, N.T. 6/12/85, at 6.26.) This decision was not unreasonable and did not unduly prejudice Petitioner. Counsel attempted to further an understandable defense strategy by admitting to the jury that which they already knew. Any attempt to argue otherwise ran the risk of seeming disingenuous and desperate. We find that Petitioner's trial counsel was not ineffective by virtue of his description of the crime against Jewel Stevens, and therefore that Petitioner is unable to demonstrate cause for his procedural default. We are therefore barred from further review of this issue.

■ Sixth, Petitioner offers as an example of his trial counsel's ineffectiveness his counsel's comments to the jury at the penalty phase regarding Petitioner's choice not to testify. At the trial's outset, Petitioner stated on the record that he did wish to testify on his own behalf. (*See* N.T. 6/5/85, at 1.3–1.5.) He later changed his mind. At the close of the penalty phase, Petitioner's counsel explained on the record that Petitioner had changed his mind and no longer wished to testify. (*See* N.T. 6/12/85, at 6.22–6.23.) Petitioner now claims that such an explanation by counsel constituted a violation of his Fifth Amendment right against self-incrimination under *Griffin v. California*, 380 U.S. 609, 614, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). We find that Petitioner's counsel was not ineffective for failing to raise such a claim. Petitioner's public insistence that he testify required an explanation by counsel when Petitioner changed his mind. Not presenting such an explanation may have led the jury to believe that Petitioner had been scared by something that happened at trial or had given up in his attempt to prove either his innocence or the presence of mitigating circumstances. By entering a brief explanation on the record, counsel tried to alleviate any speculation as to why Petitioner never took the stand. We find that this was a reasonable tactical decision under *Strickland.* We likewise find that Petitioner was not prejudiced by counsel's actions, as it would have been obvious to

---

**23.** We do not intend to establish, nor are we required to do so under *Strickland,* that Petitioner's trial counsel made the correct decision in focusing on a misidentification defense. We make the point that counsel had few other defenses available to him as part of our conclusion that counsel was reasonable in his decision to present a particular argument to the jury. It is counsel's reasonableness, not his ability to make an objectively correct decision in every circumstance, that is relevant under the Sixth Amendment. *See Strickland,* 466 U.S. at 688, 104 S.Ct. 2052.

**24.** It is this approach that distinguishes trial counsel's actions from those found constitutionally inadequate in those cases cited by

Petitioner. Petitioner cites, among others, *Buehl v. Vaughn,* 1996 WL 752959, at *37–38 (E.D.Pa. Dec.31, 1996) as a case in which an attorney's improper characterizations of his client or the crime in question constituted unconstitutional representation. Each of the cases cited by Petitioner, however, involve situations in which counsel failed to present any mitigating evidence and even went as far as to disparage their client and encourage the jury to deliver a sentence of death. Because we find that trial counsel did present evidence in mitigation and did advocate vigorously for Petitioner, these cases are distinguishable and therefore not at odds with our decision here.

the jury that Petitioner failed to testify and, as a result, extremely unlikely that trial counsel's comments in any way affected the jury's decision or compromised the adversarial process required by the Sixth Amendment. Because we find that trial counsel was not constitutionally ineffective for explaining Petitioner's decision not to testify to the jury, we also find that Petitioner is unable to show proper cause for his procedural default. Petitioner's argument is therefore inadmissible before this court.[25]

Petitioner's seventh and final example of his trial counsel's harmful conduct focuses on the language in counsel's closing argument. Petitioner objects to his counsel's comments that

Now, sometimes it is argued that the whole purpose that should appreciate you to pass the death penalty, that is the victim, whoever he or she may be will never change. That is why it is introduced records of his past, so we show you that this is the way he has been in the past. And if you are to say that he should get a life sentence, he will never change. Should he ever get out of prison, this is the way he will be in the future. That, really, is the essence of

whether a person should get a life sentence or the death penalty. Is he going to change? Is the society always going to be threatened by this human being? And the Commonwealth, of course, always does its best, as it must, to convince you that the defendant will never change, that he will always be a predator among civilized people. I urge you, ladies and gentlemen, to think carefully on that. Who are we to say that a person will never change? Who are we to say that a person should not by given a chance to live?"

(N.T. 6/12/85, at 6.25–6.26.) According to Petitioner, counsel's reference to whether the defendant is capable of change represents "an appalling ignorance of Pennsylvania's capital sentencing scheme." (Mem. Law Supp. Pet. Writ Habeas Corpus at 44.) He contends that counsel's comments implied that a life sentence should only be granted in cases where the defendant will eventually be capable of reentering society. Pennsylvania law, however, permits a capital jury to sentence a defendant to either death or life in prison without parole. Petitioner insists that his counsel's improper implication increased his likelihood of receiving a death sentence because

---

**25.** In addition to finding that trial counsel was not ineffective for raising the issue of Petitioner's failure to testify, we also find that Petitioner has no substantive Fifth Amendment claim under *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). Petitioner cites no authority, and we find no such authority, for the proposition that a defendant has a Fifth Amendment right against comments by his own counsel regarding his decision not to testify. *See United States v. Guerrero,* 938 F.2d 725, 730–31 (7th Cir.1991) ("The defendant appears to be confusing the prohibition against direct or indirect references by a prosecutor to a defendant's decision not to testify with some imagined rule that applies with equal force to his defense counsel. However, the defendant does not cite, nor have we discovered, any

case law that applies to defense counsel."). Furthermore, where a jury instruction has been given explaining a defendant's Fifth Amendment right to silence, counsel's mention of his client's decision not to testify is less likely to be sufficiently prejudicial to constitute a violation of due process. *See id.* at 731 (finding that defendant suffered no prejudice as a result of defense counsel's "decision to explain to the jury what the judge would instruct minutes later"). As a result, we find that Petitioner's claim that his Fifth Amendment rights were violated by his trial counsel's comments regarding his failure to testify at the penalty phase is groundless, and would deny it even if cause and prejudice were found to excuse Petitioner's state procedural default.

the jury mistakenly thought Petitioner may eventually be eligible for release. Counsel, however, never mentioned release in his closing. Any talk of personal change can be assumed to apply as easily to people in prison as to those outside. Counsels' comments were meant to appeal to the jury's sympathies in an attempt to have them recognize Petitioner's humanity and spare his life. Counsel did not improperly misrepresent Pennsylvania law, nor did he prejudice his client in such a way as to create a reasonable probability that he would have received a lesser sentence but for his counsel's comments.

Petitioner next argues that his counsel's use of the phrase "predator among civilized people" misrepresented Pennsylvania death penalty law by implying that the jury should consider future dangerousness as an aggravating circumstance and by prejudicing the jury into sentencing Petitioner more harshly. Petitioner neglects to notice, however, the context in which counsel used the phrase. Counsel was not referring to his client as a predator. He was instead exposing the Commonwealth's goal of painting the Petitioner as a danger to society in an attempt to establish that Petitioner was deserving of the death penalty. Counsel never implied that he considered his client dangerous, nor did he encourage the jury to think so. More specifically, counsel never spoke of aggravation in connection with any mention of rehabilitation or future dangerousness. He simply exposed his opponent's objective in hopes of convincing the fact-finder otherwise. He asked the jury to think about the Commonwealth's necessary characterization of Petitioner and appealed to their sense of humanity by asking them not to render the ultimate penalty. Petitioner misconstrues counsel's comments as highly prejudicial misrepresentations of applicable state law, when they are in fact pleas for his client's life in an otherwise bleak situation. We find that counsel's attempts to elicit sympathy and to portray the Commonwealth's goals in the harshest light possible were reasonable approaches to convincing the jury that Petitioner did not deserve to die. Furthermore, we find that Petitioner has shown no evidence to demonstrate a reasonable probability that, but for counsel's decisions, the jury's verdict would have varied. The jury found three specific aggravating circumstances and no mitigating circumstances in determining Petitioner's sentence. Because counsel's comments did not preclude the jury from finding additional mitigating circumstances, we find it highly unlikely that Petitioner experienced any actual prejudice as a result of counsel's closing argument. As a result, we find Petitioner's argument that his trial counsel was ineffective meritless, and in turn conclude that no cause exists for his default. We are therefore unable to consider this issue on its merits.

In short, counsel was not ineffective for presenting allegedly harmful arguments and evidence at trial. As a result, no cause or prejudice exists by which to excuse Petitioner's state procedural default of this issue, and it is therefore not reviewable by this court. We now turn our attention to the remaining three defaulted issues from Claims I and II.

Petitioner's fifth subclaim argues that his trial counsel was ineffective for failing to investigate, develop, or properly present evidence of Petitioner's intoxication through two lay witnesses at trial, Jack Gormley and Thomas Fulcher. He cites the ineffectiveness of his appellate counsel as an excuse for the default of his claim against his trial counsel, and argues that this claim should therefore be brought before this court for review on the merits. *See Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

Because we find that Petitioner's claim of ineffective assistance of trial counsel is groundless, we conclude that Petitioner's appellate counsel cannot be constitutionally ineffective for failing to raise such a meritless claim.[26] *See Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. Jack Gormley was the bartender who served Petitioner on the night of the murder. He testified at trial that he was unable to remember exactly how many beers he served Petitioner that evening between 11 p.m. and 2:30 a.m., but that he was certain he brought him at least one. (*See* N.T. 6/10/85, at 4.78.) Petitioner asserts that his trial counsel was constitutionally ineffective for calling Gormley to testify because Gormley's testimony was, according to Petitioner, harmful to his intoxication defense. Petitioner also asserts that his counsel was ineffective for not impeaching Gormley on the grounds that he was minimizing his account of Petitioner's intoxication to protect himself from prosecution under 47 Pa. Cons.Stat. §§ 4–497, 4–493(1), which impose liability for sale of alcohol to "visibly intoxicated persons." Thomas Fulcher was a companion of Petitioner's in the early morning of August 11, 1984. He testified at trial that he and Petitioner were together for about four hours that night, during which time Fulcher admitted to drinking approximately four to six beers. He was unable to account for the number of beers consumed by Petitioner. (*See* N.T. 6/10/85, at 4.88–4.89.) Petitioner contends that his trial counsel was similarly ineffective for calling on Fulcher to testify or, in the alternative, for not impeaching Fulcher on the grounds that he was

testifying falsely to prevent his own prosecution for driving under the influence or perhaps for somehow being involved in Petitioner's actions.

We find that none of Petitioner's arguments with respect to either witness constitute ineffective assistance of counsel. These witnesses were the only two people who were able to testify at all to Petitioner drinking on the night in question. Counsel's decision to call them was a perfectly valid tactical decision; he presented the only evidence available in an attempt to establish a potentially powerful defense for Petitioner. Had he not called these two witnesses, counsel would have been unable to demonstrate any possibility of intoxication.[27] Contrary to Petitioner's claim, counsel did not act outside the bounds of acceptable professional activity, and did not make his decision out of ineptitude, inexperience, or a lack of preparation or legal understanding. *See Strickland,* 466 U.S. at 689, 104 S.Ct. 2052; *Weatherwax I,* 20 F.3d at 579. Similar reasoning can be applied to Petitioner's argument that counsel was ineffective for not impeaching the witnesses. While their testimony might not have been ideal to Petitioner's case, refusing to impeach the only two witnesses able to establish that Petitioner was drinking at all on the morning of August 11 cannot be considered an unreasonable decision. Counsel was in a difficult situation and we cannot assume that he could have convinced either witness to testify differently, or that the information in Fulcher's affidavit eleven years later, which stated that he greatly understated Petitioner's level of intoxication, was either credible or

---

**26.** Our finding that appellate counsel cannot be constitutionally ineffective for purposes of establishing cause and prejudice necessarily includes a similar conclusion, not raised by Petitioner, that no substantive claim for ineffective assistance is available against appellate counsel with regard to this issue.

**27.** We recognize that Petitioner may have represented another source of information, but his choice to exercise his Fifth Amendment right not to testify is something beyond counsel's control.

available at the time of trial. Moreover, Petitioner presents no evidence to the contrary. We find that counsel's decision was perfectly reasonable in light of the circumstances present at trial, and that his conduct was therefore well within that required by the Sixth Amendment. As a result, Petitioner is without cause for his state procedural default of this subclaim, and federal habeas review thereof is unavailable under § 2254.[28]

Petitioner's sixth subclaim asserts that both his trial counsel and the court erred in misrepresenting the record before the jury at the penalty phase, and that his trial counsel was ineffective for making statements that were prejudicial to Petitioner's intoxication defense at sentencing. Although Petitioner did not raise any of these arguments before the state courts, he asserts that they are properly before this court because he can demonstrate cause and actual prejudice for his omission. He cites his trial and appellate counsel's ineffective assistance in not bringing these claims before the state courts as cause for his default. *See Murray*, 477 U.S. at 488, 106 S.Ct. 2639. We find, however, that Petitioner's claims are without merit, and therefore that neither his trial nor appellate counsel could have been constitutionally ineffective for failing to raise them.

Petitioner claims that his trial counsel was ineffective because he misrepresented evidence to the sentencing jury and because he failed to object to a similar misrepresentation by the court. Petitioner's arguments fail. Neither the court nor counsel misrepresented the trial record. Counsel posed a hypothetical question to an expert witness regarding Petitioner's possible level of intoxication on the night in question. He asked the witness what effect three or four drinks would have on the functioning of a person's cerebral cortex. (*See* N.T. 6/11/85, at 5.24.) When the Commonwealth objected to the number of beers used in the hypothetical, the court replied, "we don't know how much beer [Petitioner] had. We know he had one . . . There was testimony, also, that after the bar closed, [Petitioner] with four other people stayed in a parking lot and two six packs of beer were consumed. How much he drank or how little or perhaps even not, that is all we know on the record." (N.T. 6/11/85, at 5.23.) Petitioner now argues that "[t]he court mischaracterized the evidence. There was unrebutted and unquestioned testimony that Mr. Holland was drinking in the parking lot for hours after the bar closed." (Pet. Writ Habeas Corpus at 41.) This is simply not true. There is nothing in the record that affirmatively states that Petitioner drank anything after the bar closed. The closest account is that of Fulcher, who testified that he had been drinking and that Petitioner had "[p]robably the same. But I wasn't counting." (N.T. 6/10/85, at 4.88.) Trial counsel's hypothetical was not an unreasonable account of the evidence on the record; in fact, it was a more favorable account than clearly existed on the record. Counsel chose a number of beers in his hypothetical that would seem believable to the jury and that would still elicit the response he wanted from the expert, namely that "three or four beers are enough to loosen inhibitions." (N.T. 6/11/85, at 5.24.) Trial

---

**28.** Although not required to review defaulted claims on their merits under *Coleman*, we note that Petitioner's defaulted ineffective assistance arguments also fail under *Strickland*. The standard applied to establish cause and prejudice is identical to that for substantive Sixth Amendment claims. *See Strickland*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As a result, our decisions concerning cause and prejudice will mirror any substantive consideration of these issues and result in identical outcomes.

counsel was also not ineffective for failing to object to the court's characterization of the record. Not only did the court not misrepresent the record, but it permitted counsel to pose a hypothetical question in which three or four beers were consumed. The statement of the court would have permitted the jury to have a reasonable doubt that Petitioner was sober. We cannot say that counsel acted outside the broad range of professionally acceptable activity in either posing his hypothetical to the jury, or in failing to object when the court permitted him to do so. Counsel was not deficient in his performance and therefore no cause exists for Petitioner's default under *Strickland* or *Murray*.

Petitioner's argument that his counsel made prejudicial statements is similarly unfounded. Petitioner argues that counsel improperly used inflammatory language in describing the crime as "planned," and "committed by an expert." As we explained in our analysis of subclaim (4), counsel's trial strategy was one of misidentification. By describing the crime as the product of a professional, he was attempting to distance Petitioner from the event in the minds of the jury. Counsel went to great lengths to demonstrate that, despite Petitioner's criminal record, he had never been involved in any violent crimes. By highlighting the brutality of the crime charged, counsel was demonstrating how far out of character such activity would be for Petitioner. This is a reasonable tacti-

cal approach to a difficult case and is therefore not grounds for a finding of ineffective assistance of counsel. Petitioner did not demonstrate cause for his state procedural default, and thus is barred from presenting his subclaim to this court for review.

b. AEDPA Review of Ineffectiveness Subclaims

 Petitioner did, however, present two subclaims in state court, namely that his trial counsel was ineffective for failing to obtain records and to investigate, develop, and present expert testimony in mitigation of Petitioner's sentence. They are therefore subject to federal review in accordance with the AEDPA, which permits us to grant a writ of habeas corpus only if the state court rulings pertaining to Petitioner's claims were contrary to, or an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d).

Petitioner's first subclaim argues that his trial counsel was constitutionally ineffective at the sentencing phase of his capital murder trial because, among other things, counsel failed to obtain or review documents pertaining to potential mitigating circumstances. Counsel was aware that Petitioner had a prior criminal record, and that he had received psychiatric evaluations and treatment on numerous prior occasions.[29] (*See* N.T. 5/22/96, at 15–16.)

---

**29.** A number of psychiatric evaluations were performed on Mr. Holland as a result of his prior involvement with the criminal justice system. Three evaluations were performed for the Court of Common Pleas of the County of Philadelphia by Dr. R.B. Saul between August 11, 1980 and July 29, 1981. All three describe Petitioner as suffering from schizoid personality disorder with paranoid traits and substance abuse. A presentence report was prepared in April 1981 in response to a robbery conviction. That report characterized the Petitioner as anti-social and devoid of

insight into his own problems and the seriousness of his own offenses. More specifically, the report determined that Petitioner's criminal activity was the result of "psychiatric problems, drugs, and alcohol." (Report April 1981, at 7.) This report included a review of a previous evaluation by the Northeast Community Mental Health Center, which occurred on October 30, 1974, and diagnosed Petitioner with depression that is "behaviorally expressed." (Report October 1974, at 2.) Another mental health evaluation was or-

Nevertheless, counsel chose not to review any of Petitioner's prior presentence ("PSI") reports, mental health evaluations, or school records. (*See* N.T. 5/22/96, at 15, 21–22.) He claimed that this omission was a strategic decision designed to avoid introducing further evidence of Petitioner's prior criminal record. (*See* N.T. 5/22/96, at 15–16.) Counsel instead relied solely on interviews with Petitioner's family in investigating Petitioner's psychiatric history. At sentencing, Petitioner's mother and grandmother testified that Petitioner had an unhappy and difficult childhood which, in their minds, left him emotionally and psychologically disturbed.[30] In his closing argument at sentencing, trial counsel reminded the jury that Petitioner's "family sa[id] that it has been quite obvious for a while that he needs psychiatric help," and that the case at hand is the "first time [Petitioner] has done anything violent." (N.T. 6/12/85, at 6.27.) He then went on to discuss the philosophical underpinnings of the death penalty, (*See* N.T. 6/12/85, at 6.23–6.24, 6.26), and to plead for mercy and compassion for his client. (*See* N.T. 6/12/85, at 6.30–6.31.) Counsel explained

that he failed to review Petitioner's PSI reports and mental health evaluations because he "did not think getting into past cases and bringing up past reports ... I did not want that to come out to the jury." (N.T. 5/22/96, at 17.)

The Pennsylvania courts ruled on Petitioner's ineffective assistance claim at two separate collateral proceedings. The Court of Common Pleas of Philadelphia County denied Petitioner's claim that his trial counsel was ineffective for failing to review existing PSI reports and mental health evaluations in preparation for sentencing. It concluded that Petitioner's counsel made a strategic decision not to introduce the reports because they would prove a detrimental reminder to the jury of Petitioner's lifelong pattern of lawlessness. *See Commonwealth v. Holland,* Nos. 1430–1441, at 8–14 (Pa. Ct. Common Pleas Phila. Cty. Sept. 16, 1996). The court likewise found that no actual prejudice existed in Petitioner's case, as the reports in question did not contain any information distinct from that elicited at sentencing through the testimony of Peti-

dered by the court in order to determine if Petitioner was competent to stand trial for the murder of Jewel Stevens. Dr. Jay Bonovitz performed that evaluation at the stipulation of both parties and found that, although Petitioner was competent to stand trial, he suffered from a personality disorder with sociopathic traits. This diagnosis was corroborated in a psychiatric evaluation ordered by the Court of Common Pleas of Philadelphia County, in which Petitioner was again found to be free from any primary affective disorders and competent to stand trial, but was nevertheless determined to be suffering from antisocial personality disorder and a lack of insight into the nature and extent of his psychopathology. (Report June 1985, at 3–4.)

30. Specifically, Petitioner's mother testified that Petitioner "has been in prison most of his life, in his own mind." (N.T. 6/12/85, at 6.14.) Petitioner's grandmother then testified about Petitioner's childhood. She described

him as a loner, a bed-wetter, and a child that never got over his father's death. (*See* N.T. 6/12/85, at 6.15–6.17.) She testified that Petitioner was "a good boy. He never hurt anyone ... he did everything he could to help people." (N.T. 6/12/85, at 6.19.) As for testimony regarding Petitioner's mental condition, his grandmother explained he would get "terrible headaches." (N.T. 6/12/85, at 6.19.) She went on to explain that "I think Billy needs help. He doesn't understand a lot of things that he did, he doesn't know why he did them. I really think he needs psychiatric help now." (N.T. 6/12/85, at 6.18.) She repeated this analysis later in her testimony when she said "I really feel [Billy] needs psychiatric help. He's needed it for a long time ... Maybe it will help him understand a lot of things in his growing up years that he could never figure out." (N.T. 6/12/85, at 6.21.)

tioner's family members and counsel's closing argument. *See id.* at 16–21. On appeal, the Pennsylvania Supreme Court upheld the decision of the Court of Common Pleas. *See Holland II*, 727 A.2d 563 (Pa.1999). It echoed the lower court's determination that counsel had a strategic reason for failing to admit the PSI reports and mental health evaluations, specifically that doing so may have highlighted Petitioner's prior criminal activity and prejudiced the jury against him. *See id.* at 565–66.

As mentioned above, Petitioner's claim for habeas corpus relief may only be granted if the state courts' refusals to do so constitute an "unreasonable application of clearly established federal law."[31] 28 U.S.C. § 2254(d). "It is past question that the rule set forth in *Strickland* qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Williams*, 120 S.Ct. at 1512. The lone remaining question, then, is whether the Pennsylvania Supreme Court was objectively unreasonable in its decision to reject Petitioner's claim that his trial counsel was constitutionally ineffective at capital sentencing. More specifically, we must decide whether, "evaluated objectively and on the merits, [the state court decision] resulted in an outcome that cannot reasonably be justified under exist-

ing Supreme Court precedent." *Matteo*, 171 F.3d at 890.

The state courts' decisions were not unreasonable applications of *Strickland*. Petitioner's trial counsel made a decision not to exhaust limited resources examining a body of documents he knew were the product of his client's prior criminal activities. He chose to rely instead on the accounts of Petitioner's closest relatives to demonstrate Petitioner's mental infirmities to the jury, thereby denying the Commonwealth the opportunity to repeatedly focus the jury's attention on Petitioner's criminal history by referring to the reason such documents were created. We find that it is not unreasonable to conclude that this tactical decision was not the product of ineptitude, inexperience, lack of preparation, or an unfamiliarity with the relevant legal principles and therefore that it does not represent ineffective assistance of counsel under *Strickland*.[32] *See Weatherwax I*, 20 F.3d at 579.

We also find that the state courts acted reasonably in determining that trial counsel's decision not to review Petitioner's PSI reports and mental health evaluations did not meet *Strickland*'s actual prejudice standard. They found that the information available in the relevant documents was not appreciably different from that presented at sentencing by Petitioner's

---

**31.** The other statutory criteria for determining if a claim for habeas corpus may be granted, i.e. if a state court decision was "contrary to" clearly established federal law or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" are inapplicable here. 28 U.S.C. § 2254(d).

**32.** We arrive at this conclusion despite the fact that Petitioner's criminal record was introduced at sentencing anyway as part of 42 Pa. Cons.Stat. § 9711(d)(9), which permits the jury to consider as an aggravating circumstance in a capital sentencing proceeding a

petitioner's "significant history of felony convictions." We find it a reasonable application of *Strickland* for the Supreme Court of Pennsylvania to determine that counsel made a strategic decision not to introduce any *further* evidence of Petitioner's prior convictions. The state supreme court's decision is likewise not inconsistent with counsel's own reference to Petitioner's prior criminal activity, because counsel introduced Petitioner's prior convictions only in his closing argument, and then solely to show that Petitioner had never committed a violent crime. (N.T. 6/12/85, at 6.26.)

family. Under the AEDPA, we are required to defer to state court findings of fact that are not unreasonable "in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d)(2). As a result, because we do not consider the state trial court's factual conclusion unreasonable, and because Petitioner did not present clear and convincing evidence to rebut the state courts' factual findings, *see* 28 U.S.C. § 2254(e)(1), we conclude that their application of *Strickland*'s prejudice standard to those facts was not unreasonable.[33] Counsel's failure to introduce Petitioner's PSI reports and mental health evaluations did not create a reasonable probability that the jury would have sentenced Petitioner differently, and Petitioner's claim of ineffective assistance therefore fails.

Petitioner's second subclaim contains two separate contentions. First, Petitioner argues that his counsel was constitutionally deficient for failing to present expert testimony for purposes of mitigation at sentencing. Petitioner cites two examples of what he considers counsel's ineffectiveness with respect to expert testimony.[34] He claims that counsel violated his constitutional duty of representation by failing to present a defense expert in support of

mitigation and by improperly limiting the scope of that expert's examination. Second, Petitioner contends that the trial court erred in excluding the testimony of Dr. Jay Bonovitz regarding Petitioner's level of intoxication on the evening in question. We address each of these contentions below under § 2254 of the AEDPA.

Petitioner first contends that his trial counsel was constitutionally ineffective for failing to present a defense expert in support of mitigation at sentencing. At a minimum, argues Petitioner, counsel should have recalled Dr. Jay Bonovitz to testify in support of Petitioner's intoxication on the night of the crime. "Dr. Bonovitz' report contains significant mitigating evidence and clearly shows the need for further investigation, development and presentation of expert mental health testimony." (Mem. Law Supp. Pet. Writ Habeas Corpus at 33.) Petitioner goes on to claim that his defense was prejudiced by counsel's failure to present such testimony. He argues that a mental health expert could have testified to Petitioner's "lifelong history of trauma, mental and emotional impairments, and substance abuse," and more specifically to Petitioner's previously

---

**33.** We note that the AEDPA's requirement that a state court decision be reasonable does not mandate that such a decision be correct. *See Williams*, 120 S.Ct. at 1522 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law.") (emphasis in original). As a result, we do not mean to imply by our ruling here that we consider the state court decisions to be either accurate or preferred applications of *Strickland*. We merely find that those courts acted reasonably, i.e. that the outcomes arrived at were not unjustifiable under existing Supreme Court precedent.

**34.** Petitioner includes as a third example of counsel's ineffectiveness his failure to provide Dr. Bonovitz, the neutral court-appointed expert assigned to examine Petitioner before

trial, with presentence reports and mental health evaluations relevant to the examination. The Supreme Court of Pennsylvania found that counsel made a tactical choice in keeping those documents secret; namely to "minimize evidence that would have sounded against appellant ... these examinations would have contained details of prior crimes, [and] trial counsel decided that pursuing a strategy of presenting such records would not be beneficial to [Petitioner]." *Holland II*, 727 A.2d at 565–66. We likewise determined *supra* that counsel's failure to review these documents himself did not constitute ineffective assistance. As a result, we adopt our earlier reasoning in finding that this example by Petitioner does not rise to the level of constitutionally ineffective assistance.

diagnosed "personality disorder with schizoid and paranoid traits." (*Id.* at 35–36.)

The Supreme Court of Pennsylvania addressed this claim in Petitioner's state post-conviction proceedings, and determined that counsel had valid strategic reasons for refraining from requesting a court-appointed defense expert. *See Holland II,* 727 A.2d at 566. Specifically, the court concluded that counsel's decision was reasonable given the consistency in Petitioner's prior mental health examinations and the real potential for damage on cross examination. *See id.* The court specifically noted the testimony at Petitioner's state collateral proceeding of Dr. John O'Brien. *See id.* Petitioner called Dr. O'Brien as a mental health expert in order to show that his trial counsel's failure to present expert testimony of Petitioner's mental infirmities at sentencing prejudiced Petitioner's defense. Dr. O'Brien interviewed Petitioner personally and reviewed all of Petitioner's prior PSI reports and mental health evaluations. (*See* N.T. 12/14/95, at 15.) Despite Dr. O'Brien's testimony that he thought expert mental health testimony could have potentially assisted Petitioner's defense, (*see* N.T. 12/14/95, at 15, 18–19, 53, 56.) the Pennsylvania Supreme Court nonetheless found that the benefit of expert testimony to Petitioner was uncertain and that counsel's decision to focus on purely mitigating evidence, rather than become involved in a war over the true meaning of various expert evaluations, was not an unreasonable one. *See Holland II,* 727 A.2d at 566. Moreover, the repetitiveness and uncertainty of these evaluations did not, in the eyes of the Pennsylvania Supreme Court, gave rise to a reasonable probability that, but for counsel's decision, Petitioner would not have been sentenced to death. *See id.; Bryan v. Singletary,* 140 F.3d 1354, 1358–61 (11th Cir.1998) (finding that defense counsel's failure to present expert witnesses, in light of prior mitigation testimony by family members and inconclusive notice that the experts would be certain to provide helpful information if called did not violate the Sixth amendment).

We find that the Pennsylvania Supreme Court's denial of Petitioner's claim was not an objectively unreasonable application of *Strickland.*[35] Under § 2254(d) of the AEDPA, we are required to defer to state court decisions that are neither contrary to, nor unreasonable applications of, clearly established federal law. Because Petitioner cites no Supreme Court precedent requiring an outcome different from that reached by the state court, we cannot find their decision contrary to federal law. We likewise cannot find the Pennsylvania Supreme Court's decision to be an unreasonable application of such law. Regardless of whether we would have arrived at the same conclusion, we cannot find the state court's decision of such a fact-specific situation objectively unreasonable. *See Williams,* 120 S.Ct. at 1521. As a result, we are bound by the AEDPA to reject Petitioner's contention.

Petitioner's next example of his trial counsel's ineffectiveness is the narrow scope of counsel's inquiry into Petitioner's mental state. Petitioner argues that his trial counsel only gathered expert testimo-

---

**35.** We again note that our finding under the AEDPA standard for federal habeas review of state court decisions does not necessarily represent our agreement with the Pennsylvania Supreme Court's ultimate conclusion regarding Petitioner's claim. Although the term "unreasonable" in § 2254(d) is potentially difficult to define, the Supreme Court has made it clear that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams,* 120 S.Ct. at 1522. We therefore refrain from applying our own reading of *Strickland* to Petitioner's claims, and instead focus solely on the objective reasonableness of the state supreme court's decision.

ny with respect to Petitioner's competency to stand trial and potential insanity defense, and that he should have looked further into Petitioner's history of depression. More specifically, Petitioner claims that "the details and depth of Mr. Holland's depression were not evaluated by the examiner in order that more time would be available to focus on Mr. Holland's state of mind at the time of the crime." (Mem. Law Supp. Pet. Writ Habeas Corpus at 73.) Petitioner's complaint itself defeats his claim of ineffectiveness. Petitioner's counsel made a strategic decision to focus on his client's state of mind at the time of the crime, rather than to pursue a bevy of other arguments in less detail. This is precisely the sort of strategic decision protected by *Strickland.* Counsel did not act out of ineptitude or inexperience, but rather out of concern for presenting the most convincing argument available given the resources available and the relative strength of the various defenses. We therefore agree with the state court's finding that counsel was not deficient in failing to object to the scope of Dr. Bonovitz' review, and reject Petitioners' argument on its merits.

Petitioner's second contention deals with the trial court's decision to exclude testimony of Dr. Bonovitz regarding Petitioner's level of intoxication on the evening of the murder. Dr. Bonovitz attempted to repeat on the witness stand what Petitioner had told him in an interview with respect to the number of alcoholic drinks Petitioner consumed on the night in question. (*See* N.T. 6/11/85, at 5.10–5.15.) The trial court excluded the testimony as inadmissible hearsay. (*See* N.T. 6/11/85, at 5.11.) Petitioner argues that the testimony was admissible, and that his counsel was therefore ineffective for not objecting to its exclusion, on the grounds that a psychiatric interview is precisely the sort of information reasonably relied on by psy-

chiatrists in formulating opinions about their subjects. The Commonwealth responds by stating that experts are not exempt from the hearsay rule and by arguing that excluding Dr. Bonovitz' recitation of Petitioner's statements does not prohibit the doctor from voicing his opinion of Petitioner's level of intoxication based on their prior discussions. In fact, Petitioner's trial counsel was permitted to pose a hypothetical to Dr. Bonovitz based on prior testimony regarding Petitioner's alcoholic consumption in the early morning of August 11, 1984. (*See* N.T. 6/11/85, at 5.24–5.25.) The Pennsylvania Supreme Court denied Petitioner's claim, finding that Petitioner presented no evidence that Dr. Bonovitz could have presented any additional evidence at trial. *See Holland II,* 727 A.2d at 567. Since Petitioner cites no authority to contradict this conclusion, we find that it is neither contrary to, nor an unreasonable application of, clearly established federal law, and likewise reject both Petitioner's argument and any claims of ineffective assistance of counsel associated with it.

### c. Mental State Defenses

Petitioner's second main claim is that he was denied his Fifth Amendment Due Process right to his own court-appointed defense expert for assistance in developing his mental health defenses at both the guilt and penalty phases of his state court trial. Petitioner and the Commonwealth had a pretrial conference with the trial judge on November 11, 1984. The parties agreed at that conference to a neutral court-appointed expert, Dr. Jay Bonovitz, to evaluate Petitioner's mental state and report directly to the court. (*See* Letter of Judge Kubacki 1/17/85.) This was in keeping with the law in effect at that time. *See, e.g., United States ex rel. Smith v. Baldi,* 344 U.S. 561, 73 S.Ct.

391, 97 L.Ed. 549 (1953); *McGarty v. O'Brien*, 188 F.2d 151 (1st Cir.1951). *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), was decided on February 26, 1985, a month after Dr. Bonovitz' appointment and nearly four months before Petitioner's trial. *Ake* held that a defendant asserting a mental health defense is entitled, under the Fifth Amendment, to a court-appointed expert to assist in preparing that defense. Petitioner, however, never explicitly requested that the court appoint a defense mental health expert in accordance with *Ake*. After the penalty phase, the trial court-appointed another neutral expert and ordered a presentence and a psychiatric report. (*See* N.T. 6/12/85, at 6.59.) Petitioner responded by presenting a post-trial motion arguing that, under *Ake*, he was entitled to "the benefit of a presentence report, psychiatric and a[sic] medical studies" during the penalty phase. (N.T. 2/7/86, at 60.) Petitioner did not include in his post-trial motion any request for expert assistance in regard to the guilt phase of his proceeding. The trial court rejected his motion and accepted the jury's recommendation of death. (*See* N.T. 2/7/86, at 71–72.)

Although he did not raise this Fifth Amendment due process claim in any of his state court proceedings, Petitioner cites his trial and appellate counsel's ineffectiveness as cause for this omission, and argues that actual prejudice resulted, his default is thereby excused, and his claim for relief is properly before this court for review. The claims of ineffective assistance of counsel relied on by Petitioner to show cause for his default of his Fifth Amendment Due Process claim are nearly identical to those already denied on their merits in state court. The question therefore arises whether Section 2254(d) of the AEDPA, which establishes the standard to be followed by federal courts when reviewing claims already adjudicated on their merits in state court, applies to claims of cause aimed at excusing state court procedural default of other substantive claims. Section 2254(d) empowers federal courts to grant a writ of habeas corpus pursuant to "any claim that was adjudicated on the merits in State court proceedings" if the federal court finds that the state adjudication of that claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law." This is a highly deferential standard of review for federal courts, and was not the predominant standard applied to claims of cause under *Murray*, 477 U.S. at 488, 106 S.Ct. 2639. Nevertheless, *Murray* predated the AEDPA. Recent decisions, however, have also refrained from applying the AEDPA standard in cases involving claims of cause and prejudice to excuse state procedural default. *See Edwards*, 120 S.Ct. at 1591–92 (requiring that claims of cause due to ineffective assistance be exhausted in state court, but failing to expressly require that the AEDPA standard be applied by federal courts in finding a valid excuse to a petitioner's default).

Section 2254(d) addresses those situations in which a federal court may grant a writ of habeas corpus over a state court's contrary determination. It requires that a deferential standard of review be applied to *any claims* adjudicated on their merits in state court. The phrase *any claim* obviously refers to "any claim for habeas relief," as it is included in the section of the statute empowering federal courts to grant the writ. Does it also include a claim within a claim? Is a claim of ineffective assistance of counsel, when used merely to establish cause for the default of another constitutional claim, a "claim for habeas corpus relief?" Is it instead only an excuse offered to the court to explain why petitioner's ultimate claim for relief

was not presented for state court review? Could a federal court reach a different result than a state court reached on an identical set of facts? If facts were an issue, would § 2254(d)(2) or § 2254(e)(1) apply? [36]

Applying § 2254(d) would make it more difficult to establish the cause and prejudice excuse for procedural default created by the Supreme Court in *Murray*. If federal courts are required to defer to state courts in evaluating every argument in favor of excusing a petitioner's procedural default on the terms outlined in § 2254(d)(1), it could be argued that by the language of the statute they would be permitted to grant habeas relief on Sixth Amendment Right to Counsel grounds, and any claim that a petitioner argued was excused from being procedurally defaulted would never need to be heard. We believe that the procedural default doctrine addressed by the Supreme Court in *Murray* is controlling and unchanged by § 2254(d).

There are obviously major comity concerns inherent in such a determination. As mentioned above, petitioners are required to present ineffectiveness of counsel claims in state court before submitting them as cause for the procedural default of additional claims. *See Edwards*, 120 S.Ct. at 1591–92. This requirement creates an inevitable tension between state and federal courts as they perform identical analyses without any assurances that the state court's constitutional ruling will be afforded the deference it deserves. Our conclusion with respect to the ineffectiveness of Petitioner's counsel depends upon whether or not our analysis is subject to § 2254(d). We do not find the Pennsylvania Supreme Court's determination that neither Petitioner's trial nor appellate counsel was constitutionally ineffective for failing to raise Petitioner's claim that he was enti-

tled to a court-appointed defense expert under the Fifth Amendment either contrary to, or an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d). We cannot say that the Pennsylvania courts' determinations that counsel made a constitutionally permissible strategic decision not to pursue further expert testimony were contrary to that required by a Supreme Court decision "on a set of materially indistinguishable facts," *Williams*, 120 S.Ct. at 1523, or that state court applications of *Strickland* to the facts of Petitioner's case were "objectively unreasonable," *id.* at 1521, or unable to be reasonably "justified under existing Supreme Court precedent." *Matteo*, 171 F.3d at 890. As a result, if we were to apply § 2254(d)'s standard of review, we would not find that Petitioner satisfied the cause and prejudice requirement of *Murray* or that his Fifth Amendment claim was properly before this Court for review.

We have found that § 2254(d) does not apply, however, and in turn conclude that Petitioner can demonstrate that his appellate counsel was constitutionally ineffective, and therefore that Petitioner satisfies the cause and actual prejudice standard necessary to gain federal review of his defaulted claim. Petitioner asserts that both his trial and appellate counsel were ineffective. He argues that his trial counsel was deficient for failing to request that the state trial court appoint a defense expert for the purpose of eliciting information about Petitioner's mental health and substance abuse problems. He clearly should have done so. However, Petitioner's trial counsel filed a post-trial motion challenging the lack of a court-appointed defense expert in Petitioner's case. Despite the fact that the motion was dismissed, we cannot find trial

---

**36.** The facts presently before us are not disputed.

counsel constitutionally ineffective for his lack of success.[37]

**37.** Any argument that Petitioner waived his Fifth Amendment claim by raising it for the first time in a post-trial motion is unfounded. First, there is no indication from the trial court that Petitioner's post-trial motion was not considered on its merits. Trial courts have discretion to consider previously unmentioned issues, and such consideration erases any preclusive effects of the waiver doctrine. *See Harman ex rel. Harman v. Borah*, 562 Pa. 455, 756 A.2d 1116, 1124 (2000) ("Granting or denying an untimely objection lies in the discretion of the trial court.") Second, even if we did find that Petitioner's due process claim was waived by virtue of its being raised for the first time in a post-trial motion, such waiver would be excused by counsel's ineffectiveness in failing to raise it at trial. *See Commonwealth v. Nelson*, 523 A.2d 728, 736 (Pa.1987) (finding that, in case of waiver, it becomes "incumbent upon appellant to show that those omissions constituted ineffective assistance of counsel"). Therefore, even if trial counsel's post-trial motion was denied on waiver grounds (which we find it was not), and cannot therefore be considered a ruling on the merits in state court for procedural default purposes, we nevertheless find that counsel's failure to raise the claim at trial constituted ineffective assistance of counsel. Such a finding of ineffective assistance represents valid cause and prejudice to excuse Petitioner's procedural default. As a result, Petitioner's Fifth Amendment claim is properly reviewable by this court.

There would be other evidence of trial counsel's ineffectiveness. Petitioner's counsel agreed to have the court appoint a neutral psychiatric expert (Dr. Jay Bonovitz) to examine Petitioner for competency and with regard to Petitioner's proposed insanity defense. (*See* Letter of Judge Kubacki 1/17/85.) Dr. Bonovitz interviewed counsel for both sides, the Petitioner, and his immediate family. Petitioner's counsel never showed Dr. Bonovitz any of the presentence ("PSI") reports or mental health evaluations that had accumulated in Petitioner's file over the previous 10 years. In fact, he admitted to having never even read any of these documents himself. (*See* N.T. 5/22/69, at 17.) Instead, counsel accepted Dr. Bonovitz as a neutral observer of Petitioner's psychiatric condition, and called him to testify solely as to the effect of alcohol on the human cerebral cortex. (*See* N.T. 6/11/85, at 5.20.) Dr. Bonovitz' report was never entered into evidence, nor was he called to testify at any other stage in the proceeding regarding Petitioner's mental health. At the penalty phase, where counsel attempted to establish Petitioner's mental infirmities as mitigation evidence, he presented no expert testimony whatsoever; he never requested that the court appoint a defense expert to explore Petitioner's psychiatric problems, nor did he recall Dr. Bonovitz to testify to what he observed regarding Petitioner's mental health.

Petitioner argues to us that counsel demonstrated a complete lack of preparation and knowledge in failing to request that the trial court appoint a defense expert to assist in the preparation of Petitioner's mitigation defense at the penalty phase. He likewise argues that his inability to take advantage of such an expert resulted in a violation of his Fifth Amendment right to access to the adversarial process. *See Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) (finding that the Fifth Amendment grants indigent defendants the right to have independent experts appointed by the court for assistance in establishing mental incapacity defenses).

In his defense, Petitioner's trial counsel claimed that he was forced to make a tactical decision against pursuing additional expert assistance due to insufficient resources being available from the court, and a dearth of factual support for calling a psychiatric expert on Petitioner's behalf. (*See* N.T. 5/22/69, at 13–14.) Trial counsel's lack of resources argument is clearly unfounded. *Ake* had been decided by the time of Petitioner's trial. In light of its holding that defendants have a constitutional right to their own court-appointed expert, once a request was made the trial judge was required to authorize expenditures for expert assistance. The Constitution's grant of a right is not conditioned on the cost of making that right available. The request should have been made and must have been granted. Trial counsel's argument that he had no factual basis to believe that another expert would be helpful to Petitioner's case is likewise unsupported. Counsel made no effort to ascertain what mental health defenses, if any, would be reasonably available to Petitioner, nor did he assist the one expert he did retain in gaining access to information relevant to such defenses. Be-

We nevertheless find that Petitioner's appellate counsel on direct appeal to the Pennsylvania Supreme Court was constitutionally deficient. He did not raise any claims regarding Petitioner's lack of a court-appointed psychiatric expert to assist the defense. (*See* Holland I Brief at 7–30.) Petitioner argues that his appellate counsel's deficiencies were unreasonable and that they prejudiced his defense at sentencing. The Commonwealth responds by asserting that counsel had a strategic justification for withholding those claims and that, in any event, raising them would have been fruitless due to both an absence of resources for investigation and a lack of a factual basis to support mitigation of Petitioner's sentence.

Petitioner's appellate counsel testified at a state collateral proceeding. When asked why he chose not to present claims of trial counsel's ineffectiveness on direct appeal, counsel responded that he believed such claims could be brought later in collateral proceedings and that they were therefore not a sound use of the scarce funds afforded him by the court for his investigation.

(*See* N.T. 12/14/95, at 70–74.) The mere opportunity to raise an issue later, especially when that issue may be subject to a different standard of review under the PCRA, does not constitute a defensible strategic justification under *Strickland.* Neither, as we explained above, does an alleged lack of funds justify inadequate representation. Despite admitting that he thought trial counsel's performance was "wretched," appellate counsel requested neither additional funds from the court nor a remand for further evidentiary hearings to investigate trial counsel's potential ineffectiveness. (*See* N.T. 12/14/95, at 78.) Either of these approaches would have alleviated any funding dilemma counsel faced.

Petitioner's appellate counsel also testified that he was unsure as to the benefit to be derived from a defense mental health expert. (*See* N.T. 12/14/95, at 79–86.) According to appellate counsel himself, however, this uncertainty was due to his complete lack of knowledge of Petitioner's mental health, social, and educational backgrounds, (*see id.* at 92–93) as well as

---

cause counsel never reviewed Petitioner's mental health records, he was unable to advise Dr. Bonovitz of this potential source of valuable information or to make an informed judgment himself regarding the value of additional expert mental health testimony to Petitioner's defense. Willful blindness is not a valid basis for an attorney's tactical decision.

Any additional defenses by trial counsel that he was unaware of Petitioner's rights or that the Supreme Court's opinion was not sufficiently clear are also baseless. The *Ake* decision had been established for at least four months before Petitioner's trial began. It contained a clear statement of a change in the scope of the Fifth Amendment, requiring that defendants be appointed their own experts in cases in which the mental state of the defendant is of significance. *See, e.g., Starr v. Lockhart,* 23 F.3d 1280, 1289 (8th Cir.1994) (extending a defendant's Fifth Amendment right to expert assistance to capital sentencing proceedings). In short, any strategic decision

allegedly made by counsel to refrain from asking the trial court to appoint a defense expert for assistance at either trial or sentencing is clearly the product of "ineptitude, inexperience, lack of preparation or unfamiliarity with basic legal principles" and violates counsel's constitutional duty of adequate representation. *Weatherwax I,* 20 F.3d at 579.

This deficient performance prejudiced Petitioner by depriving him of any informed presentation of his mental infirmities. At his state collateral proceedings, Petitioner called Dr. John O'Brien, another psychiatric expert who, unlike Dr. Bonovitz or Petitioner's trial counsel, was familiar with all of Petitioner's prior records. Dr. O'Brien testified that an expert analysis of Petitioner's mental condition could have established a mitigating circumstance at sentencing, and that this in turn creates a reasonable probability that, but for counsel's error, the penalty phase jury's ultimate determination may have been different. (*See* N.T. 12/14/95, at 18–19.)

of the controlling Supreme Court precedent requiring courts to appoint defense mental health experts in cases involving the defendant's mental state so that those experts may assist in the evaluation, preparation, and presentation of the defense. *See Ake*, 470 U.S. at 80, 83, 105 S.Ct. 1087. Appellate counsel, like his predecessor at trial, knew nothing of Petitioner's mental health background or Fifth Amendment rights. (*See* N.T. 12/14/95, at 92–93.) His contention that no factual basis existed for pursuing Petitioner's claim is therefore groundless. There is no evidence that appellate counsel had familiarized himself with either the relevant law or facts of Petitioner's case sufficiently to make his representation reach acceptable constitutional levels. As a result, he is unable to claim that his omission of related arguments from Petitioner's direct appeal was the product of a strategic decision not founded on "ineptitude, inexperience, lack of preparation or unfamiliarity with basic legal principles." *Weatherwax I*, 20 F.3d at 579.

We also find that appellate counsel's deficient performance prejudiced Petitioner's case. According to Dr. O'Brien, counsel's failure to challenge the denial of a defense mental health expert created a reasonable probability that, but for this omission, Petitioner may have been afforded a stronger argument for mitigation and, therefore, a different sentence. The constitutionally ineffective performance of Petitioner's appellate counsel therefore represents cause and prejudice for Petitioner's state procedural default. This default is in turn excused under *Coleman*, 501 U.S. at 750, 111 S.Ct. 2546, and Petitioner's claim that he was denied his Fifth Amendment rights to a defense expert at sentencing is properly before this court for review on its merits.[38]

■ Petitioner alleges that he was denied his Fifth Amendment right to a court-appointed psychiatric expert for assistance in developing defenses at the guilt and penalty phases of his state murder trial. Because this claim was procedurally defaulted and is before us by virtue of Petitioner demonstrating cause and prejudice for that default, we are not constrained by the standard of review set forth in the AEDPA, 28 U.S.C. § 2254(d). Our review of Petitioner's claim is instead *de novo* with regard to all legal issues.[39] *See Hameen v. State of Delaware*, 212 F.3d 226, 248 (3d Cir.2000) ("[U]nder the AEDPA the limitation on the granting of an application for a writ of habeas corpus is only 'with respect to any claim that was adjudi-

---

**38.** Our decision to uphold the Pennsylvania Supreme Court's denial of Petitioner's ineffective assistance claim is not inconsistent with our previous decision to address the underlying Fifth Amendment claim to a court-appointed defense expert on the grounds that Petitioner demonstrated cause and prejudice for his state procedural default of that claim. In evaluating counsel's effectiveness for cause and prejudice purposes, we apply *Strickland* and its progeny *de novo*. *See* discussion *supra* Part III.C.2.c. Our review of a prior state court decision on its merits, however, is controlled by § 2254(d) of the AEDPA, which only permits federal reversal of state court decisions if they are either contrary to, or an unreasonable application of, clearly established federal law. Since we are unable to find so severe an error on the part of the Pennsylvania Supreme Court, we feel obliged to uphold their prior decision on those grounds, despite the fact that our own interpretation of *Strickland* yields a different result. *See Williams*, 120 S.Ct. at 1522 (finding that an incorrect application of federal law is not necessarily an unreasonable one for purposes of AEDPA review).

**39.** Our standard of review with respect to factual issues is more deferential, but does not apply in this instance, as our only consideration regarding Petitioner's claim involves purely legal questions. We base all of our analyses on the facts as they appear in the record.

cated on the merits in state court proceedings.' Hence we exercise pre-AEDPA independent judgment ...."). Applying this standard of review, we find that Petitioner was denied his right to a court-appointed expert to "assist in the evaluation, preparation, and presentation of [his] defense" at the penalty phase only, and grant Petitioner's request for habeas corpus relief on those grounds.[40] *Ake,* 470 U.S. at 83, 105 S.Ct. 1087. We do not, however, find that Petitioner is entitled to relief from his murder conviction.

The Supreme Court addressed the importance of making mental health experts available to defendants in *Ake,* in which it held:

> when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in *evaluation, preparation, and presentation of the defense.*

*Id.* at 83, 105 S.Ct. 1087 (emphasis added). The *Ake* Court distinguished *United States ex rel. Smith v. Baldi,* 344 U.S. 561, 73 S.Ct. 391, 97 L.Ed. 549 (1953), and *McGarty v. O'Brien,* 188 F.2d 151 (1st Cir.1951), which had previously determined that the appointment of neutral psychiatrists, i.e. those that were assigned to perform investigations and prepare reports for submission directly to the court, satisfied an indigent defendant's Fifth Amendment right to an adversarial proceeding, provided the expert examined the defendant and was not "beholden to the prosecution."

*McGarty,* 188 F.2d at 155. Under *Ake,* the Fifth Amendment Due Process right to psychiatric assistance "does not mean the right to place the report of a 'neutral' psychiatrist before the court; rather it means the right to use the services of a psychiatrist in whatever capacity defense counsel deems appropriate." *Smith v. McCormick,* 914 F.2d 1153, 1157 (9th Cir. 1990); *see also Starr v. Lockhart,* 23 F.3d 1280, 1289 (8th Cir.1994).

The *Ake* holding, however, is not limited to cases involving insanity defenses. The Court also found a violation of due process because the defendant was denied a court-appointed psychiatrist for purposes of developing mitigation evidence at capital sentencing. *See Ake,* 470 U.S. at 86–87, 105 S.Ct. 1087; *see also Starr,* 23 F.3d at 1289 ("As *Ake* explains, due process requires access to an expert who will conduct, not just any, but an appropriate examination. We find that [Defendant's] exam was inappropriate because it did not delve into the mitigating questions essential to [Defendant]."); *id.* at 1290 (finding that Defendant's ability to subpoena and question state examiners under oath did not amount to appropriate access to "experts who will 'assist in evaluation, preparation, and presentation of the defense' "); *Smith,* 914 F.2d at 1158.

Part of the purpose of this requirement is to ensure confidentiality between the examining expert and the defendant.

> A psychiatrist will of necessity make inquiry into the facts surrounding the alleged crime, just as the attorney will. Disclosures made to the attorney cannot

---

**40.** There is no question that *Ake* is applicable to Petitioner's case. Petitioner's trial began on June 5, 1985. The Supreme Court decided *Ake* on February 26 of that year. Although this was after the trial court-appointed Dr. Bonovitz, the opinion is nonetheless fully applicable to Petitioner's case, as his case was clearly "pending on direct review" at the time *Ake* was decided. *See Griffith v. Kentucky,* 479 U.S. 314, 322, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) (finding that Supreme Court decisions in criminal cases apply to all cases "pending on direct review" at the time of the decision).

be used to furnish proof in the Commonwealth's case. Disclosures made to the attorney's expert should be equally unavailable, at least until he is placed on the witness stand. The attorney must be free to make an informed judgment with respect to the best course for the defense without the inhibition of creating a potential Commonwealth witness. *United States v. Alvarez*, 519 F.2d 1036, 1046–47 (3d Cir.1975); *see also Smith*, 914 F.2d at 1160 ("Confidentiality must apply not only to psychiatric assistance at trial, but also to such assistance for sentencing in capital cases.").

A similar situation to that confronting Petitioner here was addressed in *Christy v. Horn*, 28 F.Supp.2d 307 (W.D.Pa.1998). *Christy* involved a petition for habeas corpus under 28 U.S.C. § 2254, and addressed the question, among others, of whether a writ should issue on the grounds that the petitioner was denied his Fifth Amendment right to a court-appointed mental health expert. The court determined that, in order to properly decide this issue, it must establish

> (1) whether [petitioner] made a sufficient showing to the trial judge that his sanity would be a "significant factor at trial," (2) whether petitioner received competent psychiatric assistance for his defense, and (3) whether the refusal to provide [petitioner] with psychiatric assistance was harmless error.

*Id.* at 320. The court performed this analysis with respect to both the guilt and sentencing phases of the petitioner's capital murder trial. With regard to whether the petitioner made a sufficient showing that his sanity would be a "significant factor at trial," the court found that petitioner had adequately established that his mental state was at issue by expressly informing the trial court of that fact pre-trial, and by virtue of the fact that the trial judge was aware of the petitioner's prior mental health problems. For these reasons, the court determined that "*Ake* required the appointment of a psychiatrist to *assist petitioner in his defense.*" *Id.* (emphasis added)

The court next found that the psychiatric assistance afforded the petitioner was inadequate. The two psychiatrists appointed by the court, Drs. Olivier and Chavern, "failed to address [petitioner's] needs as the accused. Neither ... aided [petitioner] in marshaling the facts to assist in developing any defenses." Dr. Chavern, for example, testified at a competency hearing that petitioner was competent and showed no other evidence of insanity at the time of the crime. Because Dr. Chavern's testimony "undermined any defense that [petitioner] might have hoped to pursue," and because it involved only a "conclusory review of [petitioner's] records," the court found this examination insufficient under the Fifth Amendment and *Ake*. *Id.* at 321. The court concluded by stating generally that "[a] defendant is denied the essential benefits of an expert when the services of a doctor must be shared with the prosecution." *Id.*

The *Christy* court then performed a harmless error analysis to ensure that the denial of the petitioner's Fifth Amendment rights precluded the petitioner from asserting a real defense under Pennsylvania law. The Pennsylvania Supreme Court ruled that this denial was in fact harmless error because "psychiatric assistance would not have provided Christy with a defense under Pennsylvania law because Christy was diagnosed merely with a personality disorder." *Id.* The federal habeas court, however, disagreed, finding that *Ake* required psychiatric assistance " 'to help determine whether the insanity defense is viable.' Thus, implicit within *Ake*, such assistance is required when a defendant's

mental state is at issue, even if the defendant ultimately abandons an insanity defense." *Id.* (quoting *Ake*, 470 U.S. at 82, 105 S.Ct. 1087). The court went on to find that the Pennsylvania Supreme Court's interpretation of the record was inaccurate, determining that the "record is replete with multiple diagnoses that support the conclusion that Christy suffers from severe mental illness." *Id.* at 322. The court based this conclusion in part on the post-conviction collateral hearing testimony of an additional mental health expert, Dr. Shields, who indicated that the petitioner "might have, in fact, been able to succeed with a diminished capacity defense." *Id.* The *Christy* court found that the trial court's error was not harmless because, under the circumstances, the petitioner's "mental condition was his only viable defense and his strongest argument in mitigation for sentencing purposes." *Id.* The court pointed out that a psychiatrist could have testified to the impact of the petitioner's mental impairments "throughout his lifetime and particularly on the night in question," as well as "the effect of prolonged drug and alcohol abuse on an individual with [petitioner's] mental impairments." *Id.* Finally, the court found that psychiatric testimony was necessary for the petitioner to explain his horrible conduct to the jury, and to rebut aggravating circumstances presented by the prosecution. *See id.*

Petitioner's case strongly resembles that of his counterpart in *Christy*. Petitioner made it clear in a pretrial conference on November 7, 1984 that he intended to present mental health defenses, but did not explicitly request a court-appointed mental health expert for the defense at that time. The trial judge and the parties in turn agreed to a neutral court-appointed expert, Dr. Jay Bonovitz, to evaluate Petitioner's mental state and report directly to the court. (*See* Letter of Judge Kubacki 1/17/85.) Dr. Bonovitz' appointment occurred before the Supreme Court's ruling in *Ake*, and was consistent with case law at that time. It therefore cannot be considered a violation of defendant's due process rights. *Ake* was decided on February 26, 1985, nearly four months before Petitioner's trial. At the close of Petitioner's penalty phase, the trial court-appointed another neutral expert and ordered a presentence and a psychiatric report. (N.T. 6/12/85, at 6.59.) Petitioner responded by presenting a post-trial motion arguing that, under *Ake*, Petitioner was entitled to "the benefit of a presentence report, psychiatric and a[sic] medical studies" during sentencing. (*See* N.T. 2/7/86, at 60.) The trial court rejected his motion and accepted the jury's recommendation of death. (*See* N.T. 2/7/86, at 71–72.) We find that Petitioner adequately presented his need for a court-appointed mental health expert in his post-trial motion.[41] (*See* N.T. 2/7/86, at 61 (objecting to the lack of scientific evidence available to the defense during the penalty phase).)

Petitioner was also denied proper expert assistance. His case is virtually identical

---

41. It is possible to read *Christy* to mean that the trial court, upon receiving notice of Petitioner's intent to present mental health defenses, must *sua sponte* appoint a defense expert to assist Petitioner with such defenses. Under the facts in this case, we cannot fault the trial judge for failing to appoint a defense expert when Petitioner did not ask him to do so until after the trial. Such clairvoyance cannot be required of trial judges who, in the course of handling many criminal proceedings, are faced with many difficult and pressing issues. We therefore do not interpret *Christy* to place the onus on the trial court to exercise a defendant's Fifth Amendment rights under *Ake*, but instead focus our analysis on Petitioner's post-trial motion requesting such expert assistance as the proper ground on which to claim relief. The court should have granted this post-trial motion.

to that found sufficient to grant the writ in *Christy*. The trial court-appointed a neutral psychiatric expert, Dr. Jay Bonovitz, as the sole evaluator of both Petitioner's mental history and his mental state at the time of the crime. Dr. Bonovitz was not alerted by trial counsel to the numerous PSI reports and mental health evaluations chronicling Petitioner's history, and therefore did not take them into account in his analysis. He testified only during the guilt phase of the trial, and then only on the effects of alcoholic beverages on the cerebral cortex. (*See* N.T. 6/11/85, at 5.20–5.24.) He delivered his report directly to the court; it was never introduced into evidence by either party. The report did not address any of Petitioner's potential mental health defenses. It did, however, point out that Petitioner "became evasive" when asked about the details of the crime, noting that such a reaction could be a function of the lack of confidentiality between Dr. Bonovitz and Petitioner. (*See* Report Dr. J. Bonovitz at 1–2.)

Furthermore, like the experts appointed in *Christy*, Dr. Bonovitz' conclusion regarding competency "undermined any defense that [Petitioner] might have hoped to pursue." *Christy*, 28 F.Supp.2d at 321. Unlike the expert employed in *Christy*, however, Dr. Bonovitz performed even less than a "conclusory review" of Petitioner's record; he didn't review it at all. Such an omission in turn made it virtually impossible for Dr. Bonovitz to meet his duty under the Fifth Amendment of "marshaling the facts to assist in developing any defenses." *Id.* Dr. Bonovitz provided no assistance in the preparation or formation of Petitioner's case. Petitioner was in turn denied the essential benefits of an expert because he was forced to share Dr. Bonovitz with the prosecution.

Unlike the petitioner in *Christy*, however, we do not find that Petitioner's lack of

a court-appointed mental health expert resulted in actual prejudice at every stage of Petitioner's state murder trial. We instead find that the trial court's denial of Petitioner's post-trial motion constituted harmless error with regard to the guilt phase of his state trial, but was not harmless with respect to the penalty phase. A defendant in Pennsylvania may raise one of two mental health defenses at the guilt phase of a capital murder trial. First, he may assert that he was criminally insane under the *M'Naghten* test. *See* Pa. Cons. Stat. § 314(d). *M'Naghten* entitles a defendant to an acquittal if he can demonstrate, by a preponderance of the evidence, that he had a mental disease or defect that caused him either "not to know the nature and quality of the act he was doing or, if he did know it, that he did not know he was doing what was wrong." 18 Pa. Cons. Stat. § 314(c)(2). Petitioner presented no evidence at trial to support either of these conclusions, and the jury and Pennsylvania Supreme Court on direct review under § 9711(h)(3)(i) both found that the evidence presented was sufficient to support a finding of specific intent to kill.

The second available defense requires a showing that "as a result of an abnormal mental condition [Petitioner] was at the time of the killing incapable of" the specific intent required for a finding of first-degree murder. *Pennsylvania Criminal Suggested Standard Jury Instructions* § 5.01B (8th Supp.2000). Petitioner also presents no evidence that he was unable to form the requisite intent for first-degree murder. In fact, the record reflects Petitioner admitting that he entered the Victim's apartment on the morning of August 11, 1984 with the intent "to rape somebody." (N.T.6/6/85, at 2.57.) This clearly demonstrates Petitioner's ability to form a criminal intent, and is consistent with both the jury and the Pennsylvania Supreme Court's findings regarding the sufficiency

of evidence in support of Petitioner's first-degree murder conviction. Furthermore, none of Petitioner's prior psychiatric evaluations or presentence reports found that Petitioner suffered from any condition that would inhibit his ability to form a criminal intent. They focused instead on his having a personality disorder with sociopathic traits, his traumatic background and childhood, and his substance abuse. (*See, e.g.,* Report Dr. J. Bonovitz at 2–3; Report April 1981, at 7.) We find that none of these evaluations represent evidence of an inability to form the intent necessary to be found guilty of first-degree murder, and therefore reject Petitioner's claim that his lack of a court-appointed mental health expert for assistance in preparing defenses at the guilt phase of his state murder trial was anything other than harmless error.

Our conclusion is further supported by the fact that Petitioner never requested a defense expert during the guilt phase of his state murder trial. His post-trial motion argued only that he needed a court-appointed mental health expert for assistance in developing mitigation evidence at the penalty phase. We find that this is the extent of Petitioner's remediable claim. Petitioner neither requested relief in conjunction with the guilt phase of his state trial, nor is he entitled to it under the circumstances.

We are not, however, by virtue of our conclusions regarding the guilt phase, precluded from finding that actual prejudice existed at the penalty phase. The standard established for finding mitigation at the penalty phase is different from that relied on as a defense to guilt for first degree murder. As mentioned above, a guilt phase diminished capacity defense requires a showing that the defendant did not form the specific intent necessary to satisfy the statutory definition of first-degree murder. By contrast, Pennsylvania's

mitigating circumstances do not require such a high degree of mental infirmity to justify mitigation. They instead require a showing that the "defendant was under the influence of extreme mental or emotional disturbance" or that a defendant's poor mental health constitutes "evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." *See* 42 Pa. Cons. Stat. § 9711(e)(2), (8). The United States Supreme Court has found that penalty phase juries must be afforded every opportunity to exercise their discretion in granting a sentence of life imprisonment. *See Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

We are satisfied that the evidence presented by Petitioner is relevant to a finding of the two mitigating factors mentioned above, and that his lack of a court-appointed mental health expert actually prejudiced his defense at the penalty phase. Like the petitioner in *Christy,* Petitioner's record was replete with multiple diagnoses, as well as expert testimony from his post-conviction proceedings supporting a finding of actual prejudice as a result of his not having a court-appointed mental health expert at the penalty phase of his state trial. Dr. John O'Brien testified at Petitioner's post-conviction hearing that a diminished capacity defense may have been viable at the penalty phase in light of Petitioner's mental history. (*See* N.T. 12/14/95, at 18–19.) Dr. O'Brien likewise explained that a mental health expert could have testified to the impact of Petitioner's prolonged drug abuse and other mental infirmities on his life generally and on his state of mind in the early morning of August 11, 1984. (*See* N.T. 12/14/95, at 15, 18–19, 53, 56.) Finally, like the petitioner in *Christy,* Petitioner did not experience harmless error because his mental

condition was "his only viable defense and his strongest argument in mitigation for sentencing purposes." *Christy,* 28 F.Supp.2d at 322. As a result, Petitioner is able to establish, commensurate with the petitioner in *Christy,* the requisite harm for relief from his death sentence under the Fifth Amendment.

In light of the Supreme Court's clearly established position in *Ake,* and in conjunction with a very similar decision by the court in *Christy,* we find that Petitioner was denied his Fifth Amendment right to a court-appointed defense expert at the penalty phase of his state court proceeding. We do not, however, find that a similar error was committed with respect to the guilt phase of Petitioner's trial. Petitioner did not make such a claim, nor did he present evidence capable of establishing an inability on the part of Petitioner to form the necessary intent to be acquitted of first-degree murder. As a result, we grant Petitioner's request for relief from his death sentence on the ground that he was improperly denied a court-appointed defense expert for help in developing defenses in support of mitigation at the penalty phase, but deny such relief in connection with his first-degree murder conviction. Despite our finding that Petitioner is deserving of a writ on these grounds, we nonetheless consider the remainder of his claims in order to determine an appropriate remedy.

### 3. Claim III

Petitioner's Claim III argues that the trial court's "penalty phase jury instructions unconstitutionally prevented the jury from considering and giving effect to mitigating circumstances." (Pet. Writ Habeas Corpus at 44.) He makes three separate subclaims in support of this claim. First, Petitioner argues that the court's instructions and verdict sheet violated the rule of *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), by implying that the jury must find all mitigating circumstances unanimously in order to consider such factors as evidence against sentencing Petitioner to death. Petitioner's second subclaim contends that the trial court erred in instructing the jury that only mitigating circumstances that caused the victim's death may be considered in determining Petitioner's sentence. Finally, Petitioner's third subclaim maintains that the trial court improperly instructed the jury to count, rather than weigh, aggravating versus mitigating circumstances. All of Petitioner's contentions were presented to the Pennsylvania Supreme Court, and are therefore subject to substantive review by this court in accordance with the AEDPA.

Petitioner cites problems with the trial court's jury instructions and verdict sheet in support of his subclaim that the trial court improperly misled the jury to believe that mitigating circumstances must be found unanimously in order to be considered at the penalty phase. Considering each separately, we find that the Pennsylvania Supreme Court's previous denial of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d). The Eighth Amendment prohibition on cruel and unusual punishment requires that "the sentencer in a death penalty case be permitted to consider all relevant mitigating evidence that the defendant proffers as counseling less than a sentence of death." *Frey v. Fulcomer,* 132 F.3d 916, 920 (3d Cir.1997) (citing *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), and *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)). The Supreme Court elaborated on this standard in *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860,

100 L.Ed.2d 384 (1988), in which it vacated a death sentence on the grounds that there existed a "substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." *Id.* at 384, 108 S.Ct. 1860. The Court relied on the principle that "the jury's verdict must be set aside if it could be supported on one ground but not on another, and the reviewing court was uncertain which of the two grounds was relied upon by the jury in reaching the verdict," adding that "in reviewing death sentences, the Court has demanded even greater certainty that the jury's conclusions rested on proper grounds." *Id.* at 376, 108 S.Ct. 1860.

The Third Circuit applied *Mills* in two later cases, *Zettlemoyer v. Fulcomer*, 923 F.2d 284 (3d Cir.1991), and *Frey v. Fulcomer*, 132 F.3d 916 (3d Cir.1997). The court in *Zettlemoyer* upheld the state trial court's jury instructions and verdict sheet under *Mills*.[42] It upheld the jury charge

based on the finding that a reasonable probability of juror confusion did not exist where the "trial court correctly instructed the jury that its *verdict* must be unanimous" without precluding the jury's consideration of relevant evidence by requiring either "that the jury must unanimously find the existence of particular mitigating circumstances or that the jury ... weigh only those mitigating circumstances which it found unanimously." *Zettlemoyer*, 923 F.2d at 308 (emphasis in original). With regard to the verdict sheet, the court found that it did not "limit the mitigating circumstances the jury could consider." *Id.* The court interpreted the form's language to mean that "the jury's conclusion on the particular *aggravating* circumstance must be unanimous," but also found that the "absence of a similar instruction for mitigating circumstances indicates that unanimity is not required." *Id.* Instead, the form's lack of specificity regarding mitigating circumstances suggested to the court that the jury's ability to consider such circumstances was "broad and unrestricted," and therefore permissible under the Eighth Amendment and *Mills*. *Id.*

---

42. The jury instructions in *Zettlemoyer* read as follows:

> The verdict, of course, must be unanimous. Again, if you find unanimously, beyond a reasonable doubt, the aggravating circumstance that I have mentioned ... that is an aggravating circumstance. If you find that aggravating circumstance and find no mitigating circumstances or if you find that the aggravating circumstance which I mentioned to you outweighs any mitigating circumstance you find, your verdict must be the death penalty. If, on the other hand, you find that the Commonwealth has not proven an aggravating circumstance beyond a reasonable doubt or if they have, that the mitigating circumstances outweight (sic) the aggravating circumstances, then you must bring in a verdict of life imprisonment.... Under the law, as I said, you are obligated by your oath of office to fix the

> penalty at death if you *unanimously agree* and find beyond a reasonable doubt that there is an aggravating circumstances (sic) and either no mitigating circumstance or that the aggravating circumstance outweighs any mitigating circumstances.

*Zettlemoyer*, 923 F.2d at 309–10 (emphasis added). The verdict sheet stated that

> 1. We the jury unanimously sentence the defendant to: ____ death ____ life imprisonment.
> 2. (To be used in the sentence of death) We the jury have found unanimously: ____ at least one aggravating circumstance and no mitigating circumstance. The aggravating circumstance is ____. ____ the aggravating circumstance outweighs [the] mitigating circumstances. The aggravating circumstance is ____.

*Id.*

By contrast, the *Frey* court vacated a death sentence under *Mills* despite finding that the jury charge at issue was "similar in many respects to the charge at issue in *Zettlemoyer*."[43] *Frey*, 132 F.3d at 922. The *Frey* court distinguished *Zettlemoyer* on the basis that the trial court's instructions in *Frey* implied the need for jury unanimity in decisions *preceding* the ultimate verdict. The court used as evidence in reaching this conclusion the fact that the jury instructions in *Frey* used the word "unanimously" in closer proximity to the phrase "mitigating circumstances" than did the instructions in *Zettlemoyer*. *See id.* at 923 (finding that, in the *Frey* instructions, the word "unanimously" was used within seven words of a reference to mitigating circumstances, while in *Zettlemoyer*, the two phrases were separated by seventeen words). The *Frey* court also noted that the trial court used the word "unanimously" to modify "finds," rather than to modify "agree," as in *Zettlemoyer*. According to the court in *Frey*, this use of the word unanimously in conjunction with different verbs created a reasonable likelihood that the jury was precluded from considering constitutionally viable mitigat-

ing circumstances by their confused belief that they must be unanimous in their consideration of factors affecting sentencing, rather than merely in their ultimate sentencing decision. *See id.* The *Frey* court's final distinction rested on the way in which the trial judges explained the different burdens of proof that apply to aggravating and mitigating circumstances. In *Frey*, the court explained that aggravating circumstances must be proven beyond a reasonable doubt, and that mitigating circumstances need only be shown by a preponderance of the evidence. It did not, however, mention the unanimity requirement during its explanation. The *Zettlemoyer* court, on the other hand, performed the same explanation regarding burdens of proof, but added that the jury must find aggravating circumstances "unanimously, beyond a reasonable doubt." It did not in turn use the term unanimously in connection with the mitigating circumstances' preponderance standard. *See id.* at 923–24. This further explanation, according to the court in *Frey*, helped the jury understand the limited application of the unanimity requirement in a way lacking in the *Frey* instructions.[44] As a result, the Third

**43.** The instructions at issue in *Frey* stated:

Members of the jury, you must now decide whether this defendant should be sentenced to death or life imprisonment. The sentence will depend upon your findings concerning aggravating and mitigating circumstances. The Crimes Code provides that the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstance, or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances. The verdict must be a sentence of life imprisonment in all other cases.... Remember that your verdict must be a sentence of death if you unanimously find at least one aggravating circumstances (sic) and no mitigating circumstances, or if you unanimously find one or more aggravating circumstances which outweigh any

mitigating circumstances. In all other cases, your verdict must be a sentence of life imprisonment.
*Frey*, 132 F.3d at 922.

**44.** Unlike the court in *Zettlemoyer*, the *Frey* court relied only briefly on an analysis of the verdict sheet, referring only to Pennsylvania's later adoption of a uniform verdict slip as evidence of "at least some concern ... that juries could misunderstand the previous instructions as to unanimity and the consideration of mitigating evidence by individual jurors." *Frey*, 132 F.3d at 924 (quoting *Mills*, 486 U.S. at 382, 108 S.Ct. 1860). It instead concluded that the verdict forms at issue in *Frey* and *Zettlemoyer* were "substantially the same," and focused on the significant differences between the jury charges in the two cases to justify its decision. *But see id.* at 922 (finding the two charges "similar in many respects").

Circuit vacated the petitioner's death sentence due to their finding that the jury instructions and verdict sheet in *Frey*, when taken as a whole, violated the Supreme Court's holding in *Mills*.

At the penalty phase of the case before us, the trial judge instructed the jury as follows:

> If murder in the first degree is accompanied by at least one of the following aggravating circumstances and none of the following mitigating circumstances, the person convicted shall be sentenced to death. If a murder of the first degree is not accompanied by any aggravating circumstances, or is accompanied by at least one of the following mitigating circumstances, a person shall be sentenced to life imprisonment.... Remember again that your verdict must be unanimous.

(N.T. 6/12/85, at 6.51, 6.55.) The verdict sheet submitted to the sentencing jury included a checklist of all the available aggravating and mitigating circumstances, followed by the following statement:

> We the jury have found unanimously
>
> [ ]at least one aggravating circumstance and no mitigating circumstance. The aggravating circumstance(s)(is)(are)
>
> _____.
>
> [ ]one or more aggravating circumstances which outweigh any mitigating circumstances. The aggravating circumstance(s)(is)(are) _____.
>
> We the jury unanimously render the following sentencing verdict:
>
> DEATH ( )
>
> LIFE IMPRISONMENT ( )

(First Degree Murder Verdict Penalty Determination Sheet at 3.) Petitioner contends that by failing to mention that aggravating circumstances must be found unanimously in its jury instructions, the trial court equated aggravating and miti-

gating circumstances in the minds of the jury. According to Petitioner, this is distinguishable from *Zettlemoyer*, in which the sentence was upheld because the court mentioned the unanimity requirement with regard to aggravating circumstances separately from its discussion of the role of mitigation evidence. It is also, according to Petitioner, reminiscent of *Frey*. Although the trial court in *Frey* did mention the unanimity requirement with respect to finding evidence relevant to sentencing, the petitioner's sentence was vacated due to the court's failure to make clear to the jury which evidence the requirement applied to. Petitioner argues that the trial court's failure in his case to mention unanimity with respect to aggravating or mitigating circumstances is more closely analogous to *Frey* than *Zettlemoyer* and should therefore be the basis for habeas corpus relief under *Mills*. Petitioner likewise argues, with respect to the verdict sheet, that its wording created a substantial probability that reasonable jurors felt precluded from considering mitigating circumstances that the jury did not unanimously agree on. As a result, under *Mills*, Petitioner would also have a right to habeas corpus relief from his death sentence on these grounds.

Petitioner's arguments were denied by the Pennsylvania Supreme Court in collateral proceedings. *See Holland II*, 727 A.2d at 568. Relying on the United States Supreme Court's holding in *Mills* that a jury is not required to be "affirmatively instructed that mitigating circumstances need not be unanimously found before any juror may weigh them ... [but only] that where there is a high risk that instructions could be understood as requiring unanimity as to mitigating circumstances, the sentence must be vacated," the Pennsylvania Supreme Court validated the trial court's instructions and verdict form on the

grounds that they were similar to those found acceptable in *Commonwealth v. Banks*, 540 Pa. 143, 656 A.2d 467 (1995). *Banks* involved a constitutional challenge to the following jury instruction: "the verdict must be a sentence of death if the jury *unanimously* finds at least one aggravating circumstance and *no mitigating* circumstance, or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstance or circumstances." *Id.* at 470. The Supreme Court of Pennsylvania upheld the instruction on the grounds that it "mirrors the language of [Pennsylvania's] Sentencing Code, [and] has previously been reviewed by this Court and determined not to violate *Mills*." *Id.* (state court citations omitted). It upheld the verdict sheet because it found it similar to that previously upheld in *Commonwealth v. Frey*, 520 Pa. 338, 554 A.2d 27 (1989). *See Banks*, 656 A.2d at 470.

We find that the Pennsylvania Supreme Court's decision was not contrary to, or an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d). First, neither *Zettlemoyer* nor *Frey* qualify as "clearly established federal law, as determined by the Supreme Court of the United States." [45] *See id.; Banks v. Horn*, 63 F.Supp.2d 525, 543–44 (M.D.Pa. 1999) (finding that, because it was decided prior to the amendments to § 2254, the principles enunciated in *Frey* are not applicable to cases decided thereafter). Moreover, although the Third Circuit recognizes the informative value of lower court decisions in interpreting Supreme Court precedent, *see Matteo*, 171 F.3d at 888, both *Zettlemoyer* and *Frey* are distinguishable from Petitioner's case. The Pennsylvania Supreme Court acted in accordance with analogous state court decisions applying *Mills* to Pennsylvania's death penalty statute. It seems clear that this decision was not contrary to clearly established federal law, as Petitioner presents no evidence of an existing Supreme Court precedent that would require a contrary outcome. *See Matteo*, 171 F.3d at 888. We likewise find that the Pennsylvania Supreme Court's decision did not represent an unreasonable application of such law. We are not at liberty to review the state court's decision for accuracy. Our inquiry is limited under § 2254(d) to one of reasonableness. *See Williams*, 120 S.Ct. at 1522 (explaining that an "*unreasonable* application of federal law [according to § 2254(d) ] is different from an *incorrect* application of federal law"). *Mills*, like later cases applying it, requires a very fact-specific inquiry into the instructions and verdict sheets offered to the jury. None of the cases cited by Petitioner are

---

**45.** The Supreme Court's decision in *Mills*, however, does qualify as clearly established federal law at the time Petitioner's state court conviction became final. *Mills* was decided on June 6, 1988, approximately two weeks after the Pennsylvania Supreme Court affirmed Petitioner's conviction on direct appeal on May 20, 1988. Under the AEDPA, the "threshold question ... is whether [petitioner] seeks to apply a rule of law that was clearly established at the time his state court conviction became final." *Williams*, 120 S.Ct. at 1511. A conviction is deemed final under Pennsylvania law "at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review." 42 Pa.C.S.A. § 9545(b)(3). A defendant has ninety days from the day the state court of last resort decides his case to apply for certiorari to the Supreme Court of the United States. *See* Sup.Ct. R. 11. As a result, Petitioner's state court conviction became final ninety days after the Pennsylvania Supreme Court affirmed it, on or about August 20, 1988. Because *Mills* was decided before that date, it was clearly established at the time Petitioner's conviction became final, and is therefore controlling with regard to Petitioner's case.

sufficiently analogous to the case at hand to lead us to believe that the state court acted unreasonably in this case in finding its prior holding in *Commonwealth v. Banks* to be compatible with *Mills*. *See Banks v. Horn*, 63 F.Supp.2d at 544 ("That the Third Circuit reached a contrary result does not mean that the decision of the state courts was unreasonable."). We therefore find that we are unable to conclusively determine, as granting a writ under § 2254 requires us to do, that the Pennsylvania Supreme Court's application of *Mills* was objectively unreasonable. Petitioner's argument that the jury instructions and verdict sheet at his sentencing violated *Mills* is denied on its merits.

Petitioner's second subclaim argues that the trial court's jury instructions improperly precluded the jury from considering relevant mitigating evidence by limiting such evidence to only those factors that caused Petitioner's offense. As mentioned above, a "sentencer in a death penalty case [must] be permitted to consider all relevant mitigating evidence that the defendant proffers as counseling less than a sentence of death." *Frey v. Fulcomer*, 132 F.3d 916, 920 (3d Cir.1997) (citing *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), and *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)). At the penalty phase, the trial court instructed the jury to "remember to consider all the evidence that you have heard here today. Give it the weight which it is entitled and decide for yourselves what circumstances *caused* this killing." (N.T. 6/12/85, at 6.55 (emphasis added).) Petitioner argues that this instruction improperly limited the scope of the sentencing jury's review to "causative" circumstances. He contends that this limitation was particularly harmful to him because he presented only "background" evidence in support of mitigation, none of which was even intended to

be causative. Petitioner also argues that the trial court's additional instructions referring to circumstances "accompanying" the crime were not curative. According to Petitioner, the term "accompany" encompasses the term "cause" such that references to circumstances both accompanying and causing a crime would have to be interpreted in accordance with the narrower of the two terms to represent only those circumstances that caused the crime. Finally, Petitioner claims that the trial court's error was not harmless, in that it unconstitutionally precluded the jury from considering evidence in mitigation of death.

The Supreme Court of Pennsylvania denied this allegation on the merits on direct appeal. *See Holland I*, 543 A.2d at 1076. The court reviewed the jury charge as a whole, and found that it did not have the effect of improperly limiting the jury's consideration of mitigating evidence. It focused on the fact that the trial court only used the term "cause" in relation to all circumstances related to the killing, and did not mention it with respect to aggravating or mitigating circumstances specifically. The court in *Holland I* also noted that the trial court's mention of causation occurred after it reminded the jury to consider all the relevant evidence in arriving at a sentence. *See id.* at 1076. The state supreme court continued by explaining that the Commonwealth was able to establish as an aggravating circumstance Petitioner's significant history of felony convictions. Because this circumstance is in no way causative of the crime, the court found that Petitioner's allegation that the jury was limited to only causative mitigating circumstances was empirically baseless. *See id.* Finally, the state supreme court determined that Petitioner faced no actual prejudice as a result of the instruction. First, according to its decision in *Holland*

*I*, the court determined that the only evidence Petitioner was able to present in support of mitigation was in fact causative, i.e. that he had a troubled background that caused him to behave in a socially irresponsible and irrational manner. The state supreme court also noted that Petitioner was able to establish none of the statutory mitigating circumstances at trial, while the Commonwealth proved three aggravating circumstances. As a result, any error in the jury instruction regarding mitigation was harmless in that it would have been insufficient to overcome the weighing process performed by the jury between aggravating and mitigating circumstances. *See id.* The Pennsylvania Supreme Court's determination was neither contrary to, nor an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d). Petitioner presented no evidence of a Supreme Court precedent that arrived at a conclusion opposite that of the state court on a set of materially indistinguishable facts. *See Williams,* 120 S.Ct. at 1523. Petitioner has likewise failed to demonstrate that the Pennsylvania court was objectively unreasonable in its application of Eighth Amendment Supreme Court precedent. Our review under the AEDPA requires us to evaluate not whether the state court was correct in its application of federal law, but whether it was reasonable. We find that the decision of the court in *Holland I* falls within the broad range of acceptable conclusions outlined by § 2254(d). The manner in which the trial court used the term "caused" was not likely to preclude the jury from considering all the evidence presented by Petitioner. As a result, Petitioner's argument is rejected and his claim for federal collateral relief based on the trial court's allegedly improper jury instruction regarding causative circumstances at sentencing is denied on its merits.

Petitioner's third and final subclaim contends that jurors were unconstitutionally precluded from considering all relevant mitigating evidence by virtue of the trial court's erroneous instruction regarding the proper treatment of such evidence. During Petitioner's sentencing proceeding, the trial judge instructed the jury to "follow their oath and their consciences in determining how many aggravating and how many mitigating circumstances there are." (N.T. 6/12/85, at 6.46.) "To repeat, if you find one aggravating circumstance and no mitigating circumstance, your verdict will be death. If you find no aggravating circumstances and no mitigating circumstances, the sentence will be life. If you find one aggravating and one mitigating, it will be life. If you find more aggravating circumstances than you find mitigating circumstances, then the penalty will be death." (N.T. 6/12/85, at 6.55.) Petitioner asserts that this instruction required the jury to *count,* rather than *weigh* aggravating versus mitigating circumstances, and to arrive at its determination on the basis of a quantitative comparison. He makes three distinct allegations as to why such a quantitative comparison would justify habeas corpus relief.

First, Petitioner contends that this instruction discouraged jurors from considering mitigating circumstances because Petitioner only presented evidence in favor of one mitigating circumstance and the jury had already found three aggravating circumstances. According to Petitioner, once the jury determined that three aggravating circumstances were present, in may have ceased deliberations in recognition of the fact that finding three or more mitigating circumstances was impossible in light of the Petitioner's mitigation evidence. The Pennsylvania Supreme Court agreed with Petitioner that the trial court erred in instructing the jury to count, rather than

weigh, aggravating and mitigating circumstances. *See Holland I*, 543 A.2d at 1075. It nevertheless denied Petitioner's argument that the charge precluded the jury from considering mitigating circumstances on the grounds that any error by the trial court was harmless. It found

> [N]o merit in [Petitioner's] argument that the defective instruction on "weighing" could have caused the jury to refrain from conducting any deliberations on the question of whether mitigating circumstances were present.... [T]he question of whether mitigating circumstances are present is separate and apart from the question of whether, once they are found to exist, the mitigating circumstances are sufficient to prevail over the aggravating circumstances. The record shows that the jury was thoroughly and competently instructed on the subject of what would constitute mitigating circumstances, and there is no reason to believe that the instructions on that subject were ignored.... Further. in announcing the verdict, the jury foreman expressly stated the jury's finding that no mitigating circumstances were present.

*Id.*

We are bound by the standard of review set forth in the AEDPA for claims heard on the merits in state court, which permits a reviewing court to grant a writ only when the state court decision was either "contrary to, or ... an unreasonable application of, clearly established federal law." 28 U.S.C. § 2254(d). In this case, Petitioner cites the Eighth Amendment's prohibition on cruel and unusual punishment, as interpreted in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), as the applicable federal law, and contends that the Pennsylvania Supreme Court decision represented an unreasonable application of that law. The reasonableness inquiry prescribed in § 2254(d) does not require that we affirm the correctness of the state court determination, only that we evaluate whether that court was "objectively unreasonable" in its application of federal law. *See Williams*, 120 S.Ct. at 1521. We find that the Pennsylvania Supreme Court was not objectively unreasonable in its resolution of Petitioner's prior claim. Although the charge was deemed improper by the state court, there was evidence indicating that no prejudice resulted to Petitioner's case as a result of judicial error. We are unable to say that the Pennsylvania Supreme Court was unreasonable in relying on this evidence to deny Petitioner's claim, and therefore are bound to deny that claim in accord with the standard of review set forth in § 2254(d).

Petitioner next argues that the trial court's instruction violated Petitioner's due process liberty interest by contradicting the requirements set forth by Pennsylvania's Death Penalty Statute, 42 Pa. Stat. Cons.§ 9711(c)(1)(iv).[46] *See Hicks v. Oklahoma*, 447 U.S. 343, 346, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980) (finding that a state statutory provision created a due process liberty interest for defendant). Section 9711(c)(1)(iv) requires that,

> [b]efore the jury retires to consider the sentencing verdict, the court shall instruct the jury on the following matters: ... the verdict must be a sentence of

---

46. The Commonwealth contends that this argument was never presented in state court and therefore that it is not properly before this court for review because it was procedurally defaulted. We find that this issue was fairly presented before the Pennsylvania Supreme Court on direct appeal, and therefore that it is available for federal review. (*See* Br. For Appellant I at 25); *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir.1999).

death if the jury unanimously finds at least one aggravating circumstance specified in subsection (d) and no mitigating circumstance or if the jury unanimously finds *one or more aggravating circumstances which outweigh any mitigating circumstances.*

*Id.* (emphasis added). As stated above, the Pennsylvania Supreme Court recognized that the trial court's instruction improperly omitted the weighing requirement, but nonetheless denied Petitioner's claim on the grounds that the error was harmless, i.e. it did not prejudice his defense. *See Holland I,* 543 A.2d at 1075–76. Section 2254(d) of the AEDPA requires us to defer to the state court's determination unless it was contrary to, or an unreasonable application of, clearly established federal law. We find that the Pennsylvania Supreme Court's finding of harmless error was not objectively unreasonable, as evidence did exist indicating that the jury conducted a full evaluation of Petitioner's mitigating evidence and concluded that no mitigating circumstances existed. If the jury's finding of no mitigating circumstances was proper, then it was likewise proper under Pennsylvania law for Petitioner to receive a sentence of death. Petitioner offers no evidence to rebut the state court's harmless error finding. We therefore cannot say that the Pennsylvania Supreme Court's conclusion that the trial court's error was harmless in light of this fact was unreasonable, and as a result must reject Petitioner's argument within the standard of review set forth in § 2254(d).

Petitioner's final argument asserts that the trial court's counting versus weighing instruction caused Petitioner's sentence to be arbitrary and capricious because it was determined without reference to Petitioner's actual culpability.[47] The Pennsylvania Supreme Court did not contest the impropriety of the trial court instruction, only that the error resulted in any actual harm to Petitioner's case. *See Holland I,* 543 A.2d at 1075–76. As in the previous two arguments, we cannot find that the Pennsylvania Supreme Court was objectively unreasonable in its application of *Lockett* and its progeny to the facts of Petitioner's case. As a result, we are bound under § 2254(d) to reject the argument in deference to the state court's prior determination.

Finally, we do not address Petitioner's third subclaim of ineffective assistance of trial or appellate counsel for failure to raise any of the above issues because we find that they were either raised in state court or improperly required counsel to anticipate future Supreme Court decisions and, in turn, are without merit.

### 4. *Claim IV*

In his Claim IV, Petitioner argues that he is entitled to habeas corpus relief from his death sentence because of the "prosecutor's improper argument." (Pet. Writ Habeas Corpus at 48.) He makes five separate subclaims in support of this claim. First, he contends that the prosecutor made adverse comments with regard to Petitioner's silence at the penalty phase of his state murder trial in violation of his Fifth Amendment privilege against self-

**47.** Like Petitioner's previous argument with respect to the trial court's counting instruction, the Commonwealth contends that this argument was never presented in state court and therefore that it is not properly before this court for review because it was procedurally defaulted. We find that this issue was fairly presented before the Pennsylvania Supreme Court on direct appeal, and therefore that it is available for federal review. (*See* Br. For Appellant I at 25); *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *McCandless v. Vaughn,* 172 F.3d 255, 261 (3d Cir.1999).

incrimination. Second, Petitioner argues that the prosecutor improperly denigrated the role of mercy and sympathy in the jury's sentencing decision. Third, Petitioner contends that the prosecutor improperly vouched for the propriety of the jury's finding aggravating circumstances and sentencing the defendant to death. Fourth, Petitioner notes that the prosecutor made an improper comment regarding jury deliberations. Finally, the Petitioner cites as a fifth subclaim the ineffectiveness of both his trial and appellate counsel for either failing to object to these improper statements or for failing to raise their impropriety on appeal. Petitioner's first subclaim was properly submitted for state court review on its merits, and therefore is subject to review by this court in accord with § 2254(d) of the AEDPA. The remaining four subclaims, however, were never presented in state court. They are therefore procedurally defaulted, and may only be considered by this court if Petitioner can demonstrate cause and prejudice for his default. *See Murray*, 477 U.S. at 488, 106 S.Ct. 2639. Petitioner alleges that his trial and appellate counsel were constitutionally ineffective for not raising these issues in state proceedings, and that their constitutional deficiency is grounds for excusing his procedural default. We disagree. Because we find all four of Petitioner's defaulted subclaims groundless, we conclude that his counsel cannot be ineffective for failing to raise such meritless claims, and therefore that no cause and prejudice exists to excuse Petitioner's default of these issues. *See Strickland*, 466 U.S. at 691, 104 S.Ct. 2052.

a. Defaulted Subclaims

■ We will discuss subclaims two through five first. In subclaim two Petitioner argues that the prosecutor improperly instructed the jury not to consider either mercy or sympathy in assigning Petitioner's sentence. He cites the Eighth Amendment prohibition on cruel and unusual punishment in support of this argument, specifically the Supreme Court's decision in *California v. Brown*, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987). *Brown* addressed the issue of whether a state court jury instruction prohibiting a jury from being swayed by "mere sympathy" satisfied the constitutional requirement that juries be permitted to consider all relevant evidence in mitigation of a defendant's death sentence. *See, e.g., Eddings v. Oklahoma*, 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio*, 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). The trial court in *Brown* instructed the jury that it "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." *Brown*, 479 U.S. at 540, 107 S.Ct. 837. The Supreme Court determined that a reasonable juror would understand the instruction "as a directive to ignore only the sort of sympathy that would be totally divorced from the evidence adduced during the penalty phase." *Id.* at 542, 107 S.Ct. 837. It went on to find that an "instruction prohibiting juries from basing their sentencing decisions on factors not presented at the trial, and irrelevant to the issues at the trial, does not violate the United States Constitution." *Id.* at 543, 107 S.Ct. 837.

Petitioner argues that the prosecutor at his capital murder trial twice denigrated the role of mercy and sympathy before the jury in violation of *Brown*. We disagree. Petitioner cites two prosecutorial statements as problematic under the Eighth Amendment. The first involved the prosecutor's immediate response to defense counsel's plea for mercy on behalf of Petitioner. "[Defense counsel] spoke to you and he appealed to your sense of mercy, he appealed to your sense of sympathy, in

asking you not to impose the death penalty in this case. But once again, . . . he didn't talk about the law. He didn't talk about the evidence in this case . . . ." (N.T. 6/12/85, at 6.33.) The second dealt with the prosecutor's arguments as to why Petitioner was not deserving of mercy:

> You must follow the law. You can't decide what you want to do. You can't decide that you want to give some mercy or sympathy to the defendant as he asked for. Consider, if you will, the sympathy or the mercy that he showed [the victim] in that apartment that morning. It has no place here.

(N.T. 6/12/85, at 6.47.) These statements in no way violate the Eighth Amendment. First, there is a great difference in the potential prejudicial effects of a prosecutor's closing argument, which the jury is instructed not to treat as evidence, (see N.T. 6/11/85, at 5.132) and a trial judge's instructions, which the law both assumes and demands that the jury obey. The Court in *Brown* addressed the latter of these, and was still hesitant to overrule a jury's sentencing decision. Next, the prosecutor simply did not suggest that the jury was forbidden from exercising mercy in sentencing Petitioner. He instead reminded the jury of their duty under the law to evaluate aggravating and mitigating circumstances. He then argued to the jury that the evidence presented by Petitioner at sentencing was not sufficient to engender mercy. Although Petitioner takes particular umbrage with the statement "[y]ou can't decide that you want to give some mercy or sympathy to the defendant as he asked for," we find that within the context of the entire statement, that sentence clearly amounts to an argument on the facts presented at trial, and is not nearly

as problematic as the jury instruction upheld by the Supreme Court in *Brown.* In sum, the prosecutor did not improperly argue to jurors to ignore mercy or sympathy in sentencing Petitioner.

Petitioner's third subclaim is that the prosecutor improperly vouched for the propriety of certain aggravating circumstances and, in turn, the death penalty for Petitioner. In his closing argument, the prosecutor stated "if ever there was a case where the death penalty was appropriate, this is the case. If ever there was a defendant who deserved the death penalty, it is this defendant sitting before you in the courtroom, William Holland." (N.T. 6/12/85, at 6.35.) He went on to argue in favor of the jury's finding one of the statutory aggravating circumstances by explaining that, in light of the facts of Petitioner's case, "[i]f that isn't torture, I don't know what is." (N.T. 6/12/85, at 6.37, 6.39.) Petitioner contends that the prosecutor's comments were improper because they expressed his personal views as to the appropriateness of the death penalty, and because they "emphasized his position as a prosecuting attorney" in an attempt to use his authority as a representative of the Commonwealth to influence the jury. (Mem. Law Supp. Pet. Writ Habeas Corpus at 106.)

In support of these allegations, Petitioner cites two Supreme Court cases and a series of lower federal court decisions. He relies on the Supreme Court's decision in *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), for the proposition that a prosecutor's argument runs afoul of the Eighth Amendment when it diminishes the jury's "sense of responsibility for its sentencing decision." [48]

---

**48.** Petitioner also cites two state supreme court cases that he alleges support this argument. He does not, however, cite any relevant Pennsylvania law, nor does he explain why these decisions represent anything more than persuasive authority to this court. As a

(Mem. Law Supp. Pet. Writ Habeas Corpus at 106.) According to Petitioner, by expressing his opinion as to the appropriateness of the death penalty, the prosecutor improperly assumed a portion of the sentencing jury's responsibility. *Caldwell,* however, dealt with a very different prosecutorial indiscretion than Petitioner alleges here. The prosecutor in *Caldwell* instructed the sentencing jury that "your decision is not the final decision," and that "[y]our job is reviewable." *Id.* at 325, 105 S.Ct. 2633. The prosecutor went on to say that "I think it's terribly unfair" that defense counsel told the jury they had the authority to kill the defendant. *Id.* In vacating the death sentence, the Supreme Court found that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 328–29, 105 S.Ct. 2633. As mentioned above, *Caldwell* is completely distinguishable from the case at hand. The prosecutor in Petitioner's case never even implied that the sentencing jury had anything less than full authority to determine Petitioner's fate. In fact, he even reminded the jury of the significance of their oath and the tremendous responsibility that accompanies such a pledge. (*See* N.T. 6/12/85, at 6.48–6.49.) The trial court reaffirmed this by reminding the jury that they "are not merely recommending a punishment. The verdict that you will return will actually fix the punishment at either death or life imprisonment." (N.T. 6/12/85, at 6.55.) The prosecutor did not improperly usurp the jury's sentencing responsibility, but instead attempted to bring to light the seriousness of their obligation and to encourage them to fulfill their duty in accordance with the law.

Petitioner next argues that the prosecutor's comments were constitutionally impermissible because they represented the prosecutor's personal opinion with regard to the appropriateness of the death penalty and focused on his position as a governmentally appointed prosecuting attorney. Petitioner cites *United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), as prohibiting such conduct because of two dangers inherent in statements of prosecutorial opinion:

> [S]uch comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Commonwealth and may induce the jury to trust the Commonwealth's judgment rather than its own view of the evidence.

*Id.* at 18–19, 105 S.Ct. 1038. *Young* based its decision, however, not simply on whether the prosecutor expressed an opinion as to the proper sentence, as Petitioner argues, but on whether the prosecutor's comments, when viewed "within the context of the trial … amounted to prejudicial error." *Id.* at 12 (citing *Lawn v. United States,* 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958)). The Court ultimately upheld the jury's sentencing decision on the grounds that "[t]he prosecutor's statement of his belief that respondent intended to commit fraud contained no suggestion that he was relying on information outside the evidence presented at trial," and that the "overwhelming evidence of respon-

---

result, we focus on applicable Supreme Court precedent and subsequent federal interpreta-

tions thereof to justify our ultimate decision.

dent's intent to defraud ... eliminate[d] any lingering doubt that the prosecutor's remarks unfairly prejudiced the jury's deliberations or exploited the Commonwealth's prestige in the eyes of the jury." *Id.* at 19, 105 S.Ct. 1038.

Petitioner also relies on a variety of circuit court opinions for the premise that prosecutors are constitutionally prohibited from airing their views on the appropriateness of the death penalty in a particular case. Third Circuit precedent, however, makes it clear that a prosecutor does not commit a *per se* violation if his comments rely on evidence available in the record. "[B]efore reversal is warranted based on the [prosecutor's] statements alone, those statements must be based on information not before the Court. If the statements are based on evidence, prejudice must be shown to result to the defendant before reversal is warranted. Such prejudice can be cured by an appropriate instruction by the trial judge or by a finding that there is overwhelming evidence to support the conviction." *United States v. Gallagher,* 576 F.2d 1028, 1042 (3d Cir. 1978); *see United States v. Walker,* 155 F.3d 180, 185 (3d Cir.1998) (recognizing a petitioner's "right to be tried solely on the basis of the evidence presented to the jury"); *United States v. Beaty,* 722 F.2d 1090 (3d Cir.1983) ("[T]his Circuit has long distinguished between expressions of personal opinion based on the evidence and those based on facts not in evidence. Reversal per se is required only in the latter case. If the statements are based on the evidence, prejudice must be shown to the defendant before reversal is warranted."). Statements made purely from prosecutors' personal experience are considered outside of the evidence, as are statements meant to prey on a juror's fears or emotions. *See Gallagher,* 576 F.2d at 1042 (referring to prosecutor's statement that "I do not know of a case where the evidence is stronger to

establish guilt" as one made from personal experience and outside the evidence); *see also Miller v. Lockhart,* 65 F.3d 676, 684 (8th Cir.1995) (vacating sentence in part because prosecutor "played on the jurors' 'personal fears and emotions' by calling [defendant] an escape artist who posed a threat to society"); *Newlon v. Armontrout,* 885 F.2d 1328, 1336 (8th Cir.1989) (finding that statement "concerning [prosecutor's] personal belief that this case deserved the death penalty more than any other in ten years" was not based on the evidence at trial).

The prosecutor in Petitioner's case, like his counterpart in *Young,* never strayed from the trial record in support of his arguments. (*See, e.g.,* N.T. 6/12/85, at 6.49 ("The law in this case demands [the death penalty] and the evidence demands it.").) Petitioner asserts that the prosecutor's statement that "[n]ow, if ever there was a case where the death penalty was appropriate, this is the case" was based on information not in the trial record. (N.T. 6/12/85, at 6.35.) We disagree. There is nothing in the prosecutor's statement that indicates that he is referring to anything other than trial testimony to claim that the appropriate number of aggravating circumstances exist to sentence Petitioner to death. Furthermore, as a result of defense counsel's timely objections to the prosecutor's statements and the evidence supporting the sentencing jury's verdict, we conclude that Petitioner experienced no unfair prejudice at the hands of such prosecutorial comments.

Petitioner also argues that the prosecutor's comments regarding the torture aggravating circumstance, i.e. "[i]f that isn't torture, I don't know what is" represent an improper argument under the Eighth Amendment. Again, we disagree. As in his aforementioned statement, the prosecuting attorney relied solely on trial evi-

dence regarding Petitioner's attack of the victim to support his argument that the criteria for establishing an aggravating circumstance due to torture had been met. In addition, Petitioner presented no evidence to contradict the prosecutor's assertion that Petitioner had tortured the victim before murdering her. Finally, any arguable prejudice was avoided by defense counsel's objections to the prosecutor's statements (*see* N.T. 6/12/85, at 6.35, 6.48) and the trial court's instructions regarding the non-evidentiary role of counsel's statements. *See United States v. Swinehart,* 617 F.2d 336, 339 (3d Cir.1980) (finding that "the trial judge, in his charge to the jury, helped dispel any improper inferences the jurors might have drawn from the prosecutor's remarks ... the judge instructed that ... 'statements and arguments of counsel are not evidence in the case' "); (*see also* N.T. 6/11/85, at 5.132.) As a result, we find that no unfair prejudice occurred as a result of the prosecutor's remarks regarding the appropriateness of Petitioner's death sentence.[49]

Petitioner's fourth subclaim challenges two analogies made by the prosecutor at sentencing as constitutionally impermissible. According to Petitioner, the prosecutor's comparisons between the sentencing jury in Petitioner's case and a "fire fighter who runs into a burning building to save someone, or ... a police officer who knows he must confront an armed man ... improperly urged the jury to abandon the careful and dispassionate deliberations the Eighth and Fourteenth Amendments require." (Mem. Law Supp. Pet. Writ Habeas Corpus at 107.) Petitioner argues that death sentences must be the product of a "reasoned moral response," *see Penry v. Lynaugh,* 492 U.S. 302, 328, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), and that the quick reactions demanded of a fire fighter or police officer cannot reasonably be analogized to such a response. Although we do not take issue with Petitioner's recitation of the proper legal standard for evaluating death sentences, we find that the prosecutor's remarks in no way prevented the jury from performing a reasoned moral analysis of the appropriate penalty for Petitioner. Defense counsel objected to the prosecutor's original analogy, thereby indicating his concern that it may mislead the jury. (*See* N.T. 6/12//85, at 6.35.) The prosecutor responded by explaining precisely what he meant when he analogized the sentencing jury to a fire fighter or policeman in dangerous situations: "That

---

**49.** Although not argued by the Commonwealth, we also note that the prosecutor's comments were not unconstitutional because they were made in response to defense counsel's contention that death was an inappropriately harsh punishment. Under the "invited response" doctrine, a prosecutor may respond to assertions by defense counsel that are outside the bounds of the trial record or otherwise constitutionally improper. If the prosecutor's remarks "did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction." *Young,* 470 U.S. at 12–13, 105 S.Ct. 1038. In this case, the prosecutor responded to defense counsel's attempts to "appeal to the passions of th[e] jury" (N.T. 6/12/85, at 6.29) by stating that, in light of the facts presented, "if ever there was a case where the death penalty was appropriate, this is the case. If ever there was a defendant who deserved the death penalty, it is this defendant sitting before you in the courtroom, William Holland." (N.T. 6/12/85, at 6.35.) This statement was made with regard to the requirements of the Pennsylvania Death Penalty Statute, and referred only to the statutorily defined aggravating circumstances and the fact that the evidence presented at trial clearly established at least three of these circumstances. (*See* N.T. 6/12/85, at 6.37, 6.39 ("If that isn't torture, I don't know what is.").) As a result, we find that the prosecutor's challenged comments merely compensated for defense counsel's prior indiscretion, and therefore do not violate the Eighth Amendment.

is exactly what I am telling you, ladies and gentlemen. You are bound by the law. And I am saying it is not easy to do all the time. My reference to firemen and policemen is to give you an analogy of how it isn't easy to follow the law but in this case you are bound to do it." (N.T. 6/12/85, at 6.36.) This explanation confirms that the prosecutor neither intended to, nor in fact did, influence the jury to rush to judgment in sentencing Petitioner. We find that Petitioner's challenge to the prosecutor's comments is therefore meritless.

Petitioner's fifth subclaim is that his trial and appellate counsel were constitutionally ineffective for failing to raise the above issues either at trial or on direct appeal. Because we find each of Petitioner's above assertions groundless, we likewise deny his claims of ineffective assistance, as counsel cannot be ineffective for failing to raise a meritless claim. *See Strickland,* 466 U.S. 668, 691, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (finding that failure to pursue "fruitless" claims "may not later be challenged as unreasonable").

In short, because we reject Petitioner's defaulted subclaims two through four, we also find that his trial and appellate counsel could not have been constitutionally ineffective for failing to raise such claims, and therefore conclude that no cause and prejudice exists to excuse his procedural default. These subclaims are thus not properly before this court for review on their merits.

b. AEDPA Review

In his first subclaim, Petitioner maintains that he is entitled to relief from his death sentence because the prosecutor made improper comments at sentencing regarding Petitioner's failure to testify. As a result of Petitioner's presenting this contention in state court, we may review it on its merits pursuant to § 2254(d) of the AEDPA, which permits federal courts to grant a writ of habeas corpus if a state court decision is contrary to, or an unreasonable application of, clearly established federal law. We find that the Pennsylvania Supreme Court's denial of relief to Petitioner on the basis of this subclaim does not violate this strict standard, and we therefore deny relief for this subclaim on its merits.

■ The Fifth Amendment protects criminal defendants from self-incrimination by permitting them to choose not to testify at their trials. The Supreme Court gave further life to this guarantee by holding that "the Fifth Amendment ... forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). This prohibition applies equally to both the guilt and penalty phases of capital proceedings. *See Estelle v. Smith,* 451 U.S. 454, 462–63, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) ("We can discern no basis to distinguish between the guilt and penalty phases of respondent's capital murder trial so far as the protection of the Fifth Amendment privilege is concerned."). It does not mean, however, that prosecutorial comments should not be examined in the broader context of the complete trial. "[I]t 'is not enough that the prosecutors' remarks were undesirable or even universally condemned.' The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (internal citations omitted); *see also United States v. Hasting,* 461 U.S. 499, 507–09, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) (applying the harmless error doctrine to *Griffin* ); *Lesko v. Leh-*

*man,* 925 F.2d 1527, 1544 (3d Cir.1991) ("[W]e must examine the challenged prosecutorial remark in its trial context."). Consistent with this overarching fairness standard, the Court has permitted prosecutors to provide a "fair response" to comments made by or on behalf of a defendant regarding his decision not to testify. *United States v. Robinson,* 485 U.S. 25, 32, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988) (finding that the prosecutor could mention defendant's failure to testify when defense counsel argued that his client had not been given an opportunity to explain himself to the jury).

 Petitioner challenges the statements made by the prosecutor at Petitioner's capital sentencing proceeding, arguing that they violated the prohibition in *Griffin* against a prosecutor commenting on a defendant's Fifth Amendment decision not to testify. In his closing argument, the prosecutor asked the jury "has any of you heard any remorse from [Petitioner] in this case? Has any of you seen a tear in his eye? Has he expressed the least bit of remorse for what he did to [the Victim]?" (N.T. 6/12/85, at 6.41.) Petitioner contends that these comments by the prosecutor stripped him of his privilege against self-incrimination by calling on the jury to infer that Petitioner's silence evidences his true lack of remorse and, therefore, the lack of a potentially mitigating circumstance. He cites *Lesko* in support of this argument. *Lesko* involved prosecutorial comments regarding a defendant's choice to testify only in support of mitigation at sentencing. In his closing argument, the prosecutor criticized the defendant for not having the "common decency to say I'm sorry for what I did." *Lesko,* 925 F.2d at 1544. The prosecutor went on to represent the overall message of the defendant's testimony as "I don't want you to put me to death, but I'm not even going to say

that I'm sorry." *Id.* The court determined that "the natural and necessary interpretation of these comments would be that Lesko had a moral or legal obligation to address the charges against him—indeed, to apologize for his crimes—during his penalty phase testimony, and that the jury could and should punish him for his failure to do so." *Id.* The *Lesko* court found the prosecutor's comments particularly damaging in light of the fact that had the defendant testified to those facts the prosecutor was suggesting should have been inferred from defendant's silence, "such testimony would have [clearly] been self-incriminating." *Id.* Petitioner in this case likewise argues that the prosecutor's comments about his apparent lack of remorse created a sense among the jurors that he had a legal or moral obligation to apologize for his crimes, in violation of his Fifth Amendment right not to testify.

The Pennsylvania Supreme Court addressed this issue on direct appeal from Petitioner's state court conviction. *See Holland I,* 543 A.2d 1068 (Pa.1988). The court gave three separate reasons for denying Petitioner's claim. First, the trial court sustained defense counsel's immediate objection to the statements and provided a curative instruction at the end of the penalty phase. *See id.* at 1077. Second, the prosecutor's comments were intended to address Petitioner's general demeanor, a goal that is acceptable under Pennsylvania law and the Fifth Amendment. *See id.* (citing *Commonwealth v. Travaglia,* 502 Pa. 474, 467 A.2d 288, 301 (1983)). Finally, the Pennsylvania Supreme Court determined that prosecutor's comments constituted a "fair response" to defense counsel's arguments for Petitioner's remorse. *See id.* ("[C]omment upon a defendant's failure to show remorse is permitted at least where the comment does not amount to an extended tirade focusing undue attention on the factor of remorse."). Although Pe-

titioner never took the stand, his mother testified that she was "sure he is sorry." (N.T. 6/12/85, at 6.14.) In addition, in his closing argument, defense counsel pleaded to the jury for mercy, claiming that Petitioner had "more than learned his lesson" and therefore was not deserving of a death sentence. (N.T. 6/12/85, at 6.27, 6.31.) The state court found that these assertions clearly elicited precisely the type of "fair response" permitted to the prosecutor in *Robinson. See, e.g., United States v. Isaac,* 134 F.3d 199, 206–07 (3d Cir.1998) (finding that defense counsel opened door to mention of defendant's failure to testify when he attacked credibility of prosecution's only witnesses besides defendant); *Ward v. French,* 1998 WL 743664, at *5 (4th Cir.1998) (unpublished opinion) (finding that a prosecutor's implicit referral to defendant's failure to testify was a fair response to defense counsel's promise of evidence in opening arguments that was never presented at trial).

As mentioned above, we are obligated, under § 2254(d) of the AEDPA, to defer to state court decisions, provided they are neither contrary to, nor represented an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. *See* 28 U.S.C. § 2254(d). *Lesko,* therefore, is merely persuasive authority in our evaluation of the Pennsylvania Supreme Court's decision. *See Matteo,* 171 F.3d at 890. We find that the Pennsylvania Supreme Court's decision is not contrary to federal law, as Petitioner has cited no Supreme Court precedent that requires a different outcome than that arrived at in the state courts.[50] We also find that the Pennsylvania Supreme Court did not act unreasonably in rejecting Petitioner's claim on the ground that it was adequately addressed by the trial court's sustaining of defense counsel's objection and curative instructions, that Petitioner brought his remorse into question through his counsel's arguments and his mother's penalty phase testimony, and that the prosecutor's comments could have been addressed at Petitioner's demeanor, rather than his failure to testify. Because none of these conclusions may be considered objectively unreasonable, we defer to the state court's ruling and deny Petitioner's allegation on its merits.

### 5. Claim V

In Claim V, Petitioner challenges the constitutionality of 42 Pa. Cons.Stat. § 9711(d)(9), which provides that a defendant's "significant history of felony convictions involving the use or threat of violence to the person" is an aggravating circumstance for purposes of capital sentencing. Although he did not explicitly raise this claim in state court, he nonetheless makes three subclaims in support of it being subject to federal review. The first asserts that existing Pennsylvania Supreme Court opinions upholding the constitutionality of

**50.** In addition to arguing that the Pennsylvania Supreme Court performed an unreasonable application of *Griffin* and its progeny, Petitioner also focuses on a misstatement of law in the state court opinion as evidence of unreasonableness. The Supreme Court of Pennsylvania stated that "the privilege against self-incrimination ... ha[s] no direct application to the [penalty] phase" of capital proceedings. Petitioner correctly points out that this appears to be contrary to the Supreme Court's holding in *Estelle,* and argues that such a contrary statement is grounds for relief under § 2254(d). We find, however, that the state court did not rely on this faulty premise in rejecting Petitioner's arguments on direct appeal. The Pennsylvania Supreme Court's decision would not have changed had it considered *Estelle.* As a result, the state court decision on the merits was not contrary to clearly established federal law, and Petitioner's argument is properly rejected under the AEDPA.

the (d)(9) aggravating circumstance made it futile for him to raise such a claim in state court, and therefore that his default of that claim should be excused. The second subclaim argues that the claim was exhausted by virtue of the Pennsylvania Supreme Court's statutory duty to review all death sentences for "passion, prejudice, or any other arbitrary factor." 42 Pa. Cons.Stat. § 9711(h)(3)(i). Under this scenario, 28 U.S.C. § 2254(d) governs our review of the state court's decision, and Petitioner's claim may be granted only if that decision was either contrary to, or an unreasonable application of, clearly established federal law.[51] *See id.* Finally, Petitioner's third subclaim argues that even if his claim were not decided on its merits in state court, proper cause and actual prejudice for this default exist, and we may therefore review his claim *de novo.*

### a. Defaulted Claims

■ Petitioner's first subclaim, that it was futile for him to raise Claim V in state court, is contrary to existing federal law. Futility, in the way Petitioner defines it, is not sufficient to excuse procedural default. "If a defendant perceives a constitutional claim and believes it may find favor in the federal courts, he may not bypass the state courts simply because he thinks they will be unsympathetic to the claim. Even a state court that has previously rejected a constitutional argument may decide, upon

reflection, that the contention is valid." *Engle v. Isaac,* 456 U.S. 107, 130, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982) (footnote and citations omitted); *see also Bousley v. United States,* 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) (quoting *Engle,* 456 U.S. at 130 n. 35, 102 S.Ct. 1558 ("[F]utility cannot constitute cause if it means simply that a claim was 'unacceptable to that particular court at that particular time.'")); *Beazley v. Johnson,* 242 F.3d 248, 2001 WL 118393 (5th Cir.2001) ("Needless to say, the likelihood of failure of a claim in state court is no excuse for not presenting it there."); *Minter v. Beck,* 230 F.3d 663, 666 (4th Cir.2000) (citing *Bousley* ); *Lines v. Larkins,* 208 F.3d 153, 166 (3d Cir.2000) ("[I]t does not necessarily follow, however, that Lines is entitled to an adjudication on the merits of his unexhausted federal habeas claims merely because it is now futile to attempt to raise them in state court.").

■ In his next subclaim, Petitioner argues that Claim V was evaluated on its merits in state proceedings as part of the Pennsylvania Supreme Court's mandatory statutory review of the trial record in death penalty cases for "passion, prejudice or any other arbitrary factor," or to ensure that "the evidence … support[s] the finding of at least one aggravating circumstance." 42 Pa. Cons.Stat. Ann.

---

**51.** Petitioner maintains that although his claims were not defaulted, because they were rejected *sub silentio* as part of the Pennsylvania Supreme Court's mandatory statutory review of death sentences, the silent nature of this review permits us to examine the case *de novo,* rather than through the AEDPA's deferential lens. We disagree. The AEDPA applies to "any claim that was adjudicated on the merits in State court proceedings." *See* 28 U.S.C. § 2254(d). Petitioner presents no support for his argument that, because the state court did not explicitly address his claim in its opinion, his claim should be considered

adequately reviewed for purposes of procedural default, but inadequately considered for application of § 2254(d). Petitioner may not have it both ways. If he insists that the state court considered his claims as part of its mandatory review, he must continue to consider those claims adjudicated on their merits for purposes of the AEDPA. On the other hand, if he chooses not to argue that the state court already considered his claims, he must meet the cause and prejudice standard applied in cases of procedural default in order to properly present them to this Court for review.

§ 9711(h)(3). This review includes an evaluation of the sufficiency of evidence relied upon at trial to prove any and all elements of the Commonwealth's case. *See, e.g., Banks v. Horn,* 49 F.Supp.2d 400, 406 (M.D.Pa.1999) (citing *Commonwealth v. Thomas,* 552 Pa. 621, 717 A.2d 468, 473 (1998) ("We first note that this Court is required to review the sufficiency of the evidence to sustain a conviction for first degree murder in every case in which the death penalty has been imposed.")). Such a determination necessarily includes a finding that the statutory provisions to which the evidence is applied are constitutional. A finding of sufficient evidence requires that the jury's conclusion be deemed reasonable in its application of the facts presented at trial to the law as explained by the court. It is impossible to perform this evaluation without considering whether both components are constitutionally valid. Just as consideration of improper evidence could affect a sufficiency analysis, so too must improper jury instructions; it is not appropriate for a court to uphold a verdict because the evidence presented was sufficient to require an unconstitutional ruling. This conclusion is consistent with Pennsylvania law. *See Commonwealth v. Frey,* 475 A.2d 700, 704 (Pa.1984) (analyzing jury instructions at the penalty phase of a capital proceeding under 42 Pa. Cons.Stat. § 9711(h)(3) to determine if they "inject 'passion, prejudice or some other arbitrary factor' into the deliberative process"); *see also Commonwealth v. Fisher,* 545 Pa. 233, 681 A.2d 130, 148 (1996) (finding that confusing jury instructions "interjected an arbitrary and

impermissible factor into the sentencing decision of the jury"); *Commonwealth v. Appel,* 517 Pa. 529, 539 A.2d 780, 784 (1988) (finding that the court's review of the trial record "produced no basis for overturning" the finding of aggravating circumstances); *Commonwealth v. Holcomb,* 508 Pa. 425, 498 A.2d 833, 851 (1985) (finding that § 9711(h)(3) "provides that [the court] must vacate the death sentence if ... the jury is given a false counter on the side of death"); *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937, 955 n. 19 (1982) (explaining that "significant issues perceived *sua sponte* by this Court ... will be addressed and, if possible from the record, resolved" under § 9711(h)(3)). As a result, we accept Petitioner's argument that Claim V was decided in state court, and we will move on to consider whether that decision satisfies the standard of review set forth in the AEDPA, 28 U.S.C. § 2254(d).[52]

■ Alternatively, Petitioner claims that he is excused from defaulting his claim in state court because his appellate counsel was constitutionally ineffective in failing to raise it. We find, however, that both his trial and appellate counsel acted reasonably in declining to raise such a claim. The United States Supreme Court had, at the time of Petitioner's trial, already determined that the phrase "significant history of criminal activity" in the Florida death penalty statute was not unconstitutionally vague. *See Proffitt v. Florida,* 428 U.S. 242, 257, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). By the time Peti-

---

**52.** We should note that our finding is not intended to imply that § 9711(h)(3) operates as a sort of "catch-all" exhaustion mechanism for state prisoners seeking federal habeas review. We are persuaded in this instance by the quantity of state law interpreting the provision to include a review of jury instructions, as well as by the symbiotic relationship be-

tween a trial court's instructions and a jury's factual findings. We therefore find that Petitioner's Claim V was decided by the Pennsylvania Supreme Court, but do not interpret the statute to always require review by the Pennsylvania Supreme Court, as Petitioner would argue, of every error potentially represented in the trial record.

tioner filed his post-trial motions, the Pennsylvania Supreme Court had echoed this ruling, concluding specifically that § 9711(d)(9) was not unconstitutional. *See Commonwealth v. Holcomb,* 498 A.2d 833 (Pa.1985) ("[Section 9711(d)(9) ] as here interpreted and applied does sufficiently channel jury consideration of the factors which warrant the imposition of the death penalty."). Before the case was taken up on direct appeal, the Pennsylvania Supreme Court issued a further ruling affirming the constitutionality of all of the State's aggravating circumstances. *Commonwealth v. Fahy,* 512 Pa. 298, 516 A.2d 689, 698 (1986) ("Appellant's contention that 42 Pa. Cons.Stat. § 9711(d) is vague and overbroad is dismissed as being meritless."). In short, precedent known to both trial and appellate counsel at the time of Petitioner's case clearly demonstrated that a claim challenging the constitutionality of § 9711(d)(9) would fail. Counsel for Petitioner made a tactical decision against raising such a meritless claim. This decision did not violate the presumption that "counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052, and did not demonstrate "ineptitude, inexperience, lack of preparation or unfamiliarity with basic legal principles." *Weatherwax I,* 20 F.3d at 579. Evaluated on the facts of the particular case as they were at the time of counsel's conduct, we find that both Petitioner's trial and appellate counsel reacted reasonably in the face of overwhelming negative precedent and chose to focus on potentially more promising issues than the unconstitutional vagueness of § 9711(d)(9).

b. AEDPA Review

■ In light of our conclusion that § 9711(h)(3) requires the Pennsylvania Supreme Court to review jury instructions accompanying aggravating circumstances for constitutional error, we are able to evaluate Petitioner's Claim V on its merits under the AEDPA. Claim V focuses on the constitutionality of § 9711(d)(9), which explains that an aggravating circumstance in support of a death sentence exists if "[t]he defendant has a significant history of felony convictions involving the use or threat of violence to the person." Petitioner argues that the phrase "significant history" in the statute is unconstitutionally vague, and that his state trial and appellate counsel were constitutionally ineffective in failing to object to the trial court's jury instruction incorporating that language. (*See* Pet. Writ Habeas Corpus at 50–51.) As mentioned above, we do not find Petitioner's trial or appellate counsel ineffective for failing to challenge the constitutionality of § 9711(d)(9). An aggravating circumstance is unconstitutionally vague when "the challenged provision fails adequately to inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with the kind of open-ended discretion which was held invalid in *Furman.*" *Maynard v. Cartwright,* 486 U.S. 356, 362, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). Petitioner cites three state supreme court cases from outside Pennsylvania in support of his contention that § 9711(d)(9) is unconstitutionally vague. *See Arnold v. State,* 236 Ga. 534, 224 S.E.2d 386 (1976) (invalidating an aggravating circumstance based on defendant's "substantial history" of serious assaultive criminal convictions); *Gall v. Commonwealth,* 607 S.W.2d 97, 111 n. 8 (Ky.1980) (same); *State v. David,* 468 So.2d 1126, 1129–30 (La.1984) (invalidating an aggravating circumstance based on defendant's "significant prior history" of criminal activity). Petitioner also attempts to distinguish *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), in which the Supreme Court rejected a

challenge to a mitigating circumstance in Florida's death penalty statute that permitted a sentencing jury to consider that a defendant had "no significant history of prior criminal activity." Petitioner maintains that because mitigating circumstances are not required to be as narrowly tailored or construed as aggravating circumstances, the Court's decision in *Proffitt* cannot be directly binding on our determination of the constitutionality of Pennsylvania's aggravating circumstance containing similar language. The *Proffitt* Court, however, did not necessarily entertain the same distinction encouraged by Petitioner. In explaining its decision to uphold Florida's mitigating circumstance provision, the Court stated that:

> [T]he requirements of *Furman* are satisfied when the sentencing authority's discretion is guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition. The directions given to judge and jury by the Florida statute are sufficiently clear and precise to enable the various aggravating circumstances to be weighed against the mitigating ones. As a result, the trial court's sentencing discretion is guided and channeled by a system that focuses on the circumstances of each individual defendant in deciding whether the death penalty is to be imposed.

*Id.* at 258. Furthermore, the Pennsylvania Supreme Court has repeatedly applied *Proffitt* in finding § 9711(d)(9) constitutional. *See, e.g., Commonwealth v. Holcomb*, 498 A.2d 833, 854 (Pa.1985) ("[Section 9711(d)(9) ] as here interpreted and applied does sufficiently channel jury consideration of the factors which warrant the imposition of the death penalty."); *Commonwealth v. Fahy*, 516 A.2d 689, 698 (Pa.1986) ("Appellant's contention that 42

Pa. Cons.Stat. § 9711(d) is vague and overbroad is dismissed as being meritless."). As a result, we find that the Pennsylvania Supreme Court's denial of Petitioner's claim is neither contrary to, or an unreasonable application of, clearly established federal law. Petitioner cites no Supreme Court cases requiring the opposite outcome. He likewise fails to establish that the state court was objectively unreasonable in choosing to follow its own precedent over that of other state supreme courts, especially in light of the seemingly supportive holding in *Proffitt*. In short, even if properly before us, we reject Petitioner's contention that § 9711(d)(9) violates the Eighth Amendment and, in turn, decline to grant him a writ of habeas corpus on those grounds.

### 6. *Claim VI*

In his Claim VI, Petitioner alleges that the trial court's jury instruction regarding the aggravating circumstance set forth in 42 Pa. Cons.Stat. § 9711(d)(8) violated his "rights to due process and to guided sentencing discretion under the Eighth Amendment." (Pet. Writ Habeas Corpus at 51–52.). Section 9711(d)(8) identifies an aggravating circumstance in support of the death penalty when "[t]he offense was committed by means of torture." Petitioner did not expressly present this claim in any state court proceedings. He nonetheless makes two subclaims in support of Claim VI being reviewed at this time in federal court. The first is identical to that granted with respect to Claim V, i.e. that the claim was exhausted by virtue of the Pennsylvania Supreme Court's statutory duty to review all death sentences for "passion, prejudice, or any other arbitrary factor." 42 Pa. Cons.Stat. § 9711(h)(3)(i). As in Claim V, 28 U.S.C. § 2254(d) governs our review of the state court's decision under this scenario, and Petitioner's

claim may be granted only if that decision was either contrary to, or an unreasonable application of, clearly established federal law. Alternatively, Petitioner argues in his other subclaim that even if Claim VI were not decided on its merits in the state supreme court, proper cause and actual prejudice for this default exist, and this Court may therefore review his claim *de novo*. Only the first of these subclaims appears to be correct with regard to exhaustion.

### a. Defaulted Claim

Petitioner's first subclaim argues that Claim VI was evaluated on its merits as a necessary part of the Pennsylvania Supreme Court's mandatory statutory review of the trial record in death penalty cases for "passion, prejudice or any other arbitrary factor," or to ensure that "the evidence ... support[s] the finding of at least one aggravating circumstance." 42 Pa. Cons.Stat. Ann. § 9711(h)(3). As we found in regard to Claim V, we accept Petitioner's argument that Claim VI was thus decided in state court, and we will move on to consider whether that decision satisfies the standard of review set forth in the AEDPA, 28 U.S.C. § 2254(d).

Again, as in Claim V, Petitioner argues in the alternative that, even if his Claim VI was not fairly presented in state court under § 9711(h)(3), he would be excused from defaulting his claim in state court because his appellate counsel was constitutionally ineffective in failing to raise it on appeal. Like our decision regarding Claim V, we do not agree with Petitioner's cause and actual prejudice argument in this instance. It is true that the Pennsylvania

Supreme Court addressed a very similar situation in *Commonwealth v. Nelson*, 514 Pa. 262, 523 A.2d 728 (1987), in which it found that defendant's trial counsel "was ineffective in his assistance when he failed to make a timely objection" to a jury instruction similar to that being challenged here by Petitioner, *id.* at 738, and that Petitioner's appellate counsel had the benefit of presenting his appeal after *Nelson* was decided. Nevertheless, we accept the argument that counsel made a strategic decision to avoid discussing the facts accompanying the alleged torture.

Petitioner's appellate counsel was faced with facts just as potentially inflammatory than those at issue in *Nelson*. *See id.* at 731 (describing the brutal strangulation, bludgeoning, and repeated stabbing performed by the defendant). There is, however, one major difference. Strangulation, bludgeoning and repeated stabbing could be inflicted either to kill or to torture, depending on intent. Petitioner's insertion of straight pins into Ms. Stevens' feet, however, could almost certainly only be for the purpose of torture. It is difficult to attribute any other purpose under the circumstances. In the face of this, we cannot conclude that such a decision is the product of "ineptitude, inexperience, lack of preparation and unfamiliarity with basic legal principles" such that counsel's performance violates Petitioner's right to effective assistance of counsel. *Weatherwax I*, 20 F.3d at 579. We therefore find that Petitioner has not satisfied the cause and prejudice standard necessary to receive federal review of otherwise defaulted claims. We nevertheless proceed to evaluate the substance of Claim VI under the AEDPA.[53]

---

53. The Commonwealth also argues that Petitioner's appellate counsel was not constitutionally ineffective for not challenging the (d)(8) jury instructions because such a claim was waived by virtue of trial counsel's failure to object during the penalty phase. We disagree. At the time of counsel's decision not to challenge the § 9711(d)(8) jury instruction, the Pennsylvania Supreme Court entertained a "relaxed waiver" doctrine, which permitted

### b. AEDPA Review

■ With regard to Claim VI being heard on the basis of the Pennsylvania Supreme Court's mandatory review under § 9711(h)(3), it is subject to the standard of review outlined in the AEDPA, 28 U.S.C. § 2254(d). In order for relief to be granted under the AEDPA, Petitioner must demonstrate that the prior state court decision regarding his claim was either contrary to, or an unreasonable application of, clearly established federal law. A state court decision is contrary to existing federal law if it "arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams*, 120 S.Ct. at 1523. Petitioner does and can not cite any United States Supreme Court precedent that could be considered contrary to the state court's denial of his claim, and we therefore find that he is unable to satisfy this portion of the AEDPA standard.

A state court adjudication is an "unreasonable application" of clearly established federal law if the state court's application of clearly established federal law was "*objectively unreasonable.*" *Williams*, 120 S.Ct. at 1521 (emphasis added). Although the term "unreasonable" is often difficult to define, the most important distinction is that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 1522 (emphasis in original). The Third Circuit has said

that, in evaluating reasonableness, federal habeas courts are not precluded from considering the decisions of the lower federal courts. *Matteo*, 171 F.3d at 890 (citing *O'Brien v. Dubois*, 145 F.3d 16, 25 (1st Cir.1998)).

Petitioner maintains that the Pennsylvania Supreme Court's decision to uphold his death sentence in light of the trial court's faulty jury instruction regarding the proper standard for finding torture was an unreasonable application of clearly established federal law. We disagree. Petitioner cites *Zant v. Stephens*, 462 U.S. 862, 876–77, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), *Godfrey v. Georgia*, 446 U.S. 420, 428–29, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), *Proffitt v. Florida*, 428 U.S. 242, 255–56, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), and *Gregg v. Georgia*, 428 U.S. 153, 192–94, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), for the proposition that federal law requires that standards be sufficiently precise to guide the court and jury when prescribing the death penalty. None of these decisions, however, specifically held that a jury instruction like that given in Petitioner's case was invalid. Petitioner in turn relies on decisions by the Ninth Circuit and Pennsylvania Supreme Court to demonstrate that the trial court's instruction regarding the aggravating circumstance codified in § 9711(d)(8) was constitutionally invalid.

The Ninth Circuit invalidated a jury instruction regarding a torture aggravating

defendants in death penalty cases to raise issues on appeal despite potentially waiving them by not objecting at trial. *See, e.g., Commonwealth v. Billa*, 521 Pa. 168, 555 A.2d 835, 842 (1989) (citing *Commonwealth v. Zettlemoyer*, 454 A.2d 937 (Pa.1982)). Furthermore, even if the issue had been considered waived—a result which would have been contrary to Pennsylvania law at the time—Petitioner's appellate counsel could have nonetheless raised it provided he also alleged that

Petitioner's trial counsel was constitutionally ineffective in not objecting and causing the waiver. *See Nelson*, 523 A.2d at 736. Given the Pennsylvania Supreme Court's holding in *Nelson*, this would not have been difficult to argue and therefore it would have been reasonable under *Strickland* to require of Petitioner's appellate counsel. In short, while we do not find appellate counsel ineffective, we do not subscribe to the Commonwealth's waiver reasoning as grounds for our decision.

circumstance under *Godfrey* and *Zant* because the trial court instructed the jury "in the bare terms of [the] aggravating circumstance," [54] excluding any mention of the constitutional requirement that "defendant must have intended to cause extreme pain to the victim." *Wade v. Calderon*, 29 F.3d 1312, 1320 (9th Cir.1994). The Pennsylvania Supreme Court, in a case that preceded its review of Petitioner's direct appeal of his death sentence, likewise interpreted *Godfrey* and *Zant* to forbid the exclusion of a specific intent instruction with regard to a torture aggravating circumstance. In *Commonwealth v. Nelson*, 523 A.2d 728 (Pa.1987), the Supreme Court of Pennsylvania vacated a death sentence on the grounds that a jury instruction consisting solely of the language in § 9711(d)(8), i.e. that to find an aggravating circumstance in support of the death penalty, the jury must establish that "[t]he offense was committed by means of torture," was "prejudicially deficient" and, therefore, unconstitutional. *Id.* at 737–38 (citing *Godfrey*, 446 U.S. at 428, 100 S.Ct. 1759). Petitioner bases his claim for relief in this case on the ground that the trial court's instruction with respect to § 9711(d)(8) violates *Nelson* and *Wade*'s

interpretations of *Godfrey* and analogous Supreme Court precedent.[55]

The Commonwealth responds with two additional Pennsylvania Supreme Court cases that upheld the death penalty despite similarly improper jury instructions. Although both of these cases were decided after *Nelson*, they involved convictions that were deemed final before *Nelson* was decided. They both recognized that "in spite of the fact that there was no 'specific intent to torture' instruction given to the jury in this case, it is well settled that specific intent may be proven ... if the facts of this case indicate that Appellant ... intended to torture his victim." *Fahy*, 645 A.2d at 203 n. 13; *see also Whitney*, 708 A.2d at 480 (finding that evidence was sufficient to find torture despite jury instruction being limited to language of statute).

As a result of these holdings, we cannot find that the Pennsylvania Supreme Court's decision in Petitioner's case is an unreasonable application of United States Supreme Court precedent. First, we are not bound by Ninth Circuit decisions and therefore consider that court's holding in *Wade* only as persuasive authority. Second, the Pennsylvania Supreme Court affirmed Petitioner's death sentence after

---

**54.** The California provision at issue in *Wade* differs from § 9711(d)(8). The statutory language of California's aggravating circumstance requires "proof of the infliction of extreme physical pain no matter how long its duration." *Id.* at 1319 (citing Cal.Penal Code § 190.2(a)(18)).

**55.** The Commonwealth argues that *Nelson* is not controlling because it was found not to apply retroactively. *See Commonwealth v. Whitney*, 550 Pa. 618, 708 A.2d 471, 480 (Pa.1998). We nonetheless note that such a retroactive application may be unnecessary in this case. "[F]ailure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication." *Griffith v. Kentucky*, 479 U.S. 314, 322, 107 S.Ct. 708,

93 L.Ed.2d 649 (1987). *Nelson* was decided on April 3, 1987. The Pennsylvania Supreme Court denied Petitioner's direct appeal on May 20, 1988. Petitioner's conviction was pending on direct review when *Nelson* was handed down. *See* 42 Pa.C.S.A. § 9545(b)(3) (explaining that a conviction is deemed final under Pennsylvania law "at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review"). *Nelson* therefore need not be applied retroactively in order to be considered binding on Petitioner's case. It can be properly applied here under the doctrine of *stare decisis*.

reviewing the trial court's instructions regarding each of the applicable aggravating circumstances. While there is of course no express explanation why the Pennsylvania Supreme Court did not follow the *Nelson* decision in Petitioner's case, the court did find that the evidence presented at trial was sufficient to sustain the aggravating circumstance. *See Holland I,* 543 A.2d at 1077 (determining that the trial evidence was sufficient in accordance with 42 Pa. Const. Stat. § 9711(h)(3)). We have already discussed the insertion of straight pins into the feet. Moreover, we note that *Nelson* and Pennsylvania Supreme Court decisions that preceded *Holland I* were not necessarily binding on that court under the doctrine of *stare decisis*. The Pennsylvania Supreme Court is the highest court in the state and can change its mind if it wishes, so long as the United States Constitution is not violated. *See Smith v. Horn,* 120 F.3d 400, 414 (3d Cir.1997) ("A state court's misapplication of its own law, in and of itself, cannot be corrected by a federal court. However ... [a] resulting federal constitutional error can be corrected by a federal habeas court." (citing *Gilmore v. Taylor,* 508 U.S. 333, 348–49, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993) (O'Connor, J., concurring in the judgment))). We therefore find that the Pennsylvania Supreme Court's decision to uphold the trial court's § 9711(d)(8) jury instruction was not an unreasonable application of Supreme Court precedent. We in turn conclude that Petitioner's claim does not survive the AEDPA's standard of review for state court decisions, and deny it on the merits.

### 7. *Claim VII*

Claim VII challenges Petitioner's death sentence on the grounds that his Due Process and Eighth Amendment rights were violated when he was tried by a jury that was improperly death qualified. (*See* Pet. Writ Habeas Corpus at 53–59.) Petitioner argues that five venirepersons (Angelozzi, Potok, Krebs, Powell, and Littlepage) were improperly excused for cause during voir dire. He failed, however, to present his claims regarding two of the venirepersons, Powell and Littlepage, in state court. We nevertheless find that Petitioner's Claim VII was fairly presented in state court with respect to all five venirepersons and that the claim is therefore properly before this Court for review under § 2254(d) of the AEDPA.

Respondent argues that Petitioner's claim is procedurally defaulted because "petitioner has supplemented Claim VII with additional facts and argument relating to the selection of certain jurors, which were never raised in the state courts." (Resp. Pet. Writ Habeas Corpus at 25.) Respondent is at least partially correct; Petitioner did raise objections to the disqualification of particular jurors in his federal habeas petition that were not submitted to state courts either on direct review or in state collateral review proceedings. In his direct appeal to the Pennsylvania Supreme Court, Petitioner challenged instances in which three prospective jurors, Krebs, Angelozzi, and Potok, were excluded for being somewhat uncertain as to their ability to impose the death penalty. *See Holland I,* 543 A.2d at 1073–74. In his federal habeas petition, Petitioner referred to five prospective jurors who, in his opinion, were improperly excluded on the basis of their opinion regarding the death penalty. (*See* Pet. Writ Habeas Corpus at 53–59.) In addition to the three mentioned in state court, Petitioner included potential jurors Powell and Littlepage.

Despite being omitted from his state court filings, Petitioner's claims involving the potential selection of Powell or Little-

page were properly exhausted.[56] Powell and Littlepage were both disqualified for being unsure that they could stand up alone in court and sentence a defendant to death. (*See* N.T. 6/3/85, at 43–45; N.T. 6/4/85, at 56–57.) Krebs was similarly disqualified for claiming to be uncomfortable with the prospect of individually imposing a death sentence. (*See* N.T. 6/3/85, at 22–24.) In addressing Petitioner's claim regarding Krebs, the state courts were afforded the opportunity to consider the same legal theory and factual basis that governs the situations surrounding Powell and Littlepage. *See Picard v. Connor,* 404 U.S. 270, 277, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971) ("Obviously there are instances in which 'the ultimate question for disposition' will be the same despite variations in the legal theory or factual allegations urged in its support." (citation omitted)). Moreover, the similarity of the three accounts ensures that the "same method of legal analysis" will be applied in both state and federal court. *Landano v. Rafferty,* 897 F.2d 661, 669 (3d Cir.1990). Petitioner invoked both the federal and state constitutions in claiming that improper juror exclusion denied him due process of law. (Holland I Brief at 16–23.) It would be seemingly impossible to distinguish these three situations sufficiently to arrive at different rulings. Therefore, because our decision regarding Krebs will be governed by the same legal standard and will involve the application of very nearly identical facts, we find Petitioner's claims involving Powell and Littlepage substantially equivalent to that regarding Krebs and therefore reviewable by this Court in accordance with the AEDPA.

Section 2254(d) of the AEDPA requires that federal courts defer to a state court decision unless that decision was either "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or [was] based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." The question of whether a venireperson is biased has traditionally been determined by the voir dire process culminating in a conclusion by the trial judge as to the venireperson's state of mind. *Wainwright v. Witt,* 469 U.S. 412, 428, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *see also id.* at 426, 105 S.Ct. 844 (finding that deference must be paid to the trial judge who actually sees and hears the juror). "Such a finding is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province." *Id.* A prospective juror may not be excused for cause based on his view of capital punishment "unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* at 424, 105 S.Ct. 844; *see also Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). A trial judge's finding that a juror is impermissibly biased is a factual finding entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1). *See Darden v. Wainwright,* 477 U.S. 168, 175, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); *Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). The Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

---

56. Even if we did find that Petitioner's claims involving Powell and Littlepage were defaulted, we would not be precluded from reviewing the remaining three claims of improper juror exclusion that were presented on direct appeal to the Pennsylvania Supreme Court. *See Rose v. Lundy,* 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).

■ Petitioner was convicted of first degree murder and sentenced to death. The individual voir dire of prospective jurors was presided over by the trial judge and conducted outside the presence of the other venirepersons. Typically, each venireperson was first advised that the Commonwealth would be seeking the death penalty in this case. This was followed by an explanation of the normal bifurcated procedure in a capital case, after which each venireperson was asked by the prosecutor: "Do you have any moral, religious or philosophical beliefs which would prevent you from imposing the death penalty in the appropriate case under law?" (*See, e.g.,* N.T. 6/3/85, at 93–95.) Depending on the venireperson's response to this and subsequent followup questions, the prosecutor and frequently the judge would make further inquiries into the person's feelings about the death penalty. Finally, the venireperson was either deemed acceptable to both sides or challenged.

Petitioner contends that Angelozzi, Potok, Krebs, Powell, and Littlepage were excused for cause in contravention of the Supreme Court's holdings in *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844 (1985), *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), and *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). (*See* Mem. Law Supp. Pet. Writ Habeas Corpus at 121.) He first asserts that Angelozzi and Potok were improperly excused for cause when they stated they were "unsure" or that it would be "difficult" to impose the death penalty. (*See* Mem. Law Supp. Pet. Writ Habeas Corpus at 121.) Petitioner also maintains that Krebs, Powell, and Littlepage were improperly excused for cause when they were dismissed from the jury pool despite expressing no reservations about imposing the death penalty outside of standing up in open court, facing the defendant and announcing a verdict of death. (*See* Pet. Writ Habeas Corpus at 53–58.) Petitioner argues that jurors are not required to stand alone and announce their verdict and that by misstating the jury polling procedure, the prosecutor caused venirepersons Krebs, Powell and Littlepage to express reservations about imposing the death penalty which resulted in their being improperly excused for cause. We find that all five of Petitioner's challenges fail to satisfy the AEDPA's standard of review.

Petitioner claims that the first juror in question, Ms. Angelozzi, was improperly excused for stating that imposing the death penalty would be hard for her and that she could not be sure that she would make the correct decision.[57] According to Petitioner, Angelozzi's responses do not indicate an inability to perform the duties

57. The voir dire of Ms. Angelozzi went as follows:

Prosecutor: If you find it is a first-degree murder case, you have to decide whether it is life or death.
Janice Angelozzi: It will probably be very hard for me to decide for the death penalty.
Prosecutor: Now, is that because of some religious, moral or philosophical beliefs?
Janice Angelozzi: It is the way I would feel.
Defense Counsel: I would object to the question once again, Your Honor.
Court: It may be very hard. It would be hard for anyone. But could you do it in the proper case where the law expected you to return the death penalty? Or do you have any religious or philosophical beliefs that would prevent you from voting for it?
Janice Angelozzi: Yes, according to my religion, it would be very hard.
Court: Pardon me?
Janice Angelozzi: According to my religion, I am a Catholic, it would be very hard for me.
Court: I know it would be hard.
Janice Angelozzi: I couldn't guarantee I would make the correct decision.
Court: All right, we will excuse her.
(N.T. 6/4/85, at 41–42.)

of a capital juror. We agree that a literal reading of Angelozzi's voir dire does not necessarily compel the conclusion that under no circumstances could she vote for the death penalty. The trial court, however, "aided as it undoubtedly was by the assessment of (the potential juror's) demeanor," bears the responsibility of determining whether Angelozzi's views would prevent or substantially impair her performance as a juror. *Witt,* 469 U.S. at 434, 105 S.Ct. 844. The record reflects that when Angelozzi appeared to express reservations, the prosecutor and the trial judge followed up with further questioning, demonstrating a practice of assuring themselves, if there was any doubt, of the venireperson's true position. Viewing the record of voir dire in its entirety, we conclude that the Pennsylvania Supreme Court acted reasonably in finding that the trial court's decision to exclude Angelozzi was proper.

We now turn to the second venireperson, Ms. Potok, whom Petitioner claims was improperly excluded from the jury because she never explicitly stated that she was unalterably opposed to capital punishment such that she would be unable to follow the court's instructions.[58] (*See* Mem. Law Supp. Pet. Writ Habeas Corpus at 124.) When asked by the prosecutor, "do you have any religious, moral, or philosophical beliefs that would prevent you from voting for the death penalty in the appropriate case under the law?" Potok responded, "I do not believe in the death penalty." (N.T. 6/3/85, at 97.) As the record reflects, the court followed up with several additional questions in order to assure itself of Potok's true position regarding capital punishment. (*See* N.T. 6/3/85, at 97–98.) As a result of Potok's inability to state that she would be able to impose the death penalty if warranted by the facts of the case and the law, the court dismissed her for cause. (*See* N.T. 6/3/85, at 98–99.) Under *Witt,* the court is obligated to determine whether Potok's views would prevent or substantially impair her performance as a juror. *See Witt,* 469 U.S. at 424, 105 S.Ct. 844. Through its questioning of Potok, and aided by its ability to assess her demeanor, the trial court concluded that Potok's beliefs would so damage her performance; even though many venirepersons' potential biases may

---

58. The record of the voir dire, with respect to Ms. Irene Potok contains the following:

Prosecutor: My question for you, ma'am, is do you have any religious, moral or philosophical beliefs that would prevent you from voting for the death penalty in the appropriate case under the law?
Irene Potok: I do not believe in the death penalty.
Court: Could you impose the death penalty if the law required it?
Irene Potok: I really don't know.
Court: Pardon me?
Irene Potok: I couldn't say. I don't know.
Court: You could not put aside your feelings about the death penalty and impose it if the evidence was clear and the law was clear?
Irene Potok: I never served before and I don't know what this is all about.

Court: That may be true. But I am asking you, could you put aside your personal beliefs and impose the death penalty if it were appropriate and the law said it was appropriate?
Irene Potok: If the law says, yes.
Court: You cannot say with certainty then, can you?
Irene Potok: If that was the law, you said?
Court: Yes. If the law says this case demanded the death penalty, requires the death penalty. Could you impose the death penalty?
Prosecutor: Be honest with us.
Irene Potok: It is so hard because I believe in putting a person in prison. But so far, I never heard a case and I don't know what my feelings would be.
Prosecutor: I challenge for cause.
Court: Yes.
(N.T. 6/3/85, at 97–99.)

never be established with unmistakable clarity, the trial judge may be left with the impression that a prospective juror would be unable to faithfully and impartially apply the law. *See id.* at 425–26, 105 S.Ct. 844. Viewing the record of voir dire in its entirety, and with deference to the trial judge who heard and saw the venireperson, we find that the Pennsylvania Supreme Court was not unreasonable in upholding Potok's dismissal for cause.

We also determine that the third venireperson in question, Mr. Krebs, was properly excused for cause. As mentioned above, Petitioner's application may not be granted unless the State court's adjudication of the claim was either contrary to, or an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). A juror may be excused for cause if his views on capital punishment would "prevent or substantially impair" the performance of his duties as a juror, and deference must be paid to the trial judge who makes such a determination on the basis of seeing and hearing the juror in question. *Witt*, 469 U.S. at 424–25, 105 S.Ct. 844. The remaining issue, then, is whether the state court proceeding resulted in an un-

reasonable determination of the facts based on the evidence presented. *See* 28 U.S.C. § 2254(d)(2).

The Pennsylvania Supreme Court's conclusion that Krebs was properly excused for cause was not objectively unreasonable. Petitioner contends that Krebs' responses to the death qualification questions were "clear" and "unhesitating" until he was asked by the prosecution "do you think that you could stand up in open court, face the defendant by yourself and announce your verdict of the death penalty?" at which point Krebs responded, "I am not too sure about that." (N.T. 6/3/85, at 23.) Petitioner argues that the prosecution's question mischaracterized the polling process and therefore, because Krebs initially indicated that he did not possess beliefs that would prevent him from imposing the death penalty, Krebs should not have been dismissed for cause on the basis of the prosecutor's confusing hypothetical. The record, however, indicates that Krebs' other responses were not necessarily as clear as Petitioner claims. Krebs twice reiterated that he would be hesitant to stand up in open court and sentence a defendant to death.[59] Moreover, when asked by the

---

**59.** The record of voir dire, with respect to Mr. Krebs, contains the following:

Prosecutor: Mr. Krebs, I would like to ask you a few questions to determine whether you could be a fair and impartial juror. I don't mean to invade your privacy but we have to have an idea of how you would feel on certain matters This, as you know, is a murder case.

Donald Krebs: Yes.

Prosecutor: The Commonwealth would be asking for the death penalty in this case. Do you understand that?

Donald Krebs: Yes.

Prosecutor: I want to explain to you what the law is in this matter and then I will ask you a question. First, the jury will retire to decide the guilt or innocence of the defendant. That is called the guilt phase of the trial. If you find the defendant guilty of

first degree murder, you will come back in open court and announce that verdict. Then we will move to the sentencing phase of the case. At that point, you might hear additional testimony from either the Commonwealth or the defense in this case, after which Judge Kubacki will instruct you on the law regarding sentencing in Pennsylvania. At that point, you will retire again to deliberate to decide whether under law the death penalty or life imprisonment is the appropriate penalty in this case. Do you understand that?

Donald Krebs: Yes.

Prosecutor: Do you have any moral, religious or philosophical beliefs which would prevent you from imposing the death penalty in the appropriate case under the law?

Donald Krebs: No.

Prosecutor: You seem to hesitate. Do you have a hesitation about that?

prosecutor, "do you have any moral, religious or philosophical beliefs which would prevent you from imposing the death penalty in the appropriate case under the law?" Krebs appeared to hesitate before responding "[N]o." (N.T. 6/3/85, at 22.) As *Witt* makes clear, the inquiry does not end with a mechanical recitation of a single question and answer. *See Witt,* 469 U.S. at 424–26, 105 S.Ct. 844. This Court must review the context surrounding Krebs' exclusion to see if the trial court's decision that Krebs' beliefs would prevent or substantially impair his performance of his duties as a juror is fairly supported by the record. The question of a challenge for bias is a factual issue and, consequently, a trial court's decision is entitled to a presumption of correctness. *See Witt,* 469 U.S. at 429, 105 S.Ct. 844. Because, after questioning a prospective juror, the trial judge may be left with the impression that the prospective juror would be unable to faithfully and impartially apply the law, deference must be paid to the trial court's decision even in cases where there is a lack of clarity in the printed record. *Id.* at 425–26, 105 S.Ct. 844. The transcript of voir dire shows that Krebs was questioned in the presence of both counsel and the trial judge and that at the end of the colloquy,

the prosecutor successfully challenged for cause. In light of the record, we find that Petitioner has not established by clear and convincing evidence that the judge's finding is incorrect. We deny his challenge of Krebs' exclusion.

Petitioner asserts that the fourth challenged venireperson, Ms. Powell, was improperly excluded from the jury because she answered unhesitatingly that she possessed no beliefs that would prevent or impair her from imposing the death penalty and was struck for cause only when she stated that she could not stand up in open court, face the Petitioner and announce the verdict of death. (*See* Pet. Writ Habeas Corpus at 55–56.) As with Krebs, Petitioner's argument rests on what he calls a "mischaracterization" by the Prosecutor of the polling procedure that occurs at the end of the penalty phase. Petitioner's sole argument is that jurors are not required to stand up individually and deliver the verdict and, absent this mischaracterization by the Prosecutor, Powell would not have been excused for cause. The standard as previously described is whether Powell's beliefs would prevent or substantially impair her performance as a juror. Like Krebs, Powell stated that she had no beliefs that would prevent her from imposing

Donald Krebs: No; not really.
Prosecutor: Is there any reason best known to yourself why you feel that you might not be able to impose the death penalty in the appropriate case, and again under the law?
Donald Krebs: No.
Prosecutor: Are you confident that if the law required it and the facts as you found them in your deliberations were such, that you could find that the appropriate sentence in this case would be the death penalty?
Donald Krebs: Yes.
Prosecutor: After you decide the sentencing phase of the case, you will come back into the courtroom again to announce your verdict on sentencing. Do you understand that?
Donald Krebs: Yes.

Prosecutor: At that point, do you think you could stand up in open court, face the defendant by yourself and announce your verdict of the death penalty?
Donald Krebs: I'm not too sure about that.
Prosecutor: That is one of the important things you have to do as a juror if selected. Do you think you would have a problem standing up and facing another human being and essentially sentencing him to death? Please be honest with us.
Donald Krebs: Yes.
Prosecutor: In that case, you would feel uncomfortable sitting as a juror in this case, because of that aspect of the case; is that correct?
Prosecutor: Yes.
Prosecution: Cause, Your Honor.
(N.T. 6/3/85, at 21–24.)

the death penalty in the appropriate case under law. However, when she was asked, "[w]ould you be able to stand up and face another human being and announce a verdict of death?" she responded, "[n]o." When the Prosecutor asked the question again, she repeated her answer that she would be unable to stand up and render the sentence of death.[60] (N.T. 6/3/85, at 43–45.)

Applying the analysis required by § 2254(d), and using a similar rationale to that applied to Krebs, this Court has already determined that the state court reasonably applied established federal law under *Witt*, that the question of challenge for bias is a factual issue, and that the record reveals no evidence that the state court was objectively unreasonable in its determination of the facts. Because Petitioner has not presented clear and convincing evidence to rebut the state court's factual findings, we conclude that the Pennsylvania Supreme Court was reasonable in deciding that the trial court properly excused Powell for cause.

The fifth venireperson whom Petitioner claims was improperly excused for cause is Ms. Littlepage. Petitioner presents the same argument with Littlepage as he did with Krebs and Powell. He claims that the prosecutor mischaracterized the polling process by telling Littlepage that in the event that the jury found that the appropriate sentence is death, she would have to stand and deliver the death sentence alone. According to Petitioner, this mischaracterization of the polling process caused Littlepage to state that she could not stand alone and deliver the verdict, which in turn resulted in her dismissal for cause.[61] Applying the analysis required

---

**60.** The record of voir dire, with respect to Ms. Powell contains the following:

> Prosecutor: Understanding the Commonwealth is seeking the death penalty in this case. I am telling you that now. After you heard the evidence on the guilt phase of the trial, this jury would retire to deliberate. Now, if the jury found the defendant guilty of murder in the first degree, then we will move on to the second phase which is called the sentencing phase.
>
> Now, in that phase, you might hear additional testimony from both the Commonwealth and the defense in this case. At that point, Judge Kubacki will instruct the jury on what law would apply regarding sentencing in first degree murder cases in Pennsylvania.
>
> At that point the jury will deliberate to decide whether the penalty in this case would be death or life imprisonment.
>
> My question to you ma'am, is do you have any religious, moral or philosophical beliefs which would prevent you from imposing the penalty of death in the appropriate case under the law?
>
> Jacquelyn Powell: No.
>
> Prosecutor: Is there any reason known to yourself why you could not impose the death penalty in the appropriate case under the law?

> Jacquelyn Powell: No.
>
> Prosecutor: In the event that the jury does decide on the death penalty, each and everyone of the jurors will be required to stand up in open court and face the defendant to announce their verdict of death individually. Do you understand that?
>
> Jacquelyn Powell: Yes.
>
> Prosecutor: Would you be able to stand up and face another human being and announce a verdict of death?
>
> Jacquelyn Powell: No.
>
> Prosecutor: You would not?
>
> Jacquelyn Powell: No.
>
> Prosecutor: So even if you had agreed on the death penalty in your deliberations with the jury, you would not be able to stand up and look the defendant in the eye and tell him the sentence is death, that is what you are telling us?
>
> Jacquelyn Powell: Yes.
>
> Prosecutor: In that case, I have a challenge for cause concerning this juror.
>
> Court: Yes.

(N.T. 6/3/85, at 43–45.)

**61.** The record of voir dire with respect to Ms. Littlepage contains the following:

> Prosecutor: Ms. Littlepage, do you have any moral, religious or philosophical beliefs

under § 2254(d), the record supports the conclusion that the state court decision was not contrary to, or an unreasonable application of, clearly established federal law. Moreover, there is not clear and convincing evidence that Littlepage's views would substantially impair her performance as a juror. *See* 28 U.S.C. § 2254(e)(1). Accordingly, we conclude that Littlepage was properly dismissed for cause.

### 8. Claim VIII

▮ Claim VIII contends that Petitioner's Eighth and Fourteenth Amendment rights were violated when a juror accidentally witnessed him in shackles outside the courtroom on the last day of his trial. Petitioner claims that the trial judge as well as his trial and appellate counsel were deficient in their treatment of the situation, resulting in an "inherently prejudicial" effect on Petitioner's case. Petitioner also argues that his trial and appellate counsel's failure to raise these claims constituted ineffective assistance of counsel under the Sixth Amendment. Petitioner did not present any of these arguments in state court. He instead relies on his appellate counsel's alleged ineffectiveness to demonstrate cause and prejudice for his procedural default. We find that no cause exists, as Petitioner's trial and appellate counsel were responsive to the situation and adequately represented Petitioner throughout this incident. Further, since we find that Petitioner's claim is without merit, we likewise deny his cause argu-

ment on the grounds that counsel cannot be constitutionally ineffective for failing to pursue a meritless claim. *See Strickland,* 466 U.S. at 691, 104 S.Ct. 2052 (finding that failure to pursue "fruitless" claims "may not later be challenged as unreasonable").

▮ As Petitioner points out, the Supreme Court has stated that shackling a defendant at trial "should be permitted only where justified by an essential state interest specific to each trial." *Holbrook v. Flynn,* 475 U.S. 560, 568–69, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986). It went on, however, to explain that such prejudice only constituted reversible error when it "denied [defendant's] constitutional right to a fair trial." *Id.* at 570, 106 S.Ct. 1340; *see also Estelle v. Williams,* 425 U.S. 501, 504, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976) (performing a similar analysis in regard to the effect of a defendant's wearing prison clothes at trial). Petitioner's situation does not constitute a deprivation of his right to a fair trial. Immediately after the juror witnessed Petitioner in shackles, the trial judge isolated the jury and held a brief colloquy, in which he brought the issue of potential juror prejudice to counsel's attention. (*See* N.T. 6/11/85, at 5.2.) The parties discussed the option of replacing the juror with an alternate. (*See id.*) Upon request from Petitioner himself, however, his trial counsel asked that the juror remain on the panel and the case continue as before. (*See* N.T. 6/11/85, at 5.4–5.5.) Petitioner claimed to remember

---

that would prevent you from voting to impose the death penalty in the appropriate case?

Charlotte Littlepage: No.

Prosecutor: In the event that you do serve on this jury and you find that the appropriate sentence is death, you will be brought back into the courtroom after you arrive at that verdict and you have to stand up by yourself in open court and face the defen-

dant and announce your verdict of death. Would you have any problem doing that?

Charlotte Littlepage: Yes.

Prosecutor: Would you be able to do that, stand up and look another human being in the face and pronounce the sentence of death?

Charlotte Littlepage: No.

(N.T. 6/3/85, 56.)

the juror at issue, and seemed to believe that his case would be better served by her remaining on the panel, despite any possible effects of her seeing him in shackles. (*See id.*) He cannot now claim to have been deprived of his right to a fair trial after agreeing, completely of his own free will, to continue the trial with its original jury.

In addition to Petitioner not being denied a fair trial, he was also not denied effective assistance of counsel. His trial counsel fulfilled his constitutional and ethical duties by discussing the situation with both Petitioner and the court and then respecting his client's decision to retain the juror. We cannot find him unreasonable for permitting his client the jury of his choice. Petitioner's appellate counsel was also not unreasonable. Petitioner implicitly waived his claims of juror prejudice when he requested that the juror who witnessed him in shackles remain on the panel. (*See id.*) Appellate counsel was therefore well within constitutional bounds when he chose not to pursue a claim that was disposed of in accordance with defendant's wishes. *See Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) (finding that appellate counsel may not be constitutionally compelled to raise every non-frivolous issue on appeal); *see also* R. Stern, *Appellate Practice in the United States* 266 (1981). Moreover, even if trial or appellate counsel's actions did represent cause for Petitioner's procedural default, it would be difficult to find actual prejudice when Petitioner himself did not consider the situation sufficiently damaging to his case to request corrective action. As a result, we conclude that appellate counsel was not constitutionally ineffective and that his actions therefore do not constitute cause and prejudice to excuse Petitioner's procedural default. As a result, we find that Petitioner's Claim VIII is meritless; he was not deprived of his right to a fair trial, nor were his trial or appellate counsel constitutionally ineffective in their treatment of the situation.

#### 9. Claim IX

Claim IX argues that Petitioner was deprived of due process by Officer Bridgette McGinnis' eyewitness testimony. Petitioner's first subclaim is that he was not informed of Officer McGinnis' testimony in advance and that the suggestiveness of her identification violated his right to a fair trial. In his second subclaim he contends that Officer McGinnis knowingly testified falsely when she identified Petitioner for the first time in court as the man she saw outside the Victim's apartment building on the morning of August 11, 1984. Petitioner's third subclaim alleges that his trial counsel was constitutionally ineffective for failing to impeach Officer McGinnis' testimony and for failing to request a copy of the photo array that Officer McGinnis examined and determined did not include the man she saw at the crime scene. He likewise asserts in his fourth subclaim that his appellate counsel was constitutionally ineffective for failing to raise these issues on appeal. Although none of these subclaims were raised in state court, Petitioner argues that his counsel's ineffectiveness excuses his procedural default. *See Murray,* 477 U.S. at 488, 106 S.Ct. 2639. We find that Petitioner's subclaims are meritless, and therefore that his trial and appellate counsel were not ineffective. Claim IX is therefore procedurally defaulted and beyond federal review.

 Petitioner first attempts to demonstrate cause by arguing that his trial and appellate counsel were ineffective for permitting Officer McGinnis to provide an unconstitutionally suggestive identifica-

tion of Petitioner at trial.[62] A government identification procedure violates due process when it is "impermissibly suggestive" and creates a "substantial likelihood of irreparable misidentification." *Neil v. Biggers*, 409 U.S. 188, 197, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) (quoting *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)); *see also United States v. Emanuele*, 51 F.3d 1123, 1128 (3d Cir.1995). A "suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability," for reliability is the "linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite*, 432 U.S. 98, 106, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). To determine reliability, the identification procedure must be examined in light of the "totality of the circumstances." *Biggers*, 409 U.S. at 196, 93 S.Ct. 375. These circumstances may include the witness' opportunity "to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.; see also Brathwaite*, 432 U.S. at 114, 97 S.Ct. 2243. Other evidence indicating a defendant's guilt "plays no part" in an analysis of reliability.

*Brathwaite*, 432 U.S. at 116, 97 S.Ct. 2243. Independent evidence of culpability may not cure a tainted identification procedure, nor may exculpatory information bar admission of reliable identification testimony. We consider other evidence only to determine whether an error, if present, was harmless. *See id.* at 118, 97 S.Ct. 2243 (Stevens, J. concurring).

■ Petitioner presents no evidence in support of finding a first-time, in-court identification *per se* unconstitutional, and we are not otherwise persuaded to stray from the test outlined in *Biggers*. Applying that test, we find that Officer McGinnis' identification was not impermissibly suggestive, nor was the admission of such testimony anything more than harmless trial error. Petitioner's trial and appellate counsel cannot therefore be found ineffective in their treatment of Petitioner's claim, as one cannot be found constitutionally ineffective for failing to raise a meritless claim. *See Strickland*, 466 U.S. at 691, 104 S.Ct. 2052. In contrast to Petitioner's interpretation of the facts in the trial record, we find none of the five factors presented in *Biggers* satisfied in Petitioner's case.[63] Officer McGinnis had sufficient opportunity to view the witness at the crime scene. She testified to seeing Petitioner in the spotlight of her patrol car for approximately twenty seconds. (*See*

---

**62.** We do not directly address Petitioner's complaint regarding his lack of notice of Officer McGinnis' testimony because Petitioner offers no authority to support his contention that such a failure to inform is *per se* unconstitutional. Absent such support, we analyze the issue from the standpoint of reliability, which takes into account the fact that the witness identification occurred for the first time at trial.

**63.** We also find that the trial court's failure to instruct the jury on the factors to be considered in analyzing the reliability of an identification does not justify habeas relief. Juries

are trusted with evaluating the credibility of witnesses. Only in cases with a substantial likelihood that an identification was impermissibly suggestive does a court apply the test outlined in *Biggers*. Since Officer McGinnis' testimony was in no danger of failing that test, there was no reason for the trial court to focus the jury's attention more on her testimony than on that of any other witness. We therefore find that specific jury instructions akin to those advocated by Petitioner are unnecessary and, indeed, inappropriate given the jury's assumed ability to evaluate the witness' credibility.

N.T. 6/5/85, at 1.105.) This is ample time to remember a person's appearance. *See, e.g., Coleman v. Alabama*, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970) (upholding an in-court identification on the basis of a witness getting a "real good look" at his assailant in the headlights of a passing car). Officer McGinnis is a trained police officer and she was obviously paying close attention to Petitioner, as identifying potential suspects was one of the primary reasons for her being at the crime scene. In addition, her description of the perpetrator after the incident was consistent with Petitioner's appearance, and she stated under oath that she was very certain as to Petitioner's identity. (*See* N.T. 6/5/85, at 1.106, 1.109–1.110.) Although some time did pass between Officer McGinnis' apparent encounter with Petitioner and her trial testimony, we do not find this factor of greater import than the combination of the previous four factors supporting the reliability of her identification. Finally, even if the evidence were not so overwhelmingly in favor of finding Officer McGinnis' testimony reliable, we would nonetheless decline Petitioner's claim on the grounds that allowing the identification was harmless error. *See Foster v. California*, 394 U.S. 440, 444, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969) (applying harmless error analysis to challenged identification); *Emanuele*, 51 F.3d at 1131. Officer McGinnis' testimony amounted to only one of many independent sources of proof that Petitioner attacked Jewel Stevens, not the least of which was Petitioner's signed confession to that effect. In short, even if we found that Officer McGinnis' identification was impermissibly suggestive—which we do not—we would nonetheless deny Petitioner's claim on the grounds that such error in no way affected the outcome of his trial.

Petitioner's second subclaim, that Officer McGinnis testified falsely, is also totally unsupported and meritless. Petitioner cites no evidence, other than the fact that Officer McGinnis never identified Petitioner as the perpetrator prior to trial, that the witness knowingly falsified her testimony. Moreover, Officer McGinnis explained under oath that the prosecutor specifically instructed her "to be honest about [identifying Petitioner]." (N.T. 6/5/85, at 1.137.) Counsel cannot be found constitutionally ineffective for failing to raise a meritless claim. *See Strickland*, 466 U.S. at 691, 104 S.Ct. 2052 (finding that failure to pursue "fruitless" claims "may not later be challenged as unreasonable"). Without any evidence, we find Petitioner's claim that Officer McGinnis knowingly falsified her identification testimony meritless and trial counsel's failure to raise it irrelevant for purposes of determining if counsel was constitutionally effective.

Third, despite Petitioner's allegation to the contrary, we find that his trial counsel made reasonable attempts to impeach Officer McGinnis. He repeatedly attacked Officer McGinnis' credibility and objected to his own lack of notice regarding her testimony. During cross examination, trial counsel highlighted the fact that Officer McGinnis had never identified Petitioner as the attacker before that day, (*see* N.T. 6/5/85, at 1.109, 1.118–1.119) that Officer McGinnis was inconsistent regarding the distance from which she observed the alleged perpetrator, that she did not necessarily shine a light on the man's face, and that she only observed him for twenty seconds. (*See* N.T. 6/5/85, at 1.118-1.139.) Trial counsel also formally objected to the fact that Officer McGinnis had never identified Petitioner before trial and that her testimony was tainted as she had seen Petitioner in custody outside the courtroom multiple times before identifying him as the Victim's attacker. (*See* N.T. 6/6/85, at 2.14–2.15.) He further challenged Offi-

cer McGinnis' credibility in his closing argument. He pointed out that, despite her testimony that Petitioner wore only short sleeves on the night in question, Officer McGinnis failed to notice Petitioner's multiple arm tattoos or explain the lack of Petitioner's fingerprints at the scene. (*See* N.T. 6/11/85, at 5.71–5.74.) He questioned Officer McGinnis' ability to identify Petitioner in light of accounts that Jewel Stevens' attacker wore a mask. (*See id.*) Finally, trial counsel filed a post-trial motion objecting to the Commonwealth's lack of notice to Petitioner regarding Officer McGinnis' testimony. (*See* N.T. 2/7/86, at 8–10.) Trial counsel acted reasonably and conscientiously in his attempt to discredit one of the Commonwealth's most damaging witnesses. His actions were not the product of ineptitude, inexperience, or a lack of preparation, and his lack of success cannot be considered evidence of ineffectiveness. *See Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.

Trial counsel was also not ineffective for failing to introduce the police photo array reviewed by Officer McGinnis shortly after the incident. Officer McGinnis truthfully and correctly testified that Petitioner, the man she claimed to see fleeing the scene of the crime, was not included in the array. (*See* N.T. 6/5/85, at 1.121.) This testimony was potentially very damaging to Petitioner's case; any example of Officer McGinnis' consistency in identifying Petitioner as the perpetrator would buttress her credibility in the eyes of the jury. By failing to present the photo array, trial counsel made a valid strategic decision to focus on the witness' inconsistencies on cross examination, rather than to repeat to the jury

that she accurately recognized Petitioner's absence from the array.[64] In light of the facts available at trial, trial counsel acted reasonably in deciding to avoid discussing the photo array reviewed by Officer McGinnis. In short, counsel was not ineffective for failing to impeach Officer McGinnis' testimony, and therefore no cause exists for Petitioner's procedural default of such a claim.

Fourth, Petitioner's appellate counsel was likewise not constitutionally ineffective for failing to raise similar issues on appeal. As stated above, Petitioner's claim that Officer McGinnis' testimony was either unconstitutionally suggestive or knowingly false is without merit and therefore not acceptable grounds for an ineffectiveness of counsel claim. Furthermore, because trial counsel did attempt to impeach Officer McGinnis' identification testimony, appellate counsel cannot be considered ineffective for not claiming that trial counsel failed to do so. Appellate counsel's failure to object to the lack of notice provided to Petitioner regarding Officer McGinnis' appearance was also not unreasonable. Appellate counsel is not constitutionally required to raise every nonfrivolous issue on appeal, *see Jones,* 463 U.S. at 751, 103 S.Ct. 3308, and the fact that trial counsel's similar objection was denied is a valid reason for focusing appellate arguments on different, more promising issues. Appellate counsel also exercised valid judgment in refraining from introducing the photo array examined by Officer McGinnis after the incident. Following trial counsel's lead, appellate counsel avoided accidentally supporting the offi-

---

64. Petitioner claims that trial counsel's decision was unreasonable because Petitioner's photo was part of the array, and that the Commonwealth chose to misrepresent that fact at trial. (*See* Mem. Law Supp. Pet. Writ Habeas Corpus at 130 ("It is not plausible that [the Commonwealth] would not have included [Petitioner's] photograph in an array shown to a fellow police officer who was at the scene.").) No evidence exists to support this assertion, however, and we therefore refrain from entertaining it.

cer's credibility by demonstrating her consistency in identifying Petitioner. Finally, there are no grounds for finding prejudice against Petitioner as a result of appellate counsel's alleged ineffectiveness. At best, success in this claim would remove Officer McGinnis' identification testimony from the record. This does not, however, address the problem of Petitioner's signed confession, in which he detailed his activity inside and outside the Victim's apartment on the night of the murder. There is little or no chance, even if Petitioner's Claim IX were granted on the merits, that the outcome of his trial would have been different or even drawn into question. As a result, appellate counsel acted within the wide range of reasonable activity reserved for counsel under the Sixth Amendment. He satisfied his constitutional duty to represent Petitioner on direct appeal and therefore his activities represent neither cause nor prejudice for Petitioner's procedural default of his claims regarding Officer McGinnis' identification testimony. We therefore find that all of Petitioner's arguments in Claim IX are without merit and, in turn, outside the scope of federal review.

### 10. Claim X

In his Claim X, Petitioner challenges the trial court's jury instructions regarding the voluntariness of his confession, as well as that court's admission of officers' opinion testimony regarding Petitioner's choice to confess. Petitioner also maintains that his trial counsel was constitutionally ineffective for failing to present these issues. All of these arguments were raised on direct appeal to the Pennsylvania Supreme

Court, and are therefore reviewable here under § 2254(d) of the AEDPA.[65]

Section 2254(d) permits a federal court to grant a writ of habeas corpus on an issue previously decided in state court only if that state court decision was, as a matter of law, either contrary to, or an unreasonable application of, clearly established federal law. Questions of fact can be overturned in federal court only if prior adjudications were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Petitioner first argues that the voluntariness of his confession was at issue at trial and that the trial court failed to properly instruct the jury as to the appropriate standard for determining voluntariness. He makes no evidentiary showing, however, in support of this contention. He instead ostensibly relies on the Supreme Court's decision in *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), for the proposition that it is the "Commonwealth's burden to show that a confession is voluntary, and that determination is to be made by the jury." (Mem. Law Supp. Pet. Writ Habeas Corpus at 132.) *Lego*, however, makes it clear that a defendant is not necessarily entitled to a jury determination of voluntariness in cases where the court denied such a claim before trial, and that the Constitution does not require that a finding of voluntariness be made beyond a reasonable doubt for exclusionary rule purposes. *See Lego*, 404 U.S. at 489–90, 92 S.Ct. 619. Petitioner's confessions were challenged in a pre-trial suppression hearing. The trial court found the first

**65.** The Commonwealth argues that Petitioner's claim is not exhausted because the claim in state court was not presented as raising issues of federal law. We disagree. Petitioner's brief on direct appeal to the Pennsylvania Supreme Court cited numerous Supreme Court cases and demonstrated sufficient "reliance on pertinent federal cases employing constitutional analysis" to satisfy the exhaustion requirements for federal habeas review. *McCandless*, 172 F.3d at 261.

admissible, as it satisfied the voluntariness standard, and excluded the second. (*See* N.T. 5/30/85, at 271–74.)

On direct appeal, the Pennsylvania Supreme Court determined that this adjudication satisfied Petitioner's right to due process, and therefore found that the trial court's failure to instruct the jury on the proper standard of review for establishing voluntariness did not constitute reversible error. In denying Petitioner's claim, the court found that there "must be some relationship between the law upon which an instruction is required and the evidence presented at trial," and determined that "[i]n the instant case, however, the record simply did not contain anything providing a basis for belief that [Petitioner's] confessions were involuntary ... Under the circumstances, there was no basis in the record to support charging the jury on the voluntariness of [Petitioner's] confessions." *Holland I*, 543 A.2d at 1071–72; *see also Commonwealth v. Motley*, 472 Pa. 421, 372 A.2d 764, 768 (1977) (finding that the issue of voluntariness can be presented to jury through introduction of evidence even after suppression hearing disposed of issue). We agree. Under the AEDPA, we must defer to all state court findings of fact and applications of Supreme Court precedent that are not "objectively unreasonable." [66] *See Williams*, 120 S.Ct. at 1521. We do not find that the Pennsylvania Supreme Court acted unreasonably in light of their factual findings and interpretation of *Lego*. Petitioner was granted an appropriate forum to challenge the admissibility of his confession, and presented no evidence after that adjudication to justify reopening that issue before the jury. He has likewise not presented this Court with any evidence to demonstrate that the state court factual findings regarding his confes-

sion were unreasonable. Trial courts are not required to instruct juries on matters not before them. *See, e.g., United States v. Sebetich*, 776 F.2d 412, 422 n. 16 (3d Cir.1985). As a result, we find the Pennsylvania Supreme Court acted reasonably in rejecting Petitioner's contention, and must therefore deny it ourselves.

Petitioner also asserts that the trial court erred in permitting two police officers to testify to the voluntariness of Petitioner's admitted confession, and contends that his trial counsel was ineffective for failing to object to the error. Petitioner argues that the presentation of the two officers' testimony amounted to an improper legal conclusion by an expert witness. In denying his claim, the Pennsylvania Supreme Court found that, since Petitioner had not presented any evidence to bring the voluntariness of his confession into issue at trial, that the officers' testimony amounted to "opinions of lay witnesses on a matter not in issue, and, consequently, the opinions were necessarily harmless in their effect." *Holland I*, 543 A.2d at 1072. The court also rejected Petitioner's contention that the trial court's instruction regarding the proper consideration of expert testimony may have confused the jury into treating the police officers as expert witnesses, finding such a position "patently without merit" on the grounds that the trial court specifically listed the witnesses who were to be considered experts and did not include either of the two officers in that list. *Id.* at 1073. We find that the Pennsylvania Supreme Court was not unreasonable in denying Petitioner's claim. As mentioned above, Petitioner presented no evidence of involuntariness at trial, nor was he able to support his theory of jury confusion beyond mere conjecture. Because the Pennsylvania Supreme Court's

---

**66.** We do not address the "contrary to" clause of § 2254(d) because Petitioner cites no Supreme Court cases in support of such a contention and we find none ourselves.

decision was neither contrary to, nor an existing application of, existing Supreme Court precedent, we uphold its decision and deny Petitioner a writ of habeas corpus pursuant to his Claim X.

Finally, with respect to his ineffective assistance of trial counsel claim, we find that Petitioner's counsel was not deficient in representing Petitioner. Contrary to Petitioner's account of the record, his trial counsel did in fact object to the officers' testimony regarding voluntariness, and was overruled. (*See* N.T. 6/6/85, at 2.49–2.50; N.T. 6/10/85, at 4.4–4.5.) This attempt to prevent the Commonwealth from presenting evidence of voluntariness cannot be considered ineffective assistance. Counsel did precisely what any reasonable advocate would have done in his position. This, in addition to the fact that we find Petitioner's underlying claim meritless, forces us to reject his assertion that his trial counsel was constitutionally ineffective.

### 11. *Claim XI*

In Claim XI, Petitioner makes a blanket assertion that his trial counsel was constitutionally ineffective for failing to either raise or properly litigate those issues presented in his previous ten claims. Since we addressed Petitioner's ineffective assistance arguments with respect to Claims I–X individually, we refrain from repeating our analyses here. Petitioner's Claim XI is therefore denied in accordance with our above conclusions.

### 12. *Claim XII*

Claim XII argues that Petitioner is entitled to habeas relief on the basis of the cumulative effects of the constitutional errors in his case. Since we have already identified a ground on which to grant Petitioner's resentencing, we find that such a collective consideration is unnecessary and would be inconsequential to our ultimate conclusion. Were we to do so we would not, in the absence of the ground upon which we are granting relief, find that the cumulative effect of the other grounds warranted relief.

## IV. CONCLUSION

For the foregoing reasons, we vacate Petitioner's death sentence and remand to the Pennsylvania courts for the purpose of resentencing Petitioner. Petitioner presented twelve claims for habeas corpus relief, each of which consisted of multiple subclaims and arguments. We find that one of these issues has merit. In his Claim II, Petitioner correctly argues that he was improperly denied his Fifth Amendment right to a court-appointed defense expert for assistance in developing mental health defenses at both the guilt and penalty phases of his state trial. Petitioner was particularly concerned, as are we, that such a denial interfered with his ability to present evidence in support of mitigation at sentencing. The severity and permanence of the death penalty cautions us to consider very carefully the effect of any errors in Petitioner's legal process. Society's right to levy the ultimate penalty must be conditioned on a commitment to reliability in assigning that penalty. Therefore, in light of the constitutional errors associated with the penalty phase of his state murder trial, we conclude that the death penalty is improperly supported in Petitioner's case, and remand it to the state courts for resentencing.

It is so ordered.